UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID F. JADWIN, D.O.,<br><br>                   Plaintiff,<br><br>        v.<br><br>COUNTY OF KERN; PETER BRYAN (BOTH individually and in his former capacity as Chief Executive Of Kern Medical Center); IRWIN HARRIS, M.D.; and DOES 1 through 10, inclusive,<br><br>                   Defendants. | 1:07-CV-00026-OWW-DLB<br><br>MEMORANDUM DECISION AND ORDER RE DEFENDANTS' AND PLAINTIFF'S CROSS-MOTIONS FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT |

## I. INTRODUCTION

Before the court are cross-motions for summary judgment or, in the alternative, partial summary judgment, brought by Plaintiff David F. Jadwin, D.O. ("Plaintiff") and, collectively, by Defendants County of Kern ("County"), Peter Bryan ("Bryan") and Irwin Harris ("Harris"), M.D., on all eleven claims in Plaintiff's Second Amended Complaint. The following background facts are taken from the parties' submissions in connection with the motions and other documents on file in this case.[1]

---

[1] In support of their cross-motions for summary judgment or, in the alternative, partial summary judgment, the parties submitted over 3000 pages of materials.

1

This case arises out of Plaintiff's former employment with Kern County. Plaintiff worked at the Kern Medical Center ("KMC"), an acute care teaching hospital owned and operated by the County. As of October 2000, Plaintiff, a pathologist, served as the Chair of KMC's Pathology Department. According to his employment contract with the County, his chairmanship was a full-time position. Throughout his employment, while undoubtedly dedicated to his work, Plaintiff engaged in several disagreements and/or confrontations with his fellow colleagues on a variety of issues. For example, in August 2003, during a conversation with another physician, Plaintiff grabbed the physician's necktie and pulled him into the hallway. Plaintiff apologized for this incident.

Plaintiff's lawsuit stems from the events surrounding his eventual removal from his chairmanship position and the non-renewal of his employment contract with the County. The following events are central:

(1) On July 10, 2006, upon the recommendation of Bryan, KMC's then Chief Executive Officer, the Joint Conference Committee ("JCC") voted to remove Plaintiff from his chairmanship. This vote came after Plaintiff had taken a medical leave of absence.

(2) Subsequently, in light of his removal from the chairmanship, Plaintiff executed an amendment to his employment contract which reduced his base salary.

(3) After working for the County under this amended agreement, Plaintiff was involuntarily placed on paid administrative leave pending resolution of a personnel

matter. Plaintiff remained on paid administrative leave until his employment contract expired, and the County did not renew Plaintiff's employment agreement.

Plaintiff attributes these events – his removal from the chairmanship and the associated reduction in salary, his involuntary paid administrative leave, and the non-renewal of his contract – to illegal motives which violate several state and federal employment laws.

## A. The Removal From The Chairmanship And Preceding Events

On October 24, 2000, Plaintiff signed an employment contract with the County. The term of Plaintiff's employment was set to expire on November 30, 2006. On October 5, 2002, Plaintiff executed a second employment contract which called for a term ending October 4, 2007. The contract provided that, as a Core Physician, Plaintiff must perform certain services as set forth in Exhibit A. According to Exhibit A, Plaintiff, in his role as Pathology Chairman, was expected to serve as the medical director for the anatomic pathology service and clinical laboratories at KMC, and report to the KMC Medical Director. Exhibit A explains that "[t]his is a full-time position requiring 48 hours of service, on average, per week." (Doc. 266 at 27.)

On October 12, 2005, Plaintiff presented at an intra-hospital conference called the "Tumor Conference." According to Plaintiff, his presentation dealt with the medical appropriateness of a proposed radical hysterectomy for a KMC patient. Plaintiff believed the proposed hysterectomy was based on inaccurate pathology reports from outside reviewers and Plaintiff suggested that internal review of such outside work be conducted.

1    Following the conference, Harris, Chief Medical Officer,
2    received three letters of dissatisfaction from physicians who were
3    in attendance – Drs. Scott Ragland, Jennifer Abraham, and Bill
4    Taylor.  In a letter dated October 17, 2005, Plaintiff was informed
5    that his "repeated misconduct at the Tumor Conference on October
6    12, 2005 was noted by numerous attendants, three of which have
7    written letters of their dissatisfaction, which will be entered
8    into your medical staff file.  You exceeded your time reasonably
9    allotted for the presentation of pathologic findings, you ignored
10   the requests of the leader of the conference to be brief, and you
11   became so detailed in trying to make your political point, that you
12   lost the audience and failed to meet the teaching objective of the
13   conference for the benefit of the residents."  (Doc. 266 at 129.)
14   Plaintiff did not believe that the criticism was justified.

15       A few months later, Plaintiff took a leave of absence in the
16   form of a reduced work schedule.  (Doc. 278 at 23).  In a letter to
17   Bryan dated January 9, 2006,[2] Plaintiff requested a leave of
18   absence in light of "depression" he had developed as a result of
19   alleged professional mistreatment and harassment:

20       During the past five years I have performed impeccable
         service for KMC each and every day. Virtually every
21       interaction I have had with hundreds of KMC associates
         has been professional, respectful and courteous.  I have
22       always performed or tried to perform my duties in a
         virtuous and ethical manner.   I have received high
23       performance ratings from staff and residents on
         departmental evaluations.
24
         Over the past several years I have been the victim of
25       professional mistreatment by a few members of the medical
26
27       [2] The letter is actually incorrectly dated January 9, "2005."
     According to Plaintiff, it is supposed to be dated January 9,
28   "2006." (Pl. Dep. Vol. II. 496:9-20.)  No party disputes this fact.

                                  4

staff. You are aware of these instances, as they have been discussed during multiple hospital leadership meetings and during our one-to-one meetings. I do not consider these to be directly as a result of communication failures on my part, but rather inappropriate harassment by a small group [of] individuals. I believe this harassment is in response to the many quality management issues that I have raised.

This harassment has led me [sic] develop depression and insomnia that has impacted my health and work. Although I enjoy much of my work at KMC, it is not possible for me to continue to work under this form of harassment. These issues largely have gone unresolved for years in spite of multiple requests from me for action. The most recent issue involving the October Oncology Conference is to date still unresolved.

This form of harassment is unacceptable and must be resolved quickly. I therefore request administrative leave with pay until this issue is resolved. It is my wish to resolve this issue immediately, and I request that you correct this hostile environment immediately.

(Doc. 266 at 133.) It is undisputed that, on January 9, 2006, Plaintiff asked Bryan to allow Plaintiff to work part-time and at home while Plaintiff was recovering from his disabling depression. (Doc. 278 at 28.)

On January 13, 2006, Plaintiff's psychiatrist, Paul Riskin, completed a form entitled "Certification of Health Care Provider Medical Leave of Absence." The form states that Plaintiff's medical condition or need for treatment commenced on "12-16-05" and the "probabl[e] duration of medical condition or need for treatment" is "2-3 mo." Plaintiff's probable return date was listed as "3-16-06." (Doc. 270 at 4.) On the form, Riskin identified his practice as "psychiatry" and certified that Plaintiff had a serious health condition. (*Id.*) He wrote that "it is my hope that 1-2 work days should be a reasonable schedule for a period of 2-3 months" and "Patient should work 1-2 days per week." (*Id.*) From the facts,

it remains unclear whether the County actually received this form on January 13, 2006.

On or about March 2, 2006, Plaintiff submitted a "Kern County Personnel Department Request For Leave Of Absence" form on which Plaintiff checked the box "Initial Request." (Doc. 270 at 6.) He requested a leave of absence from "12-16-05" to "3-15-06." (*Id.*) Under the section entitled "Mandatory Leave FMLA/CFRA" Plaintiff requested "Intermittent-Employee" leave. (*Id.*) He indicated that he had a physician's note.

In a letter entitled "DESIGNATION OF LEAVE (Serious Health Condition of Employee-Intermittent)," dated March 2, 2006, Sandra Chester from Human Resources ("HR") informed Plaintiff that HR had been notified of his request for leave and, as HR understood it, Plaintiff intended for his leave to commence on December 16, 2005, and end on March 15, 2006. (Doc. 259-6 at 6.) The letter also stated that "[b]ased on the information available to us, it appears that you are eligible for a leave under FMLA/CFRA. Unless we provide you with information that your leave has not been approved or that we are withdrawing our FMLA/CFRA designation, the requested leave will count against your FMLA/CFRA entitlement." (*Id.*) On March 13, 2006, Plaintiff's request for leave was approved, i.e., Plaintiff's Request For Leave Of Absence form was marked as "approved" and signed. (Doc. 259-6 at 5.) It is undisputed that Plaintiff took a reduced schedule CFRA medical leave from December 16, 2005, to March 15, 2006. (Doc. 278 at 23.)

On the day he was due back, March 16, 2006, Plaintiff wrote an e-mail to Bryan with the subject line "Leave of Absence." (Doc. 265 at 39.) In his e-mail, Plaintiff stated he would be taking a few

more months of leave:

> I will be taking you (sic) suggestion and take 2 to 3 more months of leave. I am scheduled to have surgery on March 22, 2006 with a several week recovery time. I hope that appropriate LT coverage has been scheduled to assist Phil and Savita with the service work. It is quite demanding and they both appeared to be overworked when I last saw them.

(*Id.*) In a letter dated April 20, 2006, Chester informed Plaintiff that his "Intermittent Leave of Absence expired on March 15, 2006. . . . [T]o extend your leave, you . . . need to complete the enclosed Request for Leave of Absence form and return it to the Human Resources Office, no later than Tuesday April 25, 2006." (Doc. 259-6 at 10.)

In response, Plaintiff submitted a Request For Leave Of Absence form dated April 26, 2006. (Doc. 259-6 at 11.) Plaintiff checked the box for "Extension Request" and requested a leave of absence extension from "3/15/06" to "9-15-06" with a return date of "9-16-06." (*Id.*) Plaintiff indicated he was requesting FMLA/CFRA leave for "non-Job Related/Illness or Disability" and had an accompanying physician's note. (*Id.*)

Plaintiff's accompanying physician's note, another "Certification of Health Care Provider Medical Leave of Absence" form completed by Riskin, is dated April 26, 2006. (Doc. 259-6.) Riskin wrote that, "[t]his employee is unable to work full time and requires part-time or less to avoid worsening of his serious medical condition." (*Id.*) Riskin estimated that Plaintiff would need "weekly doctor's visits" and "treatment for 6 Mo. to one year." (*Id.*)

On April 28, 2006, Plaintiff had a meeting with Bryan, Karen Barnes (County Counsel) and Steve O'Conner from HR about

**7**

Plaintiff's leave of absence.  Bryan composed an Officer Memorandum (dated April 28, 2006) purportedly summarizing the meeting.  In the memorandum, Brian states:

> I provided you [Plaintiff] with the summary of your medical leave history (see attached).  This packet contained the calculations and policies related to how the County of Kern handles medical leaves.  In essence, you have 137 hours available to be taken before you hit the 480-hour limitation.  Medical Leaves also run for a maximum of six months so this criterion sets June 16, 2006 as the last day available to you under this status.  You said that you did not have any questions and I referred you to Human Resources, Steve O'Conner, should you have any questions about how to interpret the leave provisions.
>
> You also mentioned that you were scheduled to work on Monday May 1, 2006 and asked if I wanted you to be present.  You also indicated that from that day, you would be out until further notice.  I left the option of working on Monday to you and asked that you coordinate with Dr. Dutt about coverage.  I also mentioned that after Monday it would be preferable for you not to have an intermittent work schedule and it would be easier on the department to just have you on leave until your status is resolved.
>
> Finally, I said that by June 16, 2006 you needed to give me your decision about your employment status.  Your options were to either return full time or resign your position.  As chairman, your department and the hospital needs you here full time.  You indicated that you understood the deadline.

(Doc. 259-6 at 15.)  The parties dispute whether Bryan, in Plaintiff's words, "forced" Plaintiff to take full-time leave after May 1, 2006, or whether Bryan proposed full-time leave.  At his deposition, Bryan testified as follows regarding the conversion of Plaintiff's leave from part-time to full-time:

> Q.   Okay. So you made the decision that Dr. Jadwin should be on intermittent work schedule, instead, to full-time leave, correct?
>
> A.   No, what I indicated [in his memorandum] was it would be preferable, which infers a decision.

Q.   Okay.

A.   And if I am not mistaken, Dr. Jadwin made a decision not to be present.

Q.   Okay.

A.   There was no dialogue back from Dr. Jadwin that said, no, I still want to continue the intermittent schedule that I recall.

Q.   At the meeting or otherwise?

A.   Correct.

Q.   Okay. You didn't say either way, actually, whether he wanted to go on full-time leave or not, did he?

A.   Not to my recollection.

(Bryan Dep. 250:15-251:6.) Plaintiff recalls the situation a bit differently.   Plaintiff testified at his deposition that "Bryan told me to stop going on – working on a one-to-two day schedule per week and to make my leave full time so I could exhaust it as soon as possible." (Pl. Dep. Vol. V. 854:24-855-2.)  Plaintiff testified that he was allowed part-time leave "until April, when Mr. Bryan told me that he wanted me to go on full-time leave so that I would use my leave faster." (Pl. Dep. Vol. V. 983:23-984:1.)

While on full-time leave, in a letter dated May 31, 2006, Plaintiff wrote to Bryan to request an extension of time to make a decision regarding his continued employment:

As you know, you have requested that I give you my decision by June 16 as to whether I will be continuing on in or resigning from my position at the hospital. Unfortunately, I underwent sinus surgery in early May which took some time to recover from. Then last Monday, I suffered a serious fall that fractured my foot and avulsed a ligament from my ankle.

I would greatly appreciate an extension on the June 16 deadline as my personal circumstances of late simply have not permitted me to consider and render such an important decision.

**9**

(Doc. 259-7 at 2.) In response, Bryan e-mailed Plaintiff on June 13, 2006, and sent a hard copy letter on June 14, 2006. The letter reads as follows:

> I was sorry to hear of your accident. It seems as though it has been one thing after another for you and I can imagine your growing frustration with not being healthy.
>
> My response to your request for an extension of leave has two parts to it. First, I will grant you a Personal Necessity Leave of up to 90 days. This is predicated on your providing a physician's note indicating the ailment. This is common practice with the County and I want to make sure that we are consistent in following policy.
>
> This extension of leave, however, applies only to your employment status. It does not apply to your appointment as chairman and the associated duty assignments, which brings me to the second part of this extension. You have essentially been out either full - or part-time for the past eight or nine months. You have used all of your vacation and sick time in addition to being in a non-pay status for six months, and while I understand the circumstances, it does not diminish the fact that the Department of Pathology needs a full-time chairman. For this reason, I am going to enact the provisions of the Medical Staff Bylaws, Paragraph 9.6-4, REMOVAL, and rescind your appointment as chairman. I regret that I have to do this but KMC is going through some challenging times and we need a full complement of leaders. Your continued unavailability creates a void that must be filled. This decision is effective June 17, 2006.
>
> The obvious question that I am sure comes to mind is, 'what does this mean for me?' This essentially means that should you decide to return to work at KMC either within this 90-day period or at the end of it, your contract will be changed to reflect a regular staff pathologist duty assignment. The amount of time you spend will be mutually agreeable, but your duties will not include those of the chairman.

(Doc. 259-7 at 3.) In a memorandum he drafted to the JCC dated July 10, 2006, Bryan requested that the Committee endorse his recommendation to rescind Plaintiff's appointment as Chairman of the Pathology Department. Article IX, section 9.7-4 of the KMC bylaws provides that "[r]emoval of a department chair may occur

10

with or without cause upon recommendation of the chief executive officer with a majority vote of the Joint Conference Committee." (Doc. 259-3 at 22.) In explaining his recommendation, Bryan wrote, among other things: "This recommendation to rescind Dr. Jadwin's appointment as Chairman, Department of Pathology is based solely on his continued non-availability to provide the leadership necessary for a contributing member of the medical staff leadership group." (Doc. 266-2 at 32.) The Committee endorsed Bryan's recommendation by a majority vote and Plaintiff lost his chairmanship on July 10, 2006. (Doc. 266-2 at 29.)

## B.    Reduction In Salary

Before he returned from his Personal Necessity Leave, Plaintiff signed an amendment to his employment contract. (Doc. 259-11 at 10-12.) On September 15, 2006, the County's counsel and Plaintiff's attorney[3] communicated regarding the amendment to Plaintiff's employment contract. In an e-mail dated September 15, 2006, from Barnes (the County's counsel) to Eugene Lee (Plaintiff's counsel), Barnes attached a copy of the proposed amendment and stated: "As I mentioned, the amendment, which must be approved by the Kern County Board of Supervisors before Jadwin can begin to work, reflects changes to the base salary and the job duties consistent with Dr. Jadwin's change in status from department chair to staff pathologist." (Doc. 267 at 19.)

Plaintiff executed an amendment to his employment contract, dated October 3, 2006. (Doc. 259-11 at 10-11.) The end date of his employment term (October 4, 2007) remained unaltered. The

---

[3]  **By then, Plaintiff had retained counsel.**

amendment did, however, effectuate a reduction in Plaintiff's base salary and a revision of his job duties.

## C. Paid Administrative Leave And Non-Renewal Of Plaintiff's Contract

After executing his amended employment contract and after his Personal Necessity Leave had expired, Plaintiff returned to work as a staff pathologist. Thereafter, Plaintiff, for the first time, reported various concerns he was having to outside authorities, including the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), the College of American Pathologists ("CAP"), and the California Department of Health Services ("DHS"). (Doc. 272-2 at 5.) These outside reports dealt with a host of issues including "[l]ost and incomplete product chart copies related to blood transfusion" and "[s]torage of calvarium bone flaps for reimplantation in unsafe storage and without state tissue bank license." (*See, e.g.*, Doc. 260-2 at 22.)

According to the County, Plaintiff's confrontational behavior after he came back from Personal Necessity Leave was worse than before. (Doc. 262 at 27.) On December 7, 2006, David Culberson, the Interim CEO, sent a hand delivered letter to Plaintiff informing Plaintiff that he was being placed on paid administrative leave effective immediately. (Doc. 259-10 at 39.) The letter indicated that he would remain on paid leave pending resolution of a personnel matter. In a letter to David Culberson dated December 13, 2006, Plaintiff informed hospital administration that he had notified outside authorities of alleged violations. (Doc. 265 at 79; Doc. 278 at 6.)

Plaintiff remained on paid administrative leave for the

remainder of his employment term, i.e., until October 4, 2007, and the County did not renew his contract. It is undisputed that, to this day, Plaintiff has not personally received an explanation from Defendants as to why he was placed on administrative leave or why his contract was not renewed despite repeated requests for an explanation. (Doc. 278 at 7.)

**D.    Plaintiff's Lawsuit**

Before his contract term expired, on January 6, 2007, Plaintiff filed his first Complaint in this action. (Doc. 2.) Five counts alleged violations of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12900 et seq, and two counts alleged violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et seq. After engaging in discovery, Plaintiff filed a Second Amended Complaint and added claims for retaliation under the FEHA and the FMLA on the theory that Plaintiff's employment contract was not renewed because he brought an action against Defendants alleging FEHA and FMLA violations. (Doc. 241.)

The operative complaint, Plaintiff's Second Amended Complaint, contains eleven counts. Plaintiff asserts a claim for: (1) retaliation in violation of California Health & Safety Code § 1278.5; (2) retaliation in violation of California Labor Code § 1102.5; (3) retaliation in violation of the California Moore-Brown-Roberti Family Rights Act ("CFRA"); (4) interference with FMLA rights; (5) a violation/denial of CFRA rights; (6) disability discrimination in violation of the FEHA; (7) a failure to provide reasonable accommodation for an alleged disability (depression) in violation of the FEHA; (8) a failure to engage in the interactive

13

process in violation of the FEHA; (9) a violation of the 14th Amendment's procedural due process clause via 42 U.S.C. § 1983; (10) retaliation in violation of the FMLA; and (11) retaliation in violation of the FEHA. All counts are asserted against the County. Plaintiff's ninth count is asserted against Bryan and Harris. Plaintiff alleges that, pursuant to 28 U.S.C. § 1331, federal question jurisdiction exists over his federal claims and that, pursuant to 28 U.S.C. § 1367, supplemental jurisdiction exists over his state law claims.

### III.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment and a motion for partial summary judgment (sometimes called summary adjudication) are governed by the same standards. *California v. Campbell*, 138 F.3d 772, 780-81 (9th Cir. 1998); *Costa v. Nat'l Action Fin. Servs.*, No. CIV S-05-2084 FCD/KJM, 2007 WL 4526510, at *2 (E.D. Cal. Dec. 19, 2007). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. A party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at

trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *see also S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (noting that a party moving for summary judgment on claim as to which it will have the burden at trial "must establish beyond controversy every essential element" of the claim) (internal quotation marks omitted). With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Id.*

To defeat a motion for summary judgment, the non-moving party must show there exists a *genuine* dispute (or issue) of *material* fact. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

15

*Id.* at 248. In ruling on a motion for summary judgment, the district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

"[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). And simply because the parties present cross-motions for summary judgment does not mean that there must be a winner:

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (internal citation omitted).

**IV. DISCUSSION AND ANALYSIS**

**A.** **Retaliation – California Health & Safety Code § 1278.5[4]**

As amended, Section 1278.5 of the California Health & Safety Code provides in pertinent part:

> (a) The Legislature finds and declares that it is the public policy of the State of California to encourage patients, nurses, members of the medical staff, and other health care workers to notify government entities of suspected unsafe patient care and conditions. The Legislature encourages this reporting in order to protect

---

[4] **Several of Plaintiff's claims under Health & Safety Code § 1278.5 are barred as explained in the order on Defendants' motion for judgment on the pleadings. (Doc. 310.) Because at least one claim remains, discussion and analysis is required.**

patients and in order to assist those accreditation and government entities charged with ensuring that health care is safe. The Legislature finds and declares that whistleblower protections apply primarily to issues relating to the care, services, and conditions of a facility and are not intended to conflict with existing provisions in state and federal law relating to employee and employer relations.

(b)(1) No health facility shall discriminate or retaliate, in any manner, against any patient, employee, member of the medical staff, or any other health care worker of the health facility because that person has done either of the following:

(A) Presented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity.

(B) Has initiated, participated, or cooperated in an investigation or administrative proceeding related to, the quality of care, services, or conditions at the facility that is carried out by an entity or agency responsible for accrediting or evaluating the facility or its medical staff, or governmental entity.

(2) No entity that owns or operates a health facility, or which owns or operates any other health facility, shall discriminate or retaliate against any person because that person has taken any actions pursuant to this subdivision.

. . . .

(d)(2) For purposes of this section, discriminatory treatment of an employee, member of the medical staff, or any other health care worker includes, but is not limited to, discharge, demotion, suspension, or any unfavorable changes in, or breach of, the terms or conditions of a contract, employment, or privileges of the employee, member of the medical staff, or any other health care worker of the health care facility, or the threat of any of these actions.

As currently worded, "[t]he statute prohibits retaliation against any employee who complains to an employer or a government agency about unsafe patient care or conditions." *Mendiondo v.*

17

*Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1105 (9th Cir. 2008). To establish a prima facie case of retaliation under § 1278.5, a plaintiff must show that: (1) he engaged in protected activity under the statute; (2) he was thereafter subjected to an adverse employment action; and (3) a causal link between the two. *See id.*

      1.  <u>Retroactive Application Of § 1278.5</u>

Plaintiff's briefing in connection with the cross-motions for summary judgment and his opposition brief to Defendants' motion for judgment on the pleadings reveals that Plaintiff is attempting to assert whistleblower claims under the amended version of § 1278.5.

Section 1278.5 was amended effective January 1, 2008, well after Plaintiff's employment with the County ended. All of the alleged whistleblowing and retaliation in this case preceded January 1, 2008. In his opposition brief to Defendants' motion for judgment on the pleadings, Plaintiff argued, "[b]oth whistleblower statutes which Plaintiff is suing under – Labor Code § 1102.5 and Health & Safety Code § 1278.5 — expressly provide that an employee's reports to his public employer constitute whistleblowing. H&S § 1278.5(b)(1)(A); Labor C. § 1102.5(e)." (Doc. 293 at 5.) Plaintiff's citation to "H&S § 1278.5(b)(1)(A)" is a reference to the new version of the statute. The old version of the statute, which was in effect from January 1, 2000 to December 31, 2007, did not contain this section (i.e., (b)(1)(A)). *See* Cal. Health & Safety Code § 1278.5 (Deering's Supp. 2000).

The main substantive provision of Health & Safety Code § 1278.5 that existed during Plaintiff's employment with the County reads as follows:

No health facility shall discriminate or retaliate in any

18

> manner against any patient or employee of the health facility because that patient or employee, or any other person, has presented a grievance or complaint, or has initiated or cooperated in any investigation or proceeding of any governmental entity, relating to the care, services, or conditions of that facility.

Health & Safety Code § 1278.5(b)(1) (Deering's Supp. 2000). As stated in a previous order, see *Jadwin v. County of Kern*, No. 1:07-CV-00026, 2009 WL 530084-OWW-TAG, at *3 (E.D. Cal. Mar. 2, 2009), a comparison between the old and new version of Health & Safety Code § 1278.5 reveals several textual changes, including:

> • The new version prohibits retaliation by an "entity that owns or operates a health facility, or which owns or operates any other health facility" (such as the County) and not just retaliation by the health facility at issue.
>
> • The new version explicitly prohibits retaliation against any "member of the medical staff" or "any other health care worker of the health facility." The old version prohibited retaliation against "any patient or employee of the health facility."
>
> • The new version applies to a "grievance, complaint, or report" presented to a party enumerated in the statute. The old version applies only to a "grievance or complaint."
>
> • The new version of the statute augmented the potential remedies which now (but did not previously) include "any remedy deemed warranted by the court pursuant to this chapter or any other applicable provision of statutory or common law."

In light of the statute's textual changes and their potential impact on this case, the parties were requested to file supplemental briefing to address whether the amended version of the statute applied in this case, and, if not, whether Plaintiff's § 1278.5 claims survived. *See Jadwin*, 2009 WL 530084 at *4. In his supplemental briefing, Plaintiff argues that, notwithstanding all the textual changes, the amended version of § 1278.5 merely clarified the original meaning of the statute and, as such, it can

19

be applied in this case. Citing *Mendiondo*, Plaintiff suggests that the Ninth Circuit has already determined that the amended version of the statute applies to whistleblowing and retaliation that occurred prior to its enactment into law.

In essence, in *Mendiondo* a nurse who worked at a hospital complained to the hospital's Chief Executive Officer and a supervisor about unsafe patient care and conditions at the facility. 521 F.3d at 1101. She alleged she was retaliated against for doing so. *Id*. All the alleged whistleblowing and retaliation in that case occurred before the amended version of § 1278.5 went into effect on January 1, 2008. The appellate briefing (2006 WL 3623387, 2007 WL 870285, 2007 WL 1407246) also predated January 1, 2008. The Ninth Circuit's decision was issued after January 1, 2008, and the court applied the amended version of the statute. In *Mendiondo*, the court cited to § "1278.5(b)(1)(A),(g)." 521 F.3d at 1105. This is a reference to the new version of the statute as the old version did not contain "(b)(1)(A)."

Although the Ninth Circuit apparently applied the new version of the statute in *Mendiondo*, there is no indication that the court, *sub silentio*, determined that the statute contained amendments which merely clarified existing law. Plaintiff's argument to the contrary is erroneous. No party made any such argument in *Mendiondo* so the issue was not before the court.

"In deciding the amendment's application, [a court] must explore whether the amendment changed or merely clarified existing law. A statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its enactment." *Carter v. Cal. Dep't Of Veterans Affairs*, 38 Cal. 4th

914, 922 (2006).  If an amendment merely clarifies, rather than changes, existing law, applying the amendment to transactions that predate its enactment is not problematic "because the true meaning of the statute has not changed." *In re S.B. v. S.M.*, 32 Cal. 4th 1287, 1296 (2004).  Indeed, if the amendment merely clarified, rather than changed, existing law, "liability would have existed at the time of the actions" that predate the amendment.  *McClung v. Employment Dev. Dep't*, 34 Cal. 4th 467, 472 (2004).  "An amendment which merely clarifies existing law may be given retroactive effect even without an expression of legislative intent for retroactivity."  *Negrette v. Cal. State Lottery Comm'n*, 21 Cal. App. 4th 1739, 1744 (1994).  The parties agree that, with respect to the new version of § 1278.5, there is no expression of legislative intent for retroactivity.

To determine whether a particular amendment clarified or changed the law, California courts consider whether the prior version of the statute "could not have been properly construed" to include the content of the amendment. *Carter*, 38 Cal. 4th at 924. The Legislature's declaration of what they intended by the prior statute is entitled to consideration, but it is not controlling, and simply stating that an amendment "clarified" the prior statute is not determinative:

> It is true that if the courts have not yet finally and conclusively interpreted a statute and are in the process of doing so, a declaration of a later Legislature as to what an earlier Legislature intended is entitled to consideration. But even then, a legislative declaration of an existing statute's meaning is but a factor for a court to consider and is neither binding nor conclusive in construing the statute. This is because the Legislature has no authority to interpret a statute. That is a judicial task. The Legislature may define the meaning of statutory language by a present legislative enactment which, subject to constitutional restraints, it

21

> may deem retroactive. But it has no legislative authority simply to say what it *did* mean. A declaration that a statutory amendment merely clarified the law cannot be given an obviously absurd effect, and the court cannot accept the Legislative statement that an unmistakable change in the statute is nothing more than a clarification and restatement of its original terms.

*McClung*, 34 Cal. 4th at 473 (internal citations and quotation marks omitted). At times, material changes in the language of a statute "may simply indicate an effort to clarify the statute's true meaning" such as when "the Legislature promptly reacts to the emergence of a novel question of statutory interpretation." *Carter*, 38 Cal. 4th at 923 (internal quotation marks omitted). The Legislature did not deem the amendment to § 1278.5 as an emergency measure.

While the new version of the statute contains numerous textual changes, three of them, which are relevant here, merit discussion.

First, the old version of the statute outlawed discrimination or retaliation by a "health facility." The new version of the statute states that "[n]o entity that owns or operates a health facility, or which owns or operates any other health facility, shall discriminate or retaliate against any person because that person has" engaged in protected whistleblowing. § 1278.5(b)(2). In Plaintiff's complaint he alleges, and the evidence shows, that he was employed by the County and worked at KMC, a hospital which is "owned and operated" by the County. KMC, the health facility, is not a named party to this lawsuit. Under the old version of the statute, the health facility was liable for discrimination and retaliation. Under the new version, both the health facility (KMC) and the entity which owns or operates the health facility (the

22

County) can be liable for discrimination and retaliation.

Second, the old version of the statute protected "any patient or employee of the health facility" from discrimination or retaliation. In Plaintiff's complaint he alleges, and the evidence shows, Plaintiff was an employee of the County, not of KMC. The new version of the statue protects any "patient, employee, member of the medical staff, or any other health care worker of the health facility" from discrimination or retaliation. As revealed in his pleadings, and the evidence shows, Plaintiff was on the medical staff of KMC.

Third, the old version of the statute came into play when an employee or patient of the health facility "presented a grievance or complaint." The new version of the statute applies when a protected party has "presented a grievance, complaint, *or report*." §1278.5(b)(1)(A) (emphasis added). As alleged in the pleadings, Plaintiff claims he made protected "reports." (Doc. 241 at 31.) In his summary judgment briefing, Plaintiff repeatedly refers to his protected activity in terms of a report.

If the aforementioned amendments constitute clarifications to existing law, no problem, in terms of retroactive application, is generated.

a.  <u>Entities That Own And Operate A Health Facility</u>

The old version of the statute said nothing about entities that own or operate a health facility. The text of the old version prohibited a "health facility" from engaging in certain conduct and created liability for the health facility. That the old version only imposed liability on health facilities is further buttressed

23

by the introductory section to the bill that created § 1278.5 (the old version).  The legislative counsel's digest states:

> **Existing law prohibits certain health facilities, known as long-term health care facilities, from discriminating or retaliating against a patient or employee of those long-term health care facilities because the patient or employee presents a grievance or complaint, or initiates or cooperates in an investigation or proceeding by a governmental entity, relating to the care, services, or conditions at those long-term health care facilities, except as provided. Existing law makes violation of this prohibition subject to a civil penalty of not more than $10,000.**
> **. . . .**
>
> ***This bill would impose similar prohibitions on health facilities* other than long-term health care facilities, except that violation would be subject to a civil penalty of not more than $25,000 and willful violation would be a misdemeanor punishable by a fine of not more than $20,000. By creating a new crime, this bill would impose a state-mandated local program.**

S.B. 97, 1999 Cal. Legis. Serv. ch. 155.  In light of the statute's explicit reference to "no health facility" there is no basis to interpret the old version of the statute to provide that an entity that owns or operates a health facility was, in addition to the "health facility" itself, statutorily liable for discrimination and retaliation under § 1278.5.

A report of the Senate Judiciary Committee, dated July 10, 2007, reveals that adding an entity that owns or operates a health facility to the statute did more than just clarify the original meaning of the statute:  Under the heading "Description" this report states:

> **The bill would revise and recast portions of the whistleblower statute that protects patients and employees of a health facility from discrimination or retaliation for complaining about the health facility or cooperating in the investigation of the health facility**

**24**

by a government entity.  These revisions would:

. . . .

**(4)** *extend the prohibition against discrimination or retaliation to any entity that owns or operates a health facility.*

(Emphasis added.)  A substantive *extension* of statutory coverage to include additional parties effectuates a change, not merely a clarification, to the law.  *See McClung*, 34 Cal. 4th at 471-74; *Balen v. Peralta Junior College Dist.*, 11 Cal. 3d 821, 828 n.8 (1974).  Later in the same Committee report under the heading "Background" it states:

According to the California Medical Association (CMA), sponsor of AB 632, because physicians are generally not 'employees' of a health facility, they do not benefit from the whistleblower protections afforded by Health & Safety Code 1278.5.  Thus, when they see problems with patient care beyond their own patients they may actually do nothing about it, for fear of retaliation or discrimination.

AB 632 is intended to cure this gap in coverage for whistleblowing in the health care context, *and would extend the whistleblower protection further by making an entity that owns or operates a health facility liable for the unlawful acts of the health facility*.

(Emphasis added.)  Again, this passage confirms that adding entities that own and operate a health facility to § 1278.5 expanded the statute's substantive scope, not merely clarified its original meaning.  Finally, in the same committee report under the heading "Changes To Existing Law" it states that "[t]his bill would extend the prohibition against discrimination or retaliation under 1278.5(b) to an entity that owns or operates a health facility."

There is language in other parts of the legislative history

25

which suggest that adding entities that own and operate health facilities to § 1278.5 was a clarification of existing law. A different Senate Committee Report, dated June 13, 2007, states under the heading "Changes To Existing Law":

> The bill additionally clarifies that the prohibition on discriminatory or retaliatory action by a health facility extends to the facility's administrative personnel, employees, boards, and committees of the board, and medical staff, *as well as an entity that owns or operates a health care facility*.

(Emphasis added.) A court need not accept a statement that an "unmistakable change in the statute is nothing more than a clarification and restatement of its original terms." *McClung*, 34 Cal. 4th at 473. Moreover, the other Legislative history detailed above undermines the assertion that extending the scope of the statute to include an entity that owns or operates a health facility was merely a clarification of the statute's original terms.

The amended version of the statute prohibits retaliation or discrimination by an entity that owns or operates a health facility and subjects the entity to statutory liability. This amendment to § 1278.5 added to and changed, not merely clarified, existing law.

> b.  Member Of The Medical Staff, Or Any Other Health Care Worker Of The Health Facility

Section 1278.5(b)(1) of the old version of the statute prohibited discrimination or retaliation "in any manner against *any patient or employee of the health facility because that patient or employee, or any other person, has presented a grievance or complaint, or has initiated or cooperated in any investigation or

26

proceeding of any governmental entity, relating to the care, services, or conditions of that facility." (Emphasis added.)

The text makes clear that it protects patients or employees of the health facility. The text also makes clear that it protects patients or employees from discrimination or retaliation not only when they themselves present a grievance or complaint or personally participate in an investigation or proceeding of a governmental entity, but it also protects patients or employees of the health facility from discrimination or retaliation when "any other person" presents a grievance or complaint or participates in an investigation or proceeding of a governmental entity. The added protection provided by "any other person" is quite reasonable. For example, if a patient's spouse submits a protected complaint to a government entity and the health facility retaliates against the patient, the patient has a viable statutory claim. If it were otherwise, a health facility could punish a patient with impunity so long as the patient did not personally present the grievance or complaint or did not personally participate in the investigation or proceeding. The phrase "any other person" comes after the word "because" and, read in context, "any other person" is not describing potential plaintiffs under § 1278.5. The old version of the statute could not have been properly construed as prohibiting discrimination or retaliation against individuals other than those delineated in the statute – patients or employees of the health facility.

The amended version of the statute now prohibits discrimination or retaliation against "any patient, employee,

member of the medical staff, or any other health care worker of the health facility." § 1278.5.   In his supplemental briefing, Plaintiff notes that the preamble to the bill which amended § 1278.5 "highlights" the amendment's "extension of the [s]tatute's protections to physicians," (Doc. 306 at 4.), i.e., the extension of the statute's protection to members of the medical staff.  Yet, Plaintiff takes the position that the extension of protection to members of the medical staff merely clarified the original meaning of the statute.  Plaintiff's argument is unpersuasive.

The report of the Senate Judiciary Committee, dated July 10, 2007, recognized the "gap" in the existing statute's coverage in that it only applied to employees and patients of a health care facility:

> According to the California Medical Association (CMA), sponsor of AB 632, because physicians are generally not 'employees' of a health facility, they do not benefit from the whistleblower protections afforded by Health & Safety Code 1278.5. Thus, when they see problems with patient care beyond their own patients they may actually do nothing about it, for fear of retaliation or discrimination.
>
> *AB 632 is intended to cure this gap in coverage* for whistleblowing in the health care context, and would extend the whistleblower protection further by making an entity that owns or operates a health facility liable for the unlawful acts of the health facility.

(Emphasis added.)  In that same Senate committee report, under the heading "Description," it states that the bill to amend § 1278.5 would "expand coverage of the whistleblower protections to members of the medical staff (physicians) and other health care workers were are not employees of the health facility[.]" Later in the

28

committee report, under the heading "Comment" there is a section entitled "Physicians are not employees; who are 'other health workers' covered by the bill?"  In pertinent part, that section reads:

> SB 97 (Burton), Chapter 155, Statutes of 1999 [which created the old version of § 1278.5] extended the whistleblower protections then available to patients and employees of a long-term health care facility to patients and employees of health facilities (hospitals) for filing a grievance or providing information to a governmental entity regarding care, services, or conditions at the facility. That bill was introduced at the behest of nurses who complained that various forms of discrimination or retaliation were the normal response they received when they reported problems regarding quality of care at their places of employment.

> The legislative findings and declarations contained in SB 97 referred to the state's policy of encouraging 'patients, nurses, and other health care workers to notify government entities of suspected unsafe patient care and conditions. However, the operative part of the statute that was enacted referred only to whistleblower protections for 'any patient or employee of the health facility' when 'the patient, employee, or any other person has presented a grievance' or complaint about the facility.

> This bill would insert 'members of the medical staff' into the legislative findings and declarations relating to state policy. It would then prohibit a health facility from discriminating or retaliating against 'any patient, employee, member of the medical staff, or any other health care worker of the health facility,' *thus expanding the whistleblower protections* of 1278.5 to all health care workers at the facility, including physicians.

> . . . .

> Both CMA [California Medical Association] and the CHA [California Hospital Association] agree that physicians are generally not employees of a hospital.

(Emphasis added.)  The addition of "members of the medical staff"

29

(and any other health care worker) did not simply clarify the original meaning of the statute – it expanded the protective ambit of the statute to cure a gap in coverage. The "operative" part of the statute only protected employees and patients of the health facility. The amendment expanded the statute's existing substantive reach to now include "members of the medical staff" of the health facility because, generally, physicians are not employees of the hospital (nor patients).

Plaintiff argues that the addition of "members of the medical staff" was made in response to California case law, thus suggesting it was a clarifying amendment (Doc. 306 at 4). *See Carter*, 38 Cal. 4th at 923 (recognizing that when "the Legislature promptly reacts to the emergence of a novel question of statutory interpretation" this may indicate that an amendment was merely a clarification of the statute's true meaning). Plaintiff's argument is unpersuasive. The legislative history does contain a reference to *Integrated Healthcare Holdings, Inc. v. Fitzgibbons*, 140 Cal. App. 4th 515 (2006). As explained in an Assembly Committee report dated April 10, 2007: "[T]he issue of retaliation appears in several ways. One way is in direct retaliation for a statement made by a physician regarding concerns for qualify of care. According to CMA, the most recent example occurred at Western Medical Center Santa Ana, when the new owners . . . sued Michael Fitzgibbons, M.D., a past chief of staff when [he] expressed concerns about the financial viability of the hospital." *Fitzgibbons*, however, did not involve any judicial construction or novel interpretation of § 1278.5. Rather, the legislative history shows that *Fitzgibbons*, and the facts

surrounding it, brought to light the importance of providing whistleblower protection to physicians and plugging the gap in statutory coverage.

Other legislative history materials suggest that by adding "member of the medical staff" to the new version of the statute, the California Legislature believed it was clarifying the existing statute. Plaintiff cites a passage from the Senate Judicial Committee report dated July 10, 2007:

> According to the CMA, sponsor of AB 632, [Health & Safety Code 1278.5] provides protections to employees and patients and the nebulous term 'or any other person.' Unfortunately, enterprising attorneys have used this section to deny protections for a physician who raised concerns of poor patient care by correctly stating that the physician was not an employee or patient. This bill will prevent that argument from happening again. . . . As such this section must be clarified and strengthened.

A similar passage appears in a Senate Committee report dated June 13, 2007:

> According to the author, existing law does not fully protect physicians and other health professionals from retaliation if they make a complaint or grievance about a health facility. The author states that currently, this protection only applies to patients, employees, and the nebulous term, 'any other person.' The author states that some attorneys have interpreted this to deny protections to physicians and other members of the medical staff because they are not employees or patients of the health facility. Members of the medical staff, which can include physicians and surgeons, podiatrists, opthamologists, pathologists, and radiologists, interact with peer review bodies that establish by-laws and regulations pertaining to professional conduct. Complaints about quality of care issues pertaining to health facilities can be raised with a peer review body, hospital governing board, or accrediting agency. However, the author and sponsor state that, in some cases, physicians who raise a complaint to any of these bodies are not protected under current law against retaliation and that AB 632 will clarify existing law to prevent abuses against physicians and other health professionals.

31

Both of these passages are confusing to the extent that they suggest attorneys were using the term "any other person" to deny protection to physicians and other members of the medical staff. This does not make any sense.  It is true, however, that under the old version of the statute, only patients and employees of a health facility were protected from discrimination and retaliation, and if a physician was not an employee of the health facility, he or she did not enjoy coverage.  The language "any other person" is not a nebulous reference to a vast sea of potential plaintiffs.  Rather, the statute protects a patient or employee of a health facility when either: (i) they themselves present a grievance or complaint, or participate in an investigation or proceeding of a governmental entity; or (ii) when "any other person" presents a grievance or complaint, or participates in an investigation or proceeding of a governmental entity and the patient or employee of the health facility ends up getting discriminated or retaliated against because of such activity.  The amendment, by expanding its scope to include a member of the medical staff or any other health care worker of the health facility, does "prevent" the argument that a physician is unprotected by § 1278.5 when he is not an employee of the health facility.  This amendment, however, did more than just clarify existing law; it added substantive protection that did not otherwise exist.

By expanding the coverage of the statute to include members of the medical staff and other health care workers who are not employees or patients of the health care facility, the amendment changed, not merely clarified, existing law.

### c. Grievance, Complaint, Or Report

The old version of the statute applied to "any grievance or complaint." The new version of the statute applies to "any grievance, complaint, or report." The addition of another category of protected activity effectuated a substantive change in the law. No party contends that adding the term "report" was a meaningless addition to the statute. *See People v. Hudson*, 38 Cal. 4th 1002, 1010 (2006) ("As we have stressed in the past, interpretations that render statutory terms meaningless as surplusage are to be avoided."); *S.D. Police Officers Assn v. City of S.D. Civil Serv. Comm'n*, 104 Cal. App. 4th 275, 284 (2002) ("In construing a statute we are required to give independent meaning and significance to each word, phrase, and sentence in a statute and to avoid an interpretation that makes any part of a statute meaningless.").

There are other textual changes that bear on this case including the addition of "medical staff" as a potential target of whistleblowing activity. But, the preceding analysis is sufficient to demonstrate that, in at least three material respects, the new version of § 1278.5 made substantive changes, not just clarifications, to the statute. Plaintiff was a member of the medical staff at KMC, not one of its employees. He is attempting to assert liability against an owner and operator of a health facility (the County) for retaliation, which allegedly occurred in response to protected activity including "reports" he made. In this case, the provisions discussed above cannot be applied retrospectively. Plaintiff cannot sue under the new version of the statute. Plaintiff's rights are defined by the old version of the

statute.

Plaintiff is an employee of the County and Plaintiff has not created a triable issue that he is an employee of the health facility, KMC. Under the old version of the statute, the health facility was civilly liable for acts of discrimination and retaliation and Plaintiff has not sued the facility. Applying the applicable version of the statute to Plaintiff's claims, summary judgment in favor of the County is warranted. This result underscores the gap in statutory coverage which the California Legislature has resolved.

Defendant County's motion for summary judgment with respect to whistleblower liability under § 1278.5 is GRANTED.

B.    Retaliation - California Labor Code § 1102.5

Section 1102.5(b) of the California Labor Code provides in pertinent part:

> (b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.
>
> . . . .
>
> (e) A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b).

To establish a prima facie case of retaliation under § 1102.5(b), a plaintiff must show: (1) he engaged in protected activity; (2) his employer thereafter subjected him to an adverse employment action; and (3) a causal link between the two. *Mokler v. County of*

34

*Orange*, 157 Cal. App. 4th 121, 138 (2007); *Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal. App. 4th 1378, 1384 (2005).

Plaintiff claims that he was retaliated against for protected whistleblowing regarding PCCs and skull flaps.

### 1. PCCs

#### a. Communications To His "Employer"

##### i. Protected Activity

Plaintiff asserts that by letter dated January 9, 2006, he communicated to Bryan regarding KMC's noncompliance with state regulations on blood transfusion related documentation known as product chart copies or PCCs. (Doc. 266 at 134.)  In that letter, Plaintiff stated:

> All transfusion product chart copies must be directed to the blood bank for assessment immediately following transfusion. The problems with incomplete product chart copies have been discussed multiple times with nursing and yourself. As medical director of the blood bank, I have an obligation to ensure that KMC is in compliance with state & federal regulations and AABB accreditation standards. It is my opinion as blood bank director that until nursing can otherwise assure than all product chart copies are properly completed, the blood bank must perform immediate monitoring of all product chart copies to ensure completion or corrective action.[5]

(*Id.*)  A few months later, Plaintiff sent Bryan an e-mail on April 17, 2006, with the subject line "Compliance with Regulations." This e-mail discussed deficiencies in the PCCs:

> Peter:
>
> I have completed an analysis of the 57 memos sent to nursing over the past several months detailing deficiencies in product chart copies (PCCs).  I have not received an administrative response to the memos.

---

[5]  This is the same letter in which Plaintiff noted his "depression and insomnia" and requested administrative leave.

These memos detail 34 instances of missing verification signatures, either one or both, required by regulations and standards.

Six PCCs were not located in the chart, a noticeable improvement over past performance.

One hundred fifty nine (159) PCCs had one or more other lesser, but still important deficiencies.

Two transfusions were not reported on the PCCs or to the blood bank.

The five charts reviewed without deficiency by the JCAHO that you cited on April 13th during our meeting is obviously too small a sample.

I am extremely concerned about the lack of administrative communication, attention and significant improvement in this area.  This is a compliance issue that involves Federal regulations, California regulations and accreditation standards for the JCAHO, CAP and AABB.  As the Medical Director of the Blood Bank I must advise you again that these deficiencies must be corrected immediately to meet 100 percent compliance, especially for verification signatures and lost PCCs.  I have proposed several different strategies over the past several years for achieving almost immediate results, but I am unaware that any corrective action has been put into place.

You and I have an ethical and regulatory duty to correct this situation in a timely manner. After multiple requests for action, I cannot conscientiously sit back any longer.

I therefore request a meeting with yourself, Mr. Barmann, Dr. Kercher, Dr. Harris and me to discuss a resolution for this dilemma and thereby reduce serious liability for Kern County and KMC.

(Doc. 265 at 90.)   Plaintiff contends that this communication constituted a protected disclosure and that because of this communication, he was retaliated against.

An employee engages in protected activity when he "discloses to a *governmental agency* reasonably based suspicions of illegal activity." *Mokler*, 157 Cal. App. 4th at 138 (emphasis added)

36

(internal quotation marks omitted); *see also* § 1102.5(b) (requiring disclosure to "a government or law enforcement agency").

As a threshold matter, Plaintiff asserts and Defendants acknowledge that the County employed Plaintiff, and the County is a "government agency" under Labor Code § 1102.5. (Doc. 278 at 8.) *Cf*. Cal. Gov't Code § 6252(a) (defining "local agency" as including a "county"). Plaintiff further argues that because he was an employee of a government agency (the County), then by virtue of § 1102.5(e), disclosures he made to his employer (the County) are disclosures to a government agency under Labor Code § 1102.5(b). By extension, according to Plaintiff, his communications to Bryan and other members of KMC leadership were made to his "employer." Taken facially, the statute requires disclosure to the County and Plaintiff does not explain whether Bryan and others were employed by the County. Nevertheless, because Defendants do not challenge Plaintiff on this point, it is assumed, *arguendo*, that Plaintiff's disclosures were disclosures to the County.

An employee engages in protected activity under § 1102.5(b) when he "discloses to a governmental agency *reasonably based suspicions of illegal activity*." *Mokler*, 157 Cal. App. 4th at 138 (emphasis added) (internal quotation marks omitted). The employee must "reasonably believe []he was disclosing a violation of state or federal law." *Patten*, 134 Cal. App. 4th at 1386. To have a reasonably based suspicion of illegal activity, the employee must be able to point to some legal foundation for his suspicion -- some statute, rule or regulation which may have been violated by the conduct he disclosed. *Love v. Motion Indus., Inc*., 309 F. Supp. 2d

1128, 1135 (N.D. Cal. 2004) (concluding that without citing to "any statute, rule or regulation that may have been violated by the disclosed conduct," plaintiff lacked "any foundation for the reasonableness of his belief").

Plaintiff argues that he "reasonably suspected that KMC's ongoing failure to maintain accurate and complete records of patient blood transfusions did not comply with Health & Safety Code § 1602.5, *which requires PCC documentation to conform to AABB accreditation standards.*" (Doc. 272 at 10) (emphasis added.) Section 1602.5 of the Health & Safety Code provides in pertinent part as follows:

> (a) No person shall engage in the production of human whole blood or human whole blood derivatives unless the person is licensed under this chapter and the human whole blood or human whole blood derivative is collected, prepared, labeled, and stored in accordance with both of the following:
>
> (1) The standards set forth in the 13th Edition of 'Standards for Blood Banks and Transfusion Services,' as published by the American Association of Blood Banks and in effect on November 15, 1989, or any amendments thereto or later published editions or amendments thereto. These shall be the standards for all licensed blood banks and blood transfusion services in the state.
>
> (2) Those provisions of Title 17 of the California Code of Regulations that are continued in effect by subdivision © or that are adopted pursuant to subdivision (b).

Plaintiff does not rely on § 1602.5(a)(2) to support his claim; rather, Plaintiff contends that he reasonably believed the PCCs did not comply with 1602.5(a)(1) because they did not adhere to the Standards for Blood Banks and Transfusion Services as published by the American Association of Blood Banks (AABB).

Plaintiff has not provided a copy of the AABB standards to

38

permit assessment of the reasonableness of his belief that incomplete PCCs violated § 1602.5(a)(1). Plaintiff provides an e-mail, dated May 20, 2005, which he sent to Toni Smith, Chief Nurse Executive at KMC. In this e-mail, Plaintiff recounts a conversation he had with "Holly Rapp, AABB Accreditation Director." (Doc. 265 at 121.) The e-mail (which contains some connected words) states:

> Telephone Conversation: Holly Rapp, AABB Accreditation Director [telephone number].
>
> * California accepts compliance with AABB accreditation standards as fulfilment of California State Regulations regarding blood component therapy
> * AABB Standards, 23rd Edition (2004) state: The patient's medical record shall include: transfusion order, the name of the component, the donor unit or pool identificationnumber, the date and time of transfusion, pre- and post-transfusion vital signs, theamount transfused, the identification of the transfusionist, and if applicable, transfusion adverse events.
> * The standards do not define what constitutes the 'patient's medical record'.
> * She stated that the medical record may be construed as records other than thepatient's chart.
> * When I explained the proposal to store the PCC records in the transfusion department, she said that this would be acceptable. In her experience, it is customary for the bloodbank to at least receive a copy of the PCC.
> * When I explained the problems with misplaced and incomplete documents, she said thatthis must be corrected immediately. If this requires sending all PCCs to the blood bank inthe interim to gain control of the situation, then this should be done.

(*Id.*) Defendants do not dispute that Plaintiff had this conversation with Rapp or that Plaintiff's e-mail accurately documents the conversation. Defendants include this same e-mail in their separate statement of undisputed material facts.

Defendants do not specifically challenge Plaintiff's argument that he had a reasonable belief that incomplete PCCs were unlawful.

Rather, Defendants argue that "[a]lthough California Health & Safety Code 1602.5(a) applies to the preparation, labeling, and storage of blood products, violation of 1602.5 was not Plaintiff's original concern. Instead, Plaintiff had argued aggressively with Toni Smith and others that the original copies of all PCCs should be filed and stored in the Pathology Department." (Doc. 276 at 12.) While this may be true, Defendants' argument is not entirely persuasive.

To invoke Labor Code § 1102.5(b), Plaintiff must disclose conduct which he reasonably believes is unlawful. Based on his unchallenged conversation with the AABB Accreditation Director, Plaintiff arguably had a reasonable belief that incomplete PCCs violated the AABB standards, which in turn violated Health & Safety Code § 1602.5(a)(1). That Plaintiff suggested a course of action to remedy the situation, or that Plaintiff was motivated by a desire to monitor the PCCs himself in the Pathology Department, does not negate his reasonable belief.

### ii. Adverse Employment Action And Causal Link

Plaintiff argues that after he sent Bryan the April 17, 2006 "Compliance with Regulations" e-mail, he was subject to various adverse employment actions which he contends were casually connected to his whistleblowing.

Plaintiff argues that his removal from his chairmanship (July 10, 2006) which prompted his pay cut, his involuntarily administrative leave (December 7, 2006), and the non-renewal of his contract ("on or around October 4, 2007") were "temporally proximate" to his disclosure of unlawful conduct, and the

"[p]roximity in time between the disclosure and the adverse action is sufficient to establish the required nexus" or causal link. (Doc. 272 at 14.)

To establish a causal link solely with timing evidence, the adverse action must follow "within a relatively *short* time" after the protected activity. *See Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 615 (1989)(internal quotation marks omitted); *Morgan v. Regents Of The Univ. Of Cal.*, 88 Cal. App. 4th 52, 69 (2000); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be *very close*.") (emphasis added) (internal quotation marks omitted).

Plaintiff's removal from the chairmanship in July 2006 occurred within a few months after the April 2006 e-mail and the associated pay cut followed around five-to-six months later. Plaintiff's timing evidence does not warrant summary judgment in Plaintiff's favor.

First, Plaintiff started expressing his "concerns" about the PCCs at least by May 2005 (Doc. 272. at 2.) Yet, there is no indication that after expressing these concerns in May 2005, Plaintiff was disciplined for doing so. Second, Plaintiff's "concerns" were in no way limited to PCCs. During his employment, Plaintiff raised numerous issues to Bryan and others making it difficult to attribute bias toward, or adverse action specific to,

his complaints about PCCs.  Third, Bryan's June 13, 2006 e-mail and follow-up letter on June 14, 2006 in which he informed Plaintiff that he was withdrawing/rescinding Plaintiff's chairmanship came on the heels of, and were responding to, the written request Plaintiff made for additional time to make a decision regarding his continued employment.  Bryan indicated that his decision to withdraw/rescind Plaintiff's chairmanship was due to Plaintiff's continued unavailability (not his whistleblowing).  Fourth, and relatedly, Plaintiff argues that he has "direct evidence" that he was removed from his chairmanship and his pay was cut because of his extended absences from work.  (Doc. 272 at . 15.) To support his FMLA interference claim, Plaintiff relies heavily on statements by Bryan, including that Bryan recommended Plaintiff for removal based on Plaintiff's "unavailability for service because of extended medical leaves" and "solely based on his continued non-availability to provide the leadership necessary for a contributing member of the medical staff leadership group." (*Id*. at 15-16.) Bryan's statements regarding Plaintiff's absenteeism or non-availability do not reflect any bias against Plaintiff for his PCC whistleblowing.

Taken together, Plaintiff's prior raising of PCC concerns without apparent retaliation; his numerous professed complaints apart from PCCs; the context in which Byran's communications to Plaintiff regarding the loss of his chairmanship arose; and Plaintiff's contention that his removal from his chairmanship and pay cut are attributable to his absence from work, all lead to the conclusion that Plaintiff has failed to establish that no reasonable trier of fact could find other than for him on the issue

that he was removed from his chairmanship because he made protected disclosures about PCCs.  Accordingly, Plaintiff is not entitled to summary judgment.

With respect to Defendants' motion, the evidence that Plaintiff relies on to establish his PCC whistleblowing claim is the fact the JCC removal decision in July 2006 occurred within a couple of months after Plaintiff's April 2006 e-mail to Bryan. Apart from this, Plaintiff has not pointed to any evidence which supports his theory that his PCC whistleblowing was a motivating reason behind his removal from the chairmanship.  Even assuming Plaintiff's evidence is sufficient to create a prima facie case, Plaintiff's extended absenteeism or non-availability provided a non-retaliatory reason for his removal from the chairmanship (i.e., a reason other than alleged protected whistleblowing).  The burden then shifts to Plaintiff to demonstrate pretext.  With respect to his FMLA interference claim, Plaintiff argues that some of his absenteeism prompted the removal.  Moreover, he argues that he was forced to take full-time leave so that he would "burn up" his leave entitlements, and then his leave was used against him in the removal decision. (Doc. 275 at 6.)  Plaintiff has not shown that his non-availability was merely a pretext for PCC whistleblowing retaliation.  Summary judgment in favor of Defendants is warranted on this claim.

With respect to the administrative leave and non-renewal of Plaintiff's contract, Plaintiff has failed to create a prima facie case under Labor Code § 1102.5(b).  The temporal gap between Plaintiff's April 2006 e-mail and his involuntary administrative

leave in December 2006 and the non-renewal of his contract on or around October 4, 2007, is too wide to support an inference of causation.  *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th Cir. 2006) (agreeing with the district court and concluding that an eight month gap between the protected activity and the employee's termination "was too great to support an inference" of causation).  Summary judgment in favor of Defendants is warranted on this claim.[6]

[6]  It is not entirely clear whether Plaintiff also claims that his full-time FMLA leave, which he was allegedly "forced" to take, was an adverse employment action taken in retaliation for his PCC whistleblowing. (*See* Doc. 272 at 14.) Plaintiff does not dispute that he was eligible to take full-time FMLA leave, and it is doubtful whether requiring an employee to take leave to which he is entitled can be characterized as an adverse employment action.  In any event, to the extent Plaintiff asserts that his full-time FMLA leave was an adverse employment action taken because of his PCC whistleblowing, Defendants are entitled to summary judgment on this claim.  According to Plaintiff, he had been raising his PCC concerns at least since May 2005 and there is no indication that he was disciplined for doing so.  The very same day that Plaintiff sent his "Compliance With Regulations" e-mail, Bryan drafted a memorandum summarizing a meeting he had with Plaintiff a few days earlier.  In that memorandum, Bryan acknowledged Plaintiff's positive contributions to the department. (Doc. 266 at 141-42.)  Although Plaintiff claims that his "forced" full-time FMLA leave came closely after his PCC e-mail, he actually argues that what motivated his "forced" full-time FMLA leave was a desire by Bryan/County to burn up his FMLA leave allotment more rapidly (which would provide a non-retaliatory reason for the action, i.e., a reason other than to retaliate for protected whistleblowing).  There is no indication that the formal meeting he had with Bryan and others regarding his medical leave status on April 28, 2006, had anything to do with Plaintiff's PCC whistleblowing.  Plaintiff's doctor's certification dated April 26, 2006, stated that Plaintiff was "unable to work full-time and requires part-time *or less to avoid worsening of his serious medical condition*." (Doc. 270 at 6) (emphasis added.)  At the meeting on April 28, 2006,

## b. Communications To Outside Authorities

Plaintiff contends that around Thanksgiving 2006 he blew the whistle to outside agencies regarding PCCs (and other issues). Plaintiff argues that this whistleblowing prompted his involuntary paid administrative leave (December 7, 2006) and the non-renewal of his contract (on or around October 4, 2007).

Plaintiff's retaliation claims based on his PCC-related outside whistleblowing and alleged adverse employment action in response thereto, including the paid administrative leave, are barred as explained in the order on Defendants' motion for judgment on the pleadings. Moreover, the temporal gap, almost one year, between the outside whistleblowing (Thanksgiving 2006) and the non-renewal of Plaintiff's employment contract on or around October 4, 2007, is too wide to create an inference that the County did not renew Plaintiff's contract because of the PCC whistleblowing. Summary judgment in favor of Defendants is warranted on this claim.

## 2. Skull Flaps

Plaintiff argues that he was retaliated against because of his whistleblowing regarding the storage of patient skull flaps – the top part of the human skull – in an unlicensed laboratory freezer.

---

Plaintiff was provided with materials regarding his leave availability/calculations and it was during that meeting in which Bryan allegedly told Plaintiff to take full-time leave until his status was resolved. Plaintiff actually took that full-time leave. There is no suggestion that during the meeting or afterwards, Plaintiff voiced an opinion, belief or objection that his full-time leave was in response to his PCC whistleblowing. Based on the evidence, Plaintiff has not created a triable issue that his full-time leave represents an adverse employment action taken in retaliation for his PCC whistleblowing.

According to Plaintiff, he "reasonably believed the storage of patient skull caps [or flaps] occurring in an unlicensed laboratory freezer at KMC violated Health & Safety Code 1635.1." (Doc. 272 at 18.) Section 1635.1(a) states, "[e]xcept as provided in subdivision (b), every tissue bank operating in California on or after July 1, 1992, shall have a current and valid tissue bank license issued or renewed by the department pursuant to Section 1639.2 or 1639.3."

Plaintiff points to evidence suggesting that, at times, between fifteen to twenty skull flaps were being stored in a KMC freezer and argues that "given the excessive number of skull flaps, Plaintiff's suspicion that at least some of the flaps would be reimplanted into patients in violation of Health & Safety Code 1635.1, was reasonable." (Doc. 272 at 18.)[7] Without more, evidence that, at times, fifteen to twenty skull flaps were in KMC's freezer, which was apparently an unlicensed freezer, does not lead to the reasonable conclusion that the skull flaps were destined to be re-implanted into patients. Dr. Charles Joseph Wrobel, M.D., a neurosurgeon, testified that he saves skull flaps in the KMC freezer so that he can use them to make a template for a patient, i.e, so that he can "mold a piece of titanium mesh to the right specifications" and later implant the "titanium mesh" (not the skull flap) into the patient. (Wrobel Dep. 18:16-17, 40:13-22.) Despite his professed concern for skull flap storage, Plaintiff

---

[7] Plaintiff obviously interprets § 1635.1 as requiring a license whenever tissue is stored for later re-implantation into a patient.

does not point to any evidence that, during his employment, he asked anyone at KMC for the reason why skull flaps were being stored in the freezer or otherwise investigated where stored skull flaps eventually ended up. Even assuming Plaintiff reasonably believed that KMC had an unlicensed freezer and that some of the stored skull flaps were being re-implanted into patients, Plaintiff's retaliation claim does not survive.

Plaintiff's claims based on his skull flap-related outside whistleblowing and alleged adverse employment action in response thereto, including the paid administrative leave, are barred as explained in the order on Defendants' motion for judgment on the pleadings. Moreover, the temporal gap between the outside whistleblowing (Thanksgiving 2006) and the non-renewal of Plaintiff's employment contract on or around October 4, 2007, is too wide to create an inference that the County did not renew his contract because of the skull flap whistleblowing.

For the foregoing reasons, summary judgment in favor Defendants on Plaintiff's retaliation claims under § 1102.5(b) is GRANTED.

C. **FMLA**[8]

The FMLA creates two "interrelated substantive rights for employees" of covered employers. *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003). First, an employee has the right to take up to twelve weeks of leaves during any twelve-month period for reasons specified by statute. 29 U.S.C. § 2612(a). Second, an

---

[8] There is no dispute that the County is an employer subject to the FMLA/CFRA.

47

employee who takes FMLA leave has the right, upon return from leave, to be restored to his or her original position or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. § 2614(a). To protect these rights and the exercise of them, the FMLA prohibits certain acts. *See* § 2615. In pertinent part, § 2615(a)(1) makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

Plaintiff has asserted two claims arising under § 2615(a)(1), and they are: (i) that his taking of FMLA leave was counted as a negative factor in the County's decision to demote him, cut his pay, and to not renew his contract; and (ii) that his rights under the FMLA were interfered with when Bryan "forced him to take full-time 'personal necessity leave' under the County's leave policy" instead of permitting Plaintiff to continue on a reduced leave schedule. (Doc. 272 at 17-18.)

## 1. <u>FMLA leave as a negative factor</u>

Under the FMLA, it is unlawful for an employer to "'use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'" *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (*quoting* 29 C.F.R. § 825.220©). Under Ninth Circuit case law, if an employer uses an employee's taking of FMLA leave as a "negative factor" in making "adverse employment decisions," including hiring, promotions or disciplinary actions, the employer interferes with the employee's exercise of FMLA rights in violation of § 2615(a)(1). *Id.* at 1122-23*; see also Liu,* 347 F.3d at 1133 n.7 ("In

48

this circuit . . . we have clearly determined that § 2615(a)(2) applies only to employees who oppose employer practices made unlawful by FMLA, whereas, § 2615(a)(1) applies to employees who simply take FMLA leave and as a consequence are subjected to unlawful actions by the employer.") (emphasis omitted); *Foraker v. Apollo Group, Inc.*, 427 F. Supp. 2d 936, 940 (D. Ariz. 2006).

To establish this type of interference claim under the FMLA, a plaintiff must show that (1) he took "FMLA-protected leave"; and (2) it constituted "a negative factor" in an adverse employment decision. *Bachelder,* 259 F.3d at 1125. A plaintiff "can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both. No scheme shifting the burden of production back and forth is required." *Id.* (internal citations omitted).

Defendants represent, and Plaintiff does not challenge, that Plaintiff used up all of his FMLA leave by June 14, 2006. (Doc. 291 at 2.) After that, Plaintiff went on non-FMLA Personal Necessity Leave. The issue remains as to whether Plaintiff's FMLA leave was used as a negative factor in an adverse employment decision.

a. <u>Plaintiff's Motion</u>

Plaintiff argues that he has "direct evidence" that his FMLA medical leave was a negative factor in the decision to remove him from his chairmanship and then cut his pay. Plaintiff relies on Bryan's recommendation letter to the JCC and Defendants' admission in a Scheduling Conference Order.

Bryan's recommendation letter, dated July 10, 2006, to the JCC began as follows:

**49**

> Under the provisions of paragraph 9.7-4 of the Medical
> Staff Bylaws (enclosure 1) I recommend that Dr. David
> Jadwin be removed as Chairman, Department of Pathology.
> This recommendation is based on Dr. Jadwin's
> unavailability for service because of extended medical
> leaves for non-work related ailments.

(Doc. 266-2 at 31.) Bryan then gave a chronology of events,
including Plaintiff's absences from work while he was on FMLA leave
from December 15, 2006 to March 16, 2006, and Plaintiff's full-time
FMLA leave starting in May 2006.   In the last event in his
chronology, Bryan stated:

> Since the middle of November 2005 Dr. Jadwin has worked
> only 32% of the hours normally expected of a full time
> pathologist (enclosure 9). Since my notice of June 14,
> 2006 Dr. Jadwin has made no attempt to contact me
> concerning my decision to relieve him of his chairman
> duties nor has he indicated any desire to negotiate a new
> contract.

(*Id* at 32.)  In closing, Bryan wrote:

> This recommendation to rescind Dr. Jadwin's appointment
> as Chairman, Department of Pathology is based solely on
> his continued non-availability to provide the leadership
> necessary for a contributing member of the medical staff
> leadership group. KMC must have its key personnel
> available, and Dr. Jadwin has provided no indication that
> he is committed to return to work or resume his duties as
> chairman. Other than his latest written communication
> requesting an extension of medical leave, Dr. Jadwin has
> made no attempt in the last two months to contact me
> concerning his employment status or how the Department of
> Pathology should be managed during his extended absence.
>
> I therefore request that the Joint Conference Committee
> act pursuant to paragraph 9.7-4 of the Medical Staff
> Bylaws and, by majority vote, endorse my recommendation
> to rescind Dr. Jadwin's appointment as Chairman,
> Department of Pathology.

(*Id.*)  In a scheduling Conference Order, Defendants admitted:

> 19. On or about July 10, 2006, the JCC voted to remove
> Plaintiff from his position as Chair of the Pathology
> Department at Kern Medical Center.
>
> 20. Plaintiff was removed from his position as Chair of

1    the Pathology Department in part because he was neither
2    working full-time nor present in the hospital.

3  (Doc. 29 at 8-9.)  Given Bryan's written recommendation, and in
4  light of the scheduling order, it is clear that a reasonable trier
5  of fact could easily conclude that Plaintiff's taking of FMLA
6  protected leave was a negative factor in Bryan's recommendation
7  and, because his recommendation was adopted by the JCC, a negative
8  factor in the JCC's vote as well.  Plaintiff's burden *as the moving*
9  *party*, however, does not stop there.  Plaintiff must show that no
10  reasonable trier of fact could find other than for him on the issue
11  that his taking of FMLA leave constituted a negative factor in the
12  decision to remove him from his chair position.  Plaintiff has not
13  met his burden.

14    In his deposition, Bryan explained his recommendation to the
15  JCC:

16    A.   Dr. Jadwin's nonavailability to be present was the
17    primary contributing factor to my recommendation to
      remove his as chairman.

18    Q.   Okay.

19    A.   And evidenced by his request towards the end of his
20    eligible medical leave to, again, extend it for another
      medical problem.

21    So he had fully-exhausted his rights and the institution
22    obligation to grant him medical leave.

23    Q. Okay. So to get back to my question, was Dr. Jadwin's
      medical leave a negative factor in the decision to remove
24    Dr. Jadwin from chairmanship?
      . . .

25    A.   No, the medical leave, per say, was not the basis of
26    my recommendation to remove him as Chair.

27    It was his non-availability, his non-presence on the
      institution – at the institution – that would allow him

28                                51

to effectively carry out his duties.

> Whether it was medical leave or whatever, he had exhausted his time for over an eight-month period. Not just six months, for eight months, *and he had further requested and stated his inability to return to work. That is the basis of it.*

(Brian Dep. 280:21-281:20) (emphasis added.)

Bryan's recommendation letter mentions absences other than those protected by the FMLA, namely Plaintiff's Personal Necessity Leave starting in June 2006. Plaintiff does not challenge Defendants' assertion that Plaintiff had exhausted his FMLA medical leave by the time he went on Personal Necessity Leave in June 2006, and there is no dispute that Plaintiff took that leave. Bryan's recommendation letter stressed that the decision was based "solely on [Plaintiff's] *continued* non-availability to provide the leadership necessary for a contributing member of the medical staff leadership group. KMC must have its key personnel available, and Dr. Jadwin has provided no indication that he is committed to return to work or resume his duties as chairman." (Doc. 266-2 at 32.)

Viewing the evidence in a light most favorable to the County (the non-moving party), one reasonable interpretation of the evidence is that Bryan was recommending Plaintiff for removal from his chairmanship because *after* Plaintiff's FMLA leave, Plaintiff continued to be unavailable and, at the same time, provided no indication that he was committed to return to work or was then interested in performing his chairman duties.[9] The JCC could,

---

[9] Plaintiff cites to language in *Bachelder* where the court discussed witness testimony indicating that the "likely reason" for

without violating the **FMLA**, use Plaintiff's absence from work after his **FMLA** leave and any lack of evident commitment to return to work or take on his chairman duties, as the basis for their decision. *See Bachelder*, 259 F.3d at 1125 (recognizing the legitimacy of taking adverse employment action based on absences not protected by the FMLA); *Liston v. Nevada ex rel. Dep't of Bus. & Indus.*, No. 07-16312, 2009 WL 413752, at *1 (9th Cir. Feb. 19, 2009) ("Although an employer may not use FMLA leave as a negative factor in employment decisions, there is no cause of action under the FMLA if the termination results from absences . . . not protected by the . . . [FMLA].") (alteration in original) (internal citation omitted).[10] While basing a decision on such considerations may not have been fair – at the time of Bryan's recommendation, Plaintiff was on an

_____

the plaintiff's termination was "because of her continued unavailability in 1996." 259 F.3d at 1131 n.22 (internal quotation marks omitted). The Ninth Circuit viewed the testimony as evidence supporting the plaintiff's FMLA interference claim. In *Bachelder* there was no question that plaintiff's "continued unavailability" referred to her unavailability when she was on an FMLA leave of absence. Here, by contrast, one reasonable interpretation of Bryan's recommendation is that Plaintiff's "continued non-availability" referred to his post-FMLA unavailability, i.e., his continued non-availability after his FMLA leave had expired. Bryan's mention of Plaintiff's FMLA leaves of absence was historically accurate and does not, by itself, demonstrate prohibited bias. Even though Bryan's statements in his recommendation could be construed differently and in a manner which suggests prohibited bias, this does not alter the equation. When considering Plaintiff's motion, the court must construe the evidence, and draw all reasonable inferences, in favor of the non-moving party.

    [10] District courts are not prohibited from citing unpublished opinions of the Ninth Circuit issued on or after January 1, 2007. *See* Fed. R. App. P. 32.1(a); Ninth Circuit Rule 36-3(b).

approved Personal Necessity Leave – whether the JCC's decision was unfair or imprudent is not the inquiry. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (recognizing that simply because the reason for the adverse action is "foolish or trivial or even baseless" does not create liability where the reason is not unlawful); *Maynard* v. *City of San Jose*, 37 F.3d 1396, 1405 (9th Cir. 1994) ("We do not suggest that the statements [the plaintiff] attributes to the defendants were proper or justified. We note only that the evidence presented by [the plaintiff] indicates the defendants' hostility towards him was not kindled by racial prejudice."); *Green v. Maricopa County Cmty Coll. Sch. Dist.*, 265 F. Supp. 2d 1110, 1128 (D. Ariz. 2003) (noting that whether the reason for an adverse employment action was "accurate, wise, or well-considered" is not the inquiry) (internal quotation marks omitted); *Slatkin v. Univ. of Redlands*, 88 Cal. App. 4th 1147, 1157 (2001) (recognizing that even a "personal grudge can constitute a legitimate, nondiscriminatory reason for an adverse employment decision")(internal quotation marks omitted).

The minutes from the JCC vote do not actually specify whether the voting members considered Plaintiff's FMLA leave as a negative factor or whether it was Plaintiff's post-FMLA unavailability and lack of evident commitment that prompted their action:

> The committee was advised that, under the medical staff bylaws, a department chair, specifically Dr. Jadwin, may be removed, with or without cause, upon the recommendation of the CEO of the hospital and a majority vote of the voting members of the JCC. Mr. Bryan was asked about what recourse, if any, Dr. Jadwin has if he is removed as department chair. The committee was advised that the bylaws do not afford a department chair any due process rights once he or she is removed from the

position. Mr. Bryan emphasized the importance of having a department chair who is available to manage the department and engage with the medical staff and hospital administration at all times. Mr. Bryan then recommended to the committee that Dr. Jadwin be removed as chair of the department of pathology because of his continued unavailability and lack of available leadership. The committee voted on Mr. Bryan's recommendation; there were five affirmative votes and two abstentions. Based on this vote, Dr. Jadwin was removed as chair of the department of pathology effective July 10, 2006. Mr. Bryan collected the packets containing information about Dr. Jadwin at the end of the discussion and vote.

Plaintiff has not pointed to deposition testimony or other evidence that affirmatively demonstrates that the majority voters used Plaintiff's taking of FMLA leave as a negative factor in their vote.

Plaintiff has not met his burden of proving that no reasonable trier of fact could find other than for him on the issue that his FMLA protected leave was, in fact, a negative factor in the decision to remove him from his chair position.

With respect to his pay cut via the amendment to his contract, Plaintiff argues that "because a portion of a KMC department chair's base pay is tied to his chairmanship, Plaintiff's Demotion made the Paycut a foregone conclusion; hence, the JCC vote to demote Plaintiff was effectively a vote to reduce his Base Pay as well." (Doc. 272 at 16.) According to Plaintiff, because his taking of FMLA was a negative factor in the JCC's vote to demote him, it necessarily follows that the his taking of FMLA leave was a negative factor in the pay cut decision. As discussed above, however, Plaintiff has not met his burden, as the moving party, to establish that no reasonable trier of fact could find other than

for him on the first issue.  He also has failed to meet his burden on the second issue, i.e., that his taking of FMLA leave was a negative factor in the pay cut decision.

Finally, Plaintiff argues that he has direct evidence that his taking of FMLA leave was a negative factor in the decision not to renew his contract.  He cites to the testimony of Ray Watson, then Chair of the Board of Supervisors and a member of the JCC:

> Q.   So the question is: You've mentioned that for the nonrenewal one of the reasons was that Dr. Jadwin wasn't available for work; is that correct or –
>
> A.   My understanding was that he had – he had been on medical leave, family leave, and had requested even more leave, and that for that reason and the fact that he was suing us, that we decided not to renew his contract.

(Watson Dep. 113:15-23.)   Watson's testimony does not warrant summary judgment in favor of Plaintiff.

Viewed in a light most favorable to Defendants, Watson's mention of "that reason" can be interpreted as a reference to Plaintiff's request for "even more leave" (a singular reference to the last event in a list) after Plaintiff had exhausted his FMLA medical leave.  As discussed above, once an employee exhausts his FMLA leave, the FMLA does not prohibit an employer from basing adverse employment decisions on subsequent absences.[11]  Plaintiff has not shown that no reasonable trier of fact could find other than for him on the issue of whether his FMLA leave was a negative

---

[11]   Simply because an employee has exhausted his or her FMLA leave does not give the employer the right to then take adverse action against the employee based on the protected FMLA leave already taken.

factor in the decision not to renew his contract.

          **b.   Defendants' Motion**

In their motion, Defendants argue that Plaintiff's removal from the chairmanship was based on legitimate business reasons and there is no evidence that Plaintiff's rights under the FMLA were violated.  Defendants' arguments are unpersuasive.

As discussed above, in light of Bryan's recommendation letter and the JCC vote which adopted his recommendation, and considering the admission in the scheduling order in Plaintiff's favor, a reasonable jury could conclude that Plaintiff's taking of FMLA was used as a negative factor in the decision to remove him from his chairmanship.  A triable issue exists as to whether Plaintiff's FMLA leave was a negative factor in the decision to remove him from his chairmanship and it precludes summary judgment in favor of Defendants.

Alternatively, Defendants argue that Plaintiff was not entitled to his FMLA leave from December 16, 2005, to March 15, 2006, because Plaintiff did not timely notify the County of his leave request.  For several reasons, this argument is unpersuasive.

First, this argument flatly contradicts the County's position repeatedly relied on in its motion for summary judgment that Plaintiff exhausted his FMLA leave entitlements by June 2006.  The County cannot have it both ways: it cannot argue that Plaintiff exhausted his FMLA leave and then argue that he was never entitled to FMLA leave in the first instance.  If Plaintiff was not so entitled, then he should not have exhausted his FMLA leave and he would have theoretically been entitled to more FMLA leave at a

57

subsequent time.

Second, this argument does not eviscerate Plaintiff's FMLA interference claim. Plaintiff took a second FMLA leave of absence after he submitted a second Request For Leave Of Absence form on April 26, 2006.

In his second request (April 26, 2006), Plaintiff asked that his initial leave be extended. Then, after his meeting with Bryan and others on April 28, 2006, he was granted full-time FMLA leave. In fact, documentation suggests that Plaintiff was on FMLA leave at minimum through the "06-09" pay period, which spanned from April 29, 2006 through May 12, 2006. (*See* Lee Decl., Ex. 18 at 0001527.) Defendants' brief concedes that "Plaintiff exhausted his 12 weeks leave [under the FMLA] by June 14, 2006." (Doc. 291 at 2.) Defendants further represent that "[a]ll parties agree Plaintiff completely exhausted his twelve weeks of FMLA and CFRA leave by June, 2006." (Doc. 253 at 8.) It is indisputable that Plaintiff had not exhausted his FMLA leave allotment by the end of his first leave of absence on March 15, 2006. Plaintiff subsequently went on a second full-time FMLA leave. Bryan's recommendation letter to the JCC discusses this second leave. (Doc. 266-2 at 32.) Based on the same evidence above – Bryan's recommendation letter, the JCC vote, and the admission in the scheduling order – a triable issue exists as to whether Plaintiff's FMLA leave, including his second FMLA leave, was one negative factor in the decision to remove Plaintiff from his chairmanship position.

Third, even assuming Plaintiff's notification of his need for his first FMLA leave was untimely, the County arguably waived any

objection to its timeliness.  An employer can waive an employee's FMLA notice requirements. *See* 29 CFR § 825.304; *see also* 29 CFR § 825.302(g); *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 554 (6th Cir. 2006) (recognizing that an employer can waive an argument as to the adequacy or timeliness of the employee's notice, stating "even if [the plaintiff's] notice had been late, [the employer's] only legal recourse would have been either to waive the notice requirement or to delay her leave"); *Bailey v. Miltope Corp.*, 513 F. Supp. 2d 1232, 1240 (M.D. Ala. 2007) (recognizing possibility of waiver); *Rodriguez v. Ford Motor Co.*, 382 F. Supp. 2d 928, 934 (E.D. Mich. 2005) (same).  Generally speaking, waiver is the "voluntary or intentional relinquishment of a known right." *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1208 (9th Cir. 1970) (internal quotation marks omitted).[12]

The County explicitly, in writing, approved Plaintiff's first "FMLA" leave request. (Doc. 266-2 at 65.)  After Plaintiff had taken approved FMLA leave, on April 28, 2006, in a meeting between Plaintiff, Bryan, Steve O'Connor from HR, and Karen Barnes (the County's counsel), Bryan provided Plaintiff with a summary of Plaintiff's medical leave history.  This history specifically stated that Plaintiff's "Intermittent LOA *began* 12/16/05" and the he was "entitled to 480 hrs (*FMLA* intermittent leave rule)." (Doc. 266 at 64) (emphasis added.)  This medical leave history ended with

[12]  The County does not (nor could it seriously) contend that, at the time of Plaintiff's purported late notification, the County had no knowledge of its right to question the timeliness or adequacy of Plaintiff's notification and to take appropriate action.

a calculation of how many hours (of the 480) Plaintiff had left after considering his usage during pay periods spanning from December 2005 to March 2006, i.e., pay period "05-25," which covers 12/10/05 to 12/23/05, to pay period "06-07," which covers 04/01/06 to 04/14/06. (*Id.*; *see also* Lee Decl., Ex. 18 at 0001527.) Plaintiff was specifically informed that, based on his medical history, he had "137 hours available to be taken before [he] hit the 480-hour limitation." (Doc. 266-2 at 62.). As Bryan recounted in his recommendation letter to the JCC, "Dr. Jadwin was informed . . . that, at his rate of use, he had only 137 hours of medical leave left available which would take him through June 16, 2006." (Doc. 266 at 32.) Thus, without question, Plaintiff's "FMLA" leave of absence between December 2005 and March 2006 was not only explicitly approved in writing, it was also counted against his FMLA allotment. By explicitly approving of Plaintiff's requested FMLA leave and counting it against his accrued FMLA leave hours, at minimum, there is a triable issue as to whether the County waived its belated challenge to the timeliness of Plaintiff's notice. *Salgado v. CDW Computer Ctrs., Inc.*, No. 97 C 1975, 1998 WL 60779, at *6 (N.D. Ill. Feb. 5, 1998) ("Regardless of whether the request was timely or not, defendant granted permission to take two weeks' leave. Therefore, defendant appears to have waived any possible violation of the initial notice requirements.").[13]

---

[13] Court have also concluded that when an employer grants FMLA leave, estoppel can bar an employer from later challenging the employee's eligibility for that leave. *See, e.g., Minard v. ITC Deltacom Commc'ns, Inc.,* 447 F.3d 352, 359 (5th Cir. 2006); *Woodford v. Cmty. Action of Greene County, Inc.*, 268 F.3d 51, 57

Fourth, in response to Plaintiff's separate statement of undisputed material facts, Defendants "admit" that "Plaintiff requested and took reduced work schedule CFRA medical leave from December 16, 2005 to at least March 15, 2006." (Doc. 278 at 23.) There is no reason why this admission does not apply to Plaintiff's "FMLA" leave as well (especially given that Plaintiff's approved leave request form specifically stated "FMLA" leave).

For these reasons, Defendants are not entitled to summary judgment on the ground that, because Plaintiff's notice was untimely, his leave of absence from December 16, 2005, to March 15, 2006, was unprotected under the FMLA.[14]

---

(2nd Cir. 2001); *Sutherland v. Goodyear Tire & Rubber Co.*, 446 F. Supp. 2d 1203, 1210 (D. Kan. 2006); *Allen v. Fort Wayne Foundry Corp.*, No. 1:04-cv-60, 2005 WL 2347266, at *9 (N.D. Ind. Sept. 26, 2005) (concluding, in a case involving an employee who was terminated for absenteeism, that equitable estoppel barred the employer's argument as to the plaintiff's ineligibility for FMLA leave where the employer had granted, in writing, intermittent FMLA leave and permitting the employer to later disclaim eligibility in litigation "would theoretically . . . subject [the employee] to termination . . . for the twenty-four absences [the employer] told [him] were FMLA-excused.").

[14] Plaintiff argues that, given his time-sheets in December 2005, he did not, in actuality, go on leave at that time. Plaintiff argues that his time-sheets prove that he "was working full-time from December 16, 2005 to January 9, 2005, taking 4 sick days off during the Christmas and New Year holidays, upon conclusion of which Plaintiff timely gave Bryan reasonable notice of his need for medical leave." (Doc. 288 at 5) (citation omitted.) Plaintiff claims that HR just plucked the December beginning date off of Plaintiff's FMLA documentation. In light of the court's ruling that the County has arguably waived any contention that Plaintiff failed to give timely notice of his leave, the court need not consider any additional arguments. In any event, Plaintiff's additional arguments only create confusion, leaving further triable

61

1    Defendants are also not entitled to summary judgment on the

2  ground that no triable issue remains as to whether Plaintiff's

3  taking of FMLA leave was a negative factor in the decision not to

4  renew Plaintiff's employment contract.  Watson's testimony is the

5  only evidence Plaintiff relies upon to establish that his FMLA

6  leave was a negative factor in the decision not to renew his

7  contract.  Defendants *argue* that Watson was not a decision-maker

8  and his testimony as to the reasons for the non-renewal is nothing

9  more than "after-the-fact speculation." (Doc. 276 at 25.)  At his

10 deposition, Watson testified in pertinent part as follows:

11     A.   I recall that his contract was – was expiring.  I
        couldn't tell you when, but I – I – I am aware that –
12      that it was not renewed.

13     Q.   Okay.  How did you become aware of this nonrenewal?

14     A.   That would have been part of the general discussions
        about his not being present to do his job.

15

16     . . . .

17     Q.  Sure. Okay. And do you recall who was part – who was
        in that discussion on the nonrenewal of Dr. Jadwin's
        contract?
18
       A.   The only – the only time any of these things were
19      discussed were in joint conference committee meetings,
        and there may have been a time when Mr. Bryan appeared in
20      closed session with the board.

21     Q.   Are you aware that Dr. – and what was the final
        resolution of this discussion regarding nonrenewal of Dr.
22      Jadwin's contract? Was there a decision, in fact, not to
        renew his contract then?
23
       A.   I don't recall a specific vote being taken, although
24      I imagine it was.   I can tell you that I would have
        supported that because I didn't feel that he was doing
25      his job.

26

27  ────────────────────

    issues.
28
                                    62

Q. Okay. So you don't recall a specific vote, but there was a decision not to renew his contract then?

A. Yes.

. . .

Q. Okay. What about the nonrenewal? I mean, do you recall Dr. Jadwin's physical absence being a reason for his nonrenewal of his contract?

A. Well, it could be that. It could be the fact that I think by then he was – probably was suing us. So why would you want to establish a contractual relationship with somebody who's suing you.

Q. Okay. Well, he was also suing you at the time of his removal or actually at the time of his – no, he wasn't. He wasn't okay. But I mean, you say why would you establish a contractual relationship with someone who's suing you, right?

A. Right.

Q. Was that -- does that mean – are you just speculating now, just guessing, or was that a consideration for his nonrenewal.

A. Well, I remember it being discussed.

Q. Do you recall who was at the discussion?

A. It would have been in one of the joint conference – one or more of the joint conference committee meetings along with all the other discussions about him.

. . . .

Q. Okay. But you recall it [the non-renewal] being discussed at the JCC meetings.

A. Yes.

. . . .

Q. So the question is: You've mentioned that for the nonrenewal one of the reasons was that Dr. Jadwin wasn't available for work; is that correct or –

A. My understanding was that he had – he had been on medical leave, family leave, and had requested even more leave, and that for that reason and the fact that he was suing us, that we decided not to renew his contract.

Q.  Okay.  When you say "we," this is a joint conference committee meeting, correct?

A.  And it – it probably came up at a closed session of the board of supervisors.

Q.  As well as a closed session of the JCC?

A.  Yes.

(Watson Dep. 28:9-16; 29:19-30:13; 110:12-111:10; 111:15-17; 113:15-111:4.)  In a declaration submitted in support of Defendants' motion for summary judgment, Watson explains and directly contradicts his prior sworn deposition testimony:

2. On August 25, 2008, Dr. Jadwin's attorney took my deposition. He asked me several times what I knew about the circumstances of Dr. Jadwin's 'termination.' I told him I did not recall any discussions about that. Later in my deposition, he asked me about the expiration of Dr. Jadwin's contract on October 4, 2007. I told him I had learned Dr. Jadwin's contract was expiring in general discussions about Dr. Jadwin's absence from the hospital. I told him I could not recall when those discussions had occurred. He asked me if there had been a decision to not renew Dr. Jadwin's contract. I told him that I did not recall the Joint Conference Committee ever voting on that but I said I 'imagine it was.' He then asked me if there was a decision not to renew his contract and I replied, 'Yes.'

3. My response was an unfortunate guess. Neither the Joint Conference Committee nor the Board of Supervisors ever made a decision to not renew Dr. Jadwin's contract. I have no recollection of any such decision. As a county supervisor, I am accustomed to making decisions and I assumed, if Dr. Jadwin's contract was not renewed, there had been a decision to not renew it; however, there was no such decision.

4. The Board of Supervisors never made any decisions regarding renewing or not renewing Dr. Jadwin's employment agreement. I do not know the circumstances under which Dr. Jadwin's employment agreement expired.

There are several problems with Watson's post-deposition affidavit.

First, Watson's statement that "there was no such decision"

64

and "neither the JCC nor the Board of Supervisors ever made a decision" is wholly conclusory. Second, Watson's subsequent contradictory affidavit does not eliminate his prior inconsistent sworn testimony. "Self-contradiction by the moving party's witnesses may of course create a genuine issue of material fact precluding summary judgment." *Crockett v. Abraham*, 284 F.3d 131, 133 (D.C. Cir. 2002). When a witness contradicts himself on a material fact the district court cannot determine which version of the events the ultimate trier of fact will believe. *See Peckham v. Ronrico Corp.*, 171 F.2d 653, 658 (1st Cir. 1948). Third, although Watson asserts that "no such decision was made" the County actually admitted in its response to Plaintiff's statement of undisputed material facts that a decision was made not to renew Plaintiff's contract. (Doc. 278 at 7.) Not only does Watson contradict himself, the County also contradicts Watson's affidavit. Fourth, in his affidavit, Watson does not retract his statement that Plaintiff's medical leave, and his request for even more leave, was discussed or "came up" at a meeting. The fact that Plaintiff's medical leave came up in a discussion among a County decision-making body supports Plaintiff's position.

Wilson's inconsistent testimony creates a triable issue of fact. When construed in a light most favorable to Plaintiff, Wilson's testimony suggests that Plaintiff's FMLA leave was one negative factor that influenced the admitted decision not to renew Plaintiff's contract. Although Watson's "understanding" may be based partly on statements from members of the JCC and/or the Board of Supervisors, at a minimum, the Board members' statements

65

(regardless of their truth) can be used to establish the state of mind (illicit motive or improper purpose) of those members.[15]

## 2. "Forced" Personal Necessity Leave

An employer interferes with an employee's FMLA rights by "'refusing to authorize FMLA leave'" and "'discouraging an employee from using such leave.'" *Liu*, 347 F.3d at 1134 (*quoting* 29 C.F.R. § 825.220). An employer may also interfere with an employee's rights under the FMLA by mislabeling an employee's leave as "personal leave" or something else when, in reality, the leave qualified as FMLA leave. *Id.* at 1134-35. When an employer fails to properly deem a leave of absence as an FMLA leave, the employee may remain "subject to the control and discretion of [the employer]" in a manner which the employee would not have been had the leave been appropriately deemed as FMLA leave. *Id.* at 1135.

Plaintiff appears to raise two FMLA interference claims. On one hand, Plaintiff argues that Dr. Riskin certified that Plaintiff could work part-time. Yet, in Plaintiff's meeting with Bryan on April 28, 2006, "Bryan denied Plaintiff reduced work schedule medical leave and forced him to take full-time 'personal necessity' leave under the County's leave policy." (Doc. 272 at 17-18.) This suggests that the County denied Plaintiff any FMLA leave whatsoever and, instead, forced him to take Personal Necessity Leave. If this is Plaintiff's contention, it does not make sense. Documentation

---

[15] Defendants also argue that the non-renewal of Plaintiff's contract did not constitute an adverse employment action. This argument is addressed in connection with Plaintiff's FMLA retaliation claim.

in the record suggests that Plaintiff was on FMLA leave at minimum through the "06-09" pay period, which spanned from April 29, 2006 through May 12, 2006. In its briefing, the County submits that "Plaintiff exhausted his 12 weeks leave [under the FMLA] by June 14, 2006." (Doc. 291 at 2.) The County further represent that "[a]ll parties agree Plaintiff completely exhausted his twelve weeks of FMLA and CFRA leave by June, 2006." (Doc. 253 at 8.) It appears Plaintiff himself recognized that, by the time he filed a Government Claims Act claim with the County on July 3, 2006, he had taken FMLA/CFRA leave through June 14, 2006. (Doc. 241, Ex. 2.)[16] To the extent Plaintiff claims that Defendants did not provide him any FMLA leave and forced him to take Personal Necessity Leave instead, Plaintiff's motion for summary judgment is DENIED.

At another place in his briefing, Plaintiff argues that even though he was entitled to continue his part-time FMLA leave, Bryan forced Plaintiff to take "full-time medical leave in April 2006" to "burn up Plaintiff's medical leave entitlement" and this violated the FMLA (and the CFRA). (Doc. 275 at 2).[17] In other words, he was denied his right to take FMLA leave on a reduced schedule. Based on

---

[16] Although Plaintiff only mentioned "CFRA" leave in his Government Claims Act claim, there is no reason to believe this statement does not apply equally to FMLA leave.

[17] Both "intermittent" leave and leave on a "reduced leave schedule" are recognized forms of leave under the FMLA. *See* 29 U.S.C. § 2612(b)(1)-(2). "A reduced leave schedule is a leave schedule that reduces an employee's usual number of working hours per workweek, or hours per workday. A reduced leave schedule is a change in the employee's schedule for a period of time, normally from full-time to part-time." 29 C.F.R. § 825.202.

67

the record evidence, this argument is more plausible.

To establish this type of interference claim, Plaintiff must show: (1) he is an eligible employee; (2) his employer is an employer under the FMLA; (3) he was entitled to take the FMLA leave at issue; (4) he gave adequate notice of his intention to take the leave; and (5) the defendant denied him, or actually discouraged him from taking, such leave. *See Price v. Multnomah County*, 132 F. Supp. 2d 1290, 1297 (D. Or. 2007); *see also Hurley v. Pechiney Plastic Packaging, Inc.*, 2006 WL 708656, No. C 05-05028 JSW, at *3 (N.D. Cal. Mar. 16, 2006). "A violation of the FMLA simply requires that the employer deny the employee's entitlement to FMLA leave." *Liu*, 347 F.3d at 1135.

Elements (1)-(4) are indisputable. After Plaintiff submitted his FMLA documentation for an extension on his leave (April 26, 2006), Plaintiff had his meeting with Bryan and others (April 28, 2006) and was then given full-time FMLA leave starting in May 2006.

With respect to the fifth element, Defendants did not outright deny FMLA leave. Plaintiff does not argue that he was *not* entitled to full-time FMLA leave. Plaintiff contends that he was entitled to continue his reduced leave schedule under the FMLA but was denied that right. It does not appear that the Ninth Circuit has addressed this precise claim.

The statute provides that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, *any* right provided under this subchapter." 29 U.S.C. § 2615(a) (emphasis added). Under the FMLA, when a "serious health condition" of the employee makes the employee "unable to perform

68

the functions of the position of such employee," the employee has the right to take FMLA leave on an intermittent or reduced leave schedule" but only if such leave is "medically necessary." *Id.* at 2612(a) & (b).[18]  To take intermittent leave or leave on a reduced leave schedule, "there must be a medical need for leave and it must be that such medical need can be *best accommodated* through an intermittent or reduced leave schedule." 29 CFR § 825.202(b) (emphasis added).[19]

Plaintiff is not entitled to summary judgment on his claim. The certification from his doctor stated "[t]his employee is unable to work full time and requires part-time or less to avoid worsening of his serious medical condition." (Doc. 270 at 6.)  Viewing the evidence in a light most favorable to Defendants, this "or less" statement calls into question whether a reduced leave schedule was the best accommodation for Plaintiff's serious health condition. In addition, under Defendants' version of the events, Plaintiff was not forced to take full-time leave.  Bryan indicated it would be preferable to take full-time leave (which Plaintiff does not dispute he was entitled to take) and Plaintiff took the leave without protest.  In light of the "or less" doctor's certification, full-time leave was a reasonable option.  Plaintiff has not demonstrated that no reasonable trier of fact could find other than for him that he had a right to take leave on a reduced leave

---

[18]  No party seriously disputes that Plaintiff had a "serious health condition" under the FMLA – depression.

[19]  This requirement was previously embodied in 29 C.F.R. § 825.117.

69

schedule which was interfered with.

Viewing the evidence in a light most favorable to Plaintiff, Defendant is not entitled to summary judgment on this claim. A triable issue remains as to whether, in the words of Plaintiff, the County really "forced" him to take full-time FMLA leave even though he was entitled to a reduced leave schedule. If Plaintiff can establish that he was entitled to a reduced leave schedule, and if the County nonetheless forced him to take full-time FMLA leave instead, Plaintiff would have been forced to forgo *one* right he had under the FMLA. *See* 29 U.S.C. § 2615(a) (making it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, *any* right provided under this subchapter.") 29 U.S.C. § 2615(a) (emphasis added)*; See Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 175 (2nd Cir. 2006) (recognizing that while the FMLA says "nothing about an employer's ability to 'force' an employee to take" FMLA leave, "if the [plaintiff] were able to demonstrate that such a forced leave interfered with, restrained, or denied the exercise or attempted exercise of a right provided under the FMLA, a cause of action might lie."); *cf. Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89-90 (2002) (recognizing that an employee might have a viable interference claim where the employee could take intermittent or full-time leave; however, because the employer failed to notify the employee of her rights under the FMLA, the employee unwittingly takes full-time leave instead of intermittent leave such that she has "no leave remaining for some future emergency."). The County makes no argument that it is permissible under the FMLA for an

employer to force an employee who is entitled to a reduced leave schedule to take full-time FMLA leave instead. Accordingly, summary judgment in favor of the County on this claim is DENIED.

### 3. Section 2615(b)(1) retaliation claim

The FMLA makes it unlawful for any person to "discharge or in any other manner discriminate against any individual because such individual . . . has filed any charge, or has instituted or caused to be instituted *any proceeding*, under or related to this subchapter." 29 U.S.C. § 2615(b)(1) (emphasis added). To establish a claim under this section, Plaintiff must show that (i) he engaged in the protected activity; (ii) he was subject to adverse employment action; and (iii) this occurred "because" he engaged in the protected activity. *Id.; cf. Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994) (articulating the elements of a retaliation claim under the "opposition clause" of Title VII, 42 U.S.C. § 2000e-3(a)).

### a. Protected Activity

Plaintiff filed the instant lawsuit against Defendants before his employment contract with the County expired. His original complaint in this action alleged a cause of action under § 2615 of the FMLA. This conduct constituted protected activity under § 2615(b)(1).

Applying the plain language of the statute, a federal lawsuit, such as the one Plaintiff instituted, is a "proceeding." *See* Merriam Webster's Online Dictionary http://www.merriam-webster.com/dictionary/proceeding (defining "proceeding" as a "legal action") (last visited Apr. 2, 2009); see also *Black's Law*

*Dictionary* 1221, 1512 (7th ed. 1999) (defining "proceeding" as, among other things,"[a]ny procedural means for seeking redress from a tribunal or agency"; and defining "tribunal" as "[a] court or other adjudicatory body"). Any proceeding under or related to "this subchapter" is a reference to subchapter "I" which embraces § 2615 of the FMLA. Accordingly, instituting a federal lawsuit that contains an FMLA claim under § 2615 qualifies as "instituting any proceeding, under or related to this subchapter."

### b.  Adverse Employment Action And Causality

With respect to the second element, Plaintiff argues that his contract was not renewed because he instituted his federal lawsuit which contained an FMLA claim.  Defendants counter with several arguments.

First, Defendants argue that the failure to renew a contract that expired on its own terms does not amount to an adverse employment action.  This argument is unpersuasive.  Numerous courts have recognized, whether explicitly or implicitly, that the non-renewal of a contract can qualify as an adverse employment action. *See Wilkerson v. New Media Tech. Charter Sch. Inc.,* 522 F.3d 315, 320 (3rd. Cir. 2008) ("The failure to renew an employment arrangement, whether at-will or for a limited period of time, is an employment action, and an employer violates Title VII if it takes an adverse employment action for a reason prohibited by Title VII, such as religious discrimination."); *Mateu-Anderegg v. Sch. Dist. Of Whitefish Bay,* 304 F.3d 618, 625 (7th Cir. 2002) (concluding that it is "undisputed that . . . [the plaintiff] suffered an adverse employment action" by virtue of the non-renewal of her

employment contract)*; Kassaye v. Bryant Coll.,* 999 F.2d 603, 607 (1st Cir. 1993) (noting that the "act of refusing to renew appellant's employment" may provide the grounds for a Title VII action); *Hernandez-Mejias v. Gen. Elec.*, 428 F. Supp. 2d 4, 8 (D.P.R. 2005) ("[W]e agree with the overwhelming majority of courts that non-renewal of an employment contract constitutes an adverse employment action."); *Hicks v. KNTV Television, Inc.*, 160 Cal. App. 4th 994, 1004 n.4 (2008) (concluding that because Plaintiff's term contract "expired" and was not "renewed" characterizing the non-renewal as a "termination" was not appropriate; however, the non-renewal qualified as an adverse employment action more appropriately characterized as a "refusal to hire (or rehire)"). The non-renewal of Plaintiff's contract can qualify as an adverse employment action.

Second, Defendants argue that "no vote on the renewal of the Plaintiff's contract was ever taken." (Doc. 253 at 9.) Defendants seem to suggest that they simply let Plaintiff's contract naturally expire, and no adverse decision to not renew Plaintiff's contract was ever made. It is true that an adverse employment action necessarily implies that, in some sense, the employer "took some action," *Bouman v. Block*, 940 F.2d 1211, 1229 (9th Cir. 1991), and there may be cases in which the natural expiration of a fixed term contract, with no subsequent contract renewal or retention of the employee, does not actually involve any conscious decision or other conduct which could be characterized an adverse employment *action*. Here, however, the County's argument fails. The County actually admitted in their response to Plaintiff's separate statement of

undisputed material facts that the County decided not to renew Plaintiff's contract. (Doc. 278 at 7.)

Third, Defendants argue that Plaintiff testified at his deposition, which was after his employment with the County had ended, that he did not actually want the precise contract that was in place at the end of his employment to be renewed. Rather, Plaintiff wanted his "original contract" renewed, the one which made him the chair of the pathology department and which did not have the salary reduction component. (Pl. Dep. VI 1025:24-1026:1; 1036:20-24.) To whatever extent Plaintiff did not want his employment contract, as amended, to be renewed, this fact does not eliminate liability potential. There is no evidence that the County had actual knowledge, prior to letting Plaintiff's employment contract expire, that Plaintiff did not want his then existing contract to be renewed. The County apparently learned of this only after the fact, during Plaintiff's deposition. Accordingly, the County is not in a position to argue that not renewing Plaintiff's contract is something to which Plaintiff consented and his consent precludes him from now claiming that the non-renewal was an *adverse* employment action. If the County did not renew his then existing employment contract for an unlawful reason, such a non-renewal can create liability. If Plaintiff did not want his amended contract to be renewed, this may possibly impact Plaintiff's ability to recover damages for the non-renewal, but it does not negate the fact that the failure to renew the contract could be illegal.

Fourth, Defendants argue that allowing Plaintiff's contract to

expire and not retaining him further is not an adverse employment action because Plaintiff had "no right to a renewed employment agreement." (Doc. 253 at 6.)  Even assuming this is true, this does not preclude a conclusion that the County took an adverse employment action against Plaintiff.  An employer's decision not to retain an at-will employee is still an adverse employment action regardless of the fact that the at-will employee never had any right to a renewed employment agreement. *Cf*. *Hernandez-Mejias*, 428 F. Supp. 2d at 8 ("[E]ven at-will employees and job applicants are entitled to Title VII protection.")

With respect to the causal connection between the protected activity and the adverse employment action, Plaintiff relies on the testimony of Watson.  "[M]y understanding was that [Plaintiff] had – he had been on medical leave, family leave, and had requested even more leave, and that for that reason and *the fact that he was suing us*, that we decided not to renew his contract." (Watson Dep. 113:15-23) (emphasis added.)

For purposes of Plaintiff's motion, Watson's testimony does not sufficiently demonstrate that the decision-makers deciding upon Plaintiff's non-renewal had knowledge that Plaintiff's lawsuit involved his leave rights under the FMLA.  To show that the County retaliated against Plaintiff "because" he instituted an action under the FMLA claim, the putative retaliators must have known that he engaged in the protected activity, not just that Plaintiff "was suing us." *See Morgan,* 88 Cal. App. 4th at 70 ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.") (internal

75

quotation marks omitted); *Raad v. Fairbanks N. Star Borough Sch. Dist.,* 323 F.3d 1185, 1197 (9th Cir. 2003) (stating, in a Title VII case, "the plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity"); *Gifford v. Atchison, Topeka & Santa Fe Ry. Co.*, 685 F.2d 1149, 1155 (9th Cir. 1982) (recognizing, in a Title VII case, that to have a viable retaliation claim for engaging protected activity, the employee must show "that the employer was aware of the conduct" which constituted protected activity); *Derendinger v. Kiewit Constr. Co.*, 272 F. Supp. 2d 850, 855 (D. Alaska 2003) ("Since, by definition, an employer cannot take action *because* of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish . . . [a] prima facie case.") (emphasis added); *see also Amie v. El Paso Indep. Sch. Dist.*, No. EP-06-CA-113-DB, 2007 WL 1295800, at *7 (W.D. Tex. May 02, 2007) ("However, knowledge must entail actual knowledge that 'protected activity' has taken place, not that Plaintiff had filed an unknown type of lawsuit against EPISD [his employer]"); *Stephens v. City of Topeka, Kan.*, 33 F. Supp. 2d 947, 965 (D. Kan. 1999) ("Knowledge of an unidentified lawsuit against a former employer does not satisfactorily show the requisite knowledge. Nothing in the record indicates that defendant knew the lawsuit of plaintiff was based upon discrimination . . . ."). This testimony from Watson similarly provides no strong indication that, even if the decision-makers were minimally aware of the protected activity, that it was the FMLA claim, as opposed to Plaintiff's

combative nature as further exemplified by the fact that he "was suing us," which motivated the decision-makers. Watson's testimony is simply insufficient to warrant summary judgment in Plaintiff's favor on his FMLA retaliation claim.

For purposes of Defendants' motion, when construing the evidence in a light most favorable to Plaintiff, the FMLA retaliation claim survives summary judgment. Watson testified that Plaintiff's contract was not renewed, in part, because Plaintiff "was suing us." If Watson and other decision-makers were sufficiently aware that Plaintiff's lawsuit involved protected activity, an inference arises that the protected activity motivated the non-renewal decision.

During Watson's deposition, counsel failed to elicit direct testimony from Watson regarding whether he or those discussing or deciding upon the non-renewal were aware, at the time of the non-renewal, that Plaintiff's lawsuit involved allegations concerning his leave rights. In fact, one portion of Watson's testimony demonstrates that he lacked an understanding of the nature of the lawsuit:

> Q. So do you have an understanding about whether Dr. Jadwin in this lawsuit is claiming retaliation for whistleblowing about patient-care issues and legal noncompliance issues?
>
> A. No, I – I was not aware of that.

(Watson Dep. 120:21-25.) To survive summary judgment, Plaintiff "must make *some* showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity." *Raad*, 323 F.3d 1197 (emphasis

added); *see also Dev v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) (stating, in a Title VII case, that a plaintiff "may rely on circumstantial evidence to establish her employer's awareness of protected expression" and the plaintiff must "produce evidence that would support an inference that Irsay [a decision-maker] was . . . aware" of the "sexual harassment complaints"). Here, Plaintiff has barely enough circumstantial evidence of knowledge to survive summary judgment.

Watson testified that he was aware of the "Family Medical Leave Act" and the "California Family Rights Act," that Plaintiff took a medical leave of absence, and that Plaintiff had requested "continued leaves of absence." (Watson Dep. 67:7-12; 80:23-24; 113:20.) Watson further testified that, with respect to the decision to remove Plaintiff from chairmanship, "we discussed what his rights were under the medical leave act." (Watson Dep. 68:24-25.) From his testimony, an inference arises that Watson and others were aware that Plaintiff's leave rights would be implicated by the removal decision. Moreover, Watson testified that he and others rely on County counsel for information with respect to employment decisions: "Before a personnel decision was made, we would — would be advised by counsel as to whether the employee's rights had been honored." (Watson Dep. 71:7-9.) Watson's testimony suggests that, before the non-renewal decision, Watson and others conferred with a person with specific knowledge of the particulars of Plaintiff's lawsuit (County counsel). At no point in Watson's testimony did he affirmatively disclaim knowledge that Plaintiff's lawsuit concerned his leave rights. Based on Watson's testimony,

Plaintiff has circumstantial evidence sufficient to raise an inference that he and others who discussed and decided upon the non-renewal were aware that Plaintiff's lawsuit concerned his leave rights. *See Dey*, 28 F.3d at 1458 (noting that, to survive summary judgment, a plaintiff need not prove knowledge of protected activity "by a preponderance of the evidence."). Accordingly, Defendants' motion for summary judgment on the FMLA retaliation claim is DENIED.

D. **CFRA**

1. **"Retaliation" For Taking CFRA Leave**

The Ninth Circuit in *Bachelder* and *Liu* rejected the application of the *McDonnell Douglas* burden-shifting framework to an FMLA claim premised on the theory that an employer used an employee's FMLA leave as a negative factor in an adverse employment decision. *Bachelder* and *Liu* also disapproved of labeling such claims as "retaliation" claims. At least some California courts, on the other hand, apply the *McDonnell Douglas* burden-shifting framework to parallel CFRA claims and call them "retaliation" claims. In *Faust v. California Portland Cement Co.*, the court explained:

> *Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 261, addresses the elements of a cause of action for retaliation in violation of the CFRA. *Dudley*, which was guided by the federal law counterpart, sets forth the elements as follows: (1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA leave; (3) the plaintiff exercised her right to take leave for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse employment action, such as termination, fine, or suspension, because of her exercise of her right to CFRA leave. Once an employee establishes a prima facie case, the employer is required to offer a legitimate,

> nonretaliatory reason for the adverse employment action. If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation drops out of the picture, and the burden shifts back to the employee to prove intentional retaliation.

150 Cal. App. 4th 864, 885 (2007) (internal citations and quotation marks omitted).

As the moving party with the burden of proof on his CFRA retaliation claim, Plaintiff must show that no reasonable trier of fact could find against him that because of his CFRA leave, an adverse employment decision was made. Plaintiff must "demonstrate affirmatively (by admissible evidence) that there is no genuine issue of material fact as to each element of [his] claim for relief, entitling [him] to judgment as a matter of law." *Coldwell v. County of Fresno*, No. CV-F-07-1131 LJO SMS, 2009 WL 179686, at *3 (E.D. Cal. Jan. 26, 2009).

With respect to the first three elements, Defendants admit that Plaintiff took a CFRA leave from December 16, 2005 to March 15, 2006. (Doc. 278 at 23.) Defendants also concede that Plaintiff took additional CFRA leave because Defendants acknowledge that Plaintiff exhausted his CFRA leave by June 2006. However, for the reasons discussed above with respect to Plaintiff's FMLA claim, there is a triable issue as to whether Plaintiff was removed from his chairmanship, and as to whether his contract was not renewed, because of his CFRA leave. Accordingly, Plaintiff is not entitled to summary judgment on his CRFA retaliation claim.

Defendants are also not entitled to summary judgment on this CFRA retaliation claim. The nature of Plaintiff's evidence is such

that notwithstanding the contention that he was removed from his chairmanship for legitimate reasons – because of his unprotected absence and lack of evident commitment to return to work – a reasonable trier of fact could nonetheless conclude that, because of his CFRA leave, Plaintiff was removed from his chairmanship. The same can be said with respect to the non-renewal of Plaintiff's employment contract.   Plaintiff's and Defendants' motions for summary judgement are DENIED.

### 2.  Denial Of/Interference With CFRA Leave

Under the CFRA, it is unlawful for an employer "to refuse to grant a request" for CFRA leave made by an eligible employee for a qualifying reason.  Cal. Gov't Code § 12945.2(a).  Plaintiff makes the same claim under the CFRA that he does under the FMLA – that he was "forced" to take full-time leave when he was entitled to a reduced leave schedule.  The same conclusions reached above apply equally to this CFRA claim. *See Liu*, 347 F.3d at 1132 n.4 (recognizing that leave denial/interfence claims under the CFRA and FMLA can be analyzed together "[s]ince CFRA adopts the language of the FMLA and California state courts have held that the same standards apply.").  The motions are DENIED.

### E.  Disability Claims

Plaintiff raises three FEHA claims related to an alleged disability.  Plaintiff asserts that the County accommodated his disability (depression) from December 16, 2005 to April 16, 2006, by providing him with a reduced work schedule. (Doc. 272 at 23.) Plaintiff asserts that he requested an extension of his reduced leave schedule.  According to Plaintiff, "[o]n April 18, 2006,

Bryan refused to accommodate Jadwin's disability" and "[i]nstead he forced him to take full-time leave" and required Plaintiff, upon the cessation of his leave, to return to work full-time. (*Id.*) Plaintiff claims that by failing to permit him to continue with his reduced leave schedule, the County failed to reasonably accommodate his disability in violation of the FEHA. Plaintiff also claims that because he was required or "forced" to take a full-time leave, the County failed to engage in the interactive process. Finally, Plaintiff argues that the County discriminated against him because of his disability in that his removal from the chairmanship and associated pay cut, and the non-renewal of his contract, are attributable to his disability.

### 1. Failure To Make Reasonable Accommodation

Under the FEHA, it is unlawful for an employer to "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee" unless the accommodation would "produce undue hardship to its operation." Cal. Gov't Code § 12940(m). In order to establish a FEHA claim for failure to make reasonable accommodate, a plaintiff must show that, at the time of the alleged failure, (1) he had a disability of which the employer was aware, (2) he was able to perform the essential functions of the job at issue with or without accommodation, i.e., that he was qualified individual,[20] and (3), the employer failed to reasonably

[20] In cases where a leave of absence may be a reasonable accommodation, the question is not whether the employee can perform the essential functions of the job during the leave period. Rather, the question is whether the leave of absence is likely to enable the employee, upon his return from leave, to resume

accommodate for his disability. *Nadaf-Rahrov v. Neiman Marcus Group, Inc.*, 166 Cal. App. 4th 952, 977-79 (2008); *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 256 (2000); *Diaz v. Fed. Express Corp.*, 373 F. Supp. 2d 1034, 1054 (C.D. Cal. 2005).

### a. Disability

In this case, Plaintiff claims his "depression" qualifies as a "mental disability." Under the FEHA, a "mental disability" is defined, in relevant part, as including "any mental or psychological disorder or condition, such as mental retardation, organic brain syndrome, emotional or mental illness, or specific learning disabilities, that limits a major life activity." § 12926(i)(1). A "mental disability" includes "chronic or episodic conditions" such as, but not limited to, "clinical depression." *See* § 12926.1©.

Defendants do not seriously dispute that Plaintiff had depression, a mental condition, while working for the County. In his letter to Bryan dated January 9, 2006, Plaintiff noted that he was suffering from "depression and insomnia." (Doc. 266 at 133.) Plaintiff's assertion that he was suffering from depression is corroborated by the forms that Plaintiff's doctor, Dr. Riskin, filled out to qualify Plaintiff for medical leaves. On these forms, Dr. Riskin identified his practice as "psychiatry" and

---

performing the essential functions of the job. *Hanson v. Lucky Stores, Inc.,* 74 Cal. App. 4th 215, 226 (1999)*; Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1135-36 (9th Cir. 2001); *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999). Working part-time while making a "gradual return to full-time work" can be a reasonable accommodation. *Pals v. Schepel Buick & GMC Truck*, *Inc.*, 220 F.3d 495, 498 (7th Cir. 2000).

indicated that Plaintiff needed treatment and reoccurring doctor's visits for his condition. (Doc. 270 at 4-6.) Plaintiff's assertion that he was suffering from depression is also corroborated by Dr. Reading, Plaintiff's forensic psychologist, who diagnosed Plaintiff as having a major depressive disorder:

> Dr. Jadwin developed an Axis I disorder during the course of working at Kern, consisting of a major depressive disorder. This was treated with both psychotherapy and psychotropic medication by Dr Riskin, while he continued to work, initially culminating in a regression of his symptoms and improvement in function by around 2004. He continued to function until the issues arising from the oncology conference in 2005 led to a further flare up of his depressive disorder, which had receded but not resolved at that time. Arising from this and its aftermath, he encountered a serious recurrence of his depressive disorder, which has continued to the current time.

(Doc. 269 at 61.)   The County does not challenge that Plaintiff's depression qualifies as "any mental . . . disorder or condition" within the meaning of the FEHA.   *See Auburn Woods I Homeowners Ass'n v. Fair Employment Hous. Comm'n*, 121 Cal. App. 4th 1578, 1592-93 (2004) ("Numerous cases under state and federal law have held that depression and its related manifestations can meet the definition of disability under antidiscrimination laws.").

Rather than challenge the existence of Plaintiff's depression, Defendants argue that Plaintiff's depression is not recognized under the FEHA because it is a "work-related injury which arose during the course of his employment, not a disability that he brought with him to the job." (Doc. 262 at 13.)   Defendants' argument lacks merit.   To be "disabled" within the meaning of the FEHA, the employee need not bring the disability with him to the job.   A work-caused condition can be a cognizable "disability"

under the FEHA. *See City of Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1157 (1998) ("Nothing in [the FEHA] suggests that the FEHA only applies to physical or mental disabilities that are unrelated to work.").[21]

---

[21] In a related argument, Defendants contend that Plaintiff's disability-related FEHA claims are preempted by California workers' compensation scheme. Defendants argue that workers' compensation provides the exclusive remedy for Plaintiff's disability-related FEHA claims because his disability – depression – was allegedly "caused by working at KMC." (Doc. 253 at 15.) This argument is erroneous. Plaintiff is not seeking damages for his depression. Plaintiff is seeking remedies for violations of the FEHA, which violations (if they occurred) fell outside the compensation bargain. The workers' compensation scheme does not provide the exclusive remedy for Plaintiff's disability-related claims under the FEHA even if his depression arose from the employment relationship. *See City of Moorpark*, 18 Cal. 4th at 1148 ("[W]e consider whether FEHA . . . remedies are available to an employee who has suffered discrimination based on a work-related disability, meaning . . . a disability resulting from an injury arising out of and in the course of the employment that gave rise to the discrimination. We conclude that section 132a does not provide the exclusive remedy . . . and that FEHA . . . remedies are available."); *Ruiz v. Cabrera*, 98 Cal. App. 4th 1198, 1203 (2002) ("[A]n injured worker c[an] pursue a disability discrimination claim under the Fair Employment and Housing Act or a so-called *Tameny* wrongful termination claim even though the disability arose from an on-the-job injury.") (internal citation omitted); *Bagatti v. Dep't of Rehab.*, 97 Cal. App. 4th 344, 366-68 (2002) (concluding that the Workers' Compensation Act does not provide the exclusive remedy for a FEHA failure to accommodate claim, reasoning, in part, that "[j]ust as discrimination on the basis of disability falls outside the compensation bargain, so too the employer's commission of another statutory unlawful employment practice, as defined by subdivision (m) of section 12940, falls outside the compensation bargain."). If the County can show that Plaintiff applied for and obtained some compensation under the workers' compensation scheme, due to "equitable principles," Plaintiff would not be able to "recover these [same] damages as part of a subsequent FEHA proceeding." *City of Moorpark*, 18 Cal. 4th at 1158. No such

Alternatively, Defendants argue that Plaintiff's mental condition did not "substantially" limit him in the major life activity of working. Defendants' reliance on the "substantially limits" test from the ADA regime is misplaced. California law does not follow this standard. *Turner v. Ass'n Of Am. Med. Colls.*, 167 Cal. App. 4th 1401, 1405-06 (2008) ("[T]he California definition of disability as one that 'limits' a major life activity by making it 'difficult' is more inclusive than the ADA's 'substantially limits' standard.").

Under California law a mental condition "limits" a major life activity if "it makes the achievement of the major life activity difficult." § 12926(i)(1)(B). This must be determined "without regard to mitigating measures, such as medications, assistive devices, or reasonable accommodations, unless the mitigating measure itself limits a major life activity." § 12926(i)(1)(A). "Major life activities" are to "be broadly construed and shall include physical, mental, and social activities and working." § 12926(i)(1)©. With respect to "working," it qualifies as a major life activity "regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments." § 12926.1©; *see also EEOC v. United Parcel Serv., Inc.*, 424 F.3d 1060, 1073 (9th Cir. 2005). The "FEHA does not require that the disability result in utter inability or even substantial limitation on the individual's ability to perform major life activities. A limitation is sufficient." *United Parcel*

---

showing has been made.

*Service, Inc.*, 424 F.3d at 1071.

Plaintiff asserts that his depression made it difficult for him to engage in "the medical work to which he had devoted his life." (Doc. 272 at 19.) "In deciding whether [the employees'] limitations . . . make them 'disabled' under FEHA, the proper comparative baseline is either the individual without the impairment in question or the average unimpaired person." *Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 345 (2008) (emphasis and internal quotation marks omitted). An average person can work 40 hours in a week, as "40 hours is considered a full work week in our culture." *Arteaga*, 163 Cal. App. 4th at 346 (internal quotation marks omitted). Plaintiff has established that, at the time he sought a continuation of his reduced work schedule, he was limited in the major life activity of working. His doctor's certifications and his taking of leave reveal that his mental condition made it difficult for him to work full-time, which is certainly a "limitation" on working.

### b. Knowledge

Under the FEHA, an impairment such as a mental or physical condition does not by itself qualify as a mental or physical disability under the statute. *Gelfo v. Lockheed Martin Corp*, 140 Cal. App. 4th 34, 47 (2006). To constitute a disability, the condition must limit a major life activity of the employee. *Id*.

Courts have recognized that the knowledge required to support a disability-related claim varies depending on the context. For reasonable accommodation claims, a showing that the employer knew the employee had some impairment such as a mental or physical

condition is not enough.  The employer must have been aware that the impairment limited the employee in a major life activity.  *See Adams v. Rice,* 531 F.3d 936, 953-54 (D.C. Cir. 2008) ("If, however, the hypothetical telephone receptionist sought an accommodation from his employer so that he could return to work, the employer would obviously need to know about the employee's claimed hearing limitation" not just the medical condition itself); *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 164 (5th Cir. 1996) ("[I]t is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability.  This distinction is important because the ADA requires employers to reasonably accommodate limitations, not disabilities."); *Avila v. Cont'l Airlines, Inc.*, 165 Cal. App. 4th 1237, 1252 (2008) ("[T]he duty of an employer reasonably to accommodate an employee's handicap does not arise until the employer is aware of respondent's disability and physical limitations.") (internal quotation marks omitted).

With respect to a disability discrimination claim (which Plaintiff also raises and which will be discussed below), where an adverse employment action is taken because of the employee's condition (e.g., cancer), an employer's actual knowledge of the condition is enough.  To be liable, the employer need not know that the condition (of which it has knowledge) sufficiently limits a major life activity.

> [I]n pure discrimination cases like Adams's, an employer's knowledge of the precise limitation at issue is irrelevant; so long as the employee can show that her

> impairment ultimately clears the statutory hurdle for a disability-i.e., it substantially limited a major life activity-the employer will be liable if it takes adverse action against her based on that impairment.

*Adams*, 531 F.3d at 953.

If an employer disclaims actual knowledge of the employee's condition, an employer can still be found liable for disability discrimination in cases where knowledge of a disability can be inferred. "Liability for disability discrimination does not require professional understanding of the plaintiff's condition. It is enough to show that the defendant knew of symptoms raising an inference that the plaintiff was disabled." *Sanglap v. LaSalle Bank, FSB*, 345 F.3d 515, 520 (7th Cir. 2003). Knowledge of just the symptoms or effects of an otherwise undisclosed condition is not, however, sufficient if those symptoms or effects do not raise an inference that the person is disabled. *See Avila,* 165 Cal. App. 4th at 1249 & n.5 (concluding the employer lacked sufficient knowledge of an employee's physical disability because the hospital forms the employee submitted stated only that the she was hospitalized for three days and unable to work on four work days but did not otherwise indicate that the employee suffered from pancreatitis or any other condition, and for all the employer knew the employee "might have been hospitalized for reasons other than disability"); *Brundage v. Hahn*, 57 Cal. App. 4th 228, 237 (1997) (concluding the employer lacked knowledge of the employee's mental disability –– manic depressive disorder -- even though the employer knew the employee "had taken a substantial amount of leave for medical appointments" because none of the employee's leave requests "even

hinted at any mental disability"); *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995).

For purposes of his accommodation claim, Plaintiff has sufficient evidence that Bryan/County were aware that he had a mental condition and the limits it placed upon his ability to work full-time.

Plaintiff's January 9, 2006, letter to Bryan specifically stated that Plaintiff had developed "depression and insomnia." (Doc. 266 at 133.)  In their response to Plaintiff's statement of undisputed material facts, Defendants concede that "[o]n January 9, 2006, Dr. Jadwin had asked Defendant Bryan to allow him to work part-time and at home *while he was recovering from his disabling depression*." (Doc. 278 at 28) (emphasis added.) Defendants also concede that "Bryan admitted knowing that Dr. Jadwin needed leave because of his depression." (Doc. 278 at 27.)  In addition to these concessions, Bryan attached Plaintiff's two requests for medical leave to the memorandum he (Bryan) drafted summarizing the meeting on April 28, 2006. (Doc. 266-2 at 9-10.)  This demonstrates Bryan had access to some of Plaintiff's leave-related documentation and knew of Plaintiff's medical request for additional leave.  Both of his requests for medical leave also noted, on their face, that they were accompanied by a "Physician's Note." (*Id.*).  Defendants concede that "Dr. Riskin's certifications stated that Plaintiff needed medical/recuperative leave for depression from December 16, 2005 to September 16, 2006." (Doc. 278 at 27.) These forms indicated that Dr. Riskin's practice was "psychiatry" and recommended that Plaintiff work less than full-time. (Doc. 270 at 4-6.)  *See Faust*,

150 Cal. App. 4th at 887 (concluding that the employee's submission of a chiropractor's "work status report" stating that the employee was "'unable to perform regular job duties'" created a triable issue as to the employer's knowledge of the employee's physical disability, noting that "an employer knows an employee has a disability when the employee tells the employer about his condition, or when the employer otherwise becomes aware of the condition, such as through a third party or by observation."). Plaintiff has carried his burden of demonstrating that Bryan/County had sufficient knowledge of his disability at the time of his requested accommodation.

### c. Denial Of A Reasonable Accommodation

Plaintiff argues that notwithstanding knowledge of his disability, the County denied him a reasonable accommodation. Plaintiff concedes that the County accommodated his disability for four months, "from December 16, 2005 to April 16, 2006, by providing him with the reduced work schedule medical leave" that he had requested. (Doc. 272 at 23.) Plaintiff argues that he requested an extension of his reduced leave schedule consistent with his psychiatrist's certification. On April 28, 2006, Bryan allegedly refused to grant this request and accommodate Plaintiff's disability. Instead, Bryan allegedly required Plaintiff to take full-time leave until June 16, 2006, the date on which Plaintiff would have apparently exhausted all potential sources of leave entitlement (Doc. 266-2 at 5.) On that date, Plaintiff had to give the County an answer as to whether the would return to work full-time or not. (*Id.*)

By classifying his full-time leave – which Bryan allegedly required him to take – as a denial of reasonable accommodation, Plaintiff has overlooked the fact that his full-time leave could have constituted a reasonable accommodation in itself. *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 226 (1999) ("[A] finite leave can be a reasonable accommodation under FEHA, provided it is likely that at the end of the leave, the employee would be able to perform his or her duties."); *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1135-36 (9th Cir. 2001) (recognizing that a leave of absence may be a reasonable accommodation under the ADA where it "would reasonably accommodate an employee's disability and permit him, upon his return, to perform the essential functions of the job").

Whether his full-time leave was a reasonable accommodation is a fact-specific individualized inquiry that takes into account the totality of the circumstances. *See Hanson*, 74 Cal. App. 4th at 228 n.11; *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999); *Zukle v. Regents Of The Univ. Of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999). "In the summary judgment context, a court should weigh the risks and alternatives, including possible hardships on the employer, to determine whether a genuine issue of material fact exists as to the reasonableness of the accommodation." *Nunes*, 164 F.3d at 1247. When more than one accommodation is reasonable, it is the employer's prerogative to choose which accommodation will be utilized. *Hanson*, 74 Cal. App. 4th at 228.

When confronted with Plaintiff's request for an extension on his leave, besides the course it took, the County could have

permitted Plaintiff to continue working on a reduced schedule for some period of time, and at least until all his sources of leave (including his entitlements under the FMLA/CFRA) were exhausted. Despite potential alternatives, if the accommodation Plaintiff actually received was a reasonable one, Plaintiff's accommodation claim fails as a matter of law.

In light of all the circumstances, there is a genuine dispute as to whether full-time leave was a reasonable accommodation for Plaintiff's disability.

In the County's favor, Plaintiff's doctor's certification indicated he needed to work "part-time *or less*" to avoid worsening of his serious medical condition. (Doc. 270 at 6) (emphasis added.) The certification certainly justified the County in offering full-time leave. If Plaintiff was offered full-time leave and he took it without protest (which the evidence, when construed in a light most favorable to Defendants, suggests), a trier of fact could conclude that full-time leave was a reasonable accommodation.

In Plaintiff's favor, the doctor's certification did *not* explicitly restrict Plaintiff from working altogether – which, if Plaintiff is  to believed, is what Bryan did by requiring him to take full-time leave. The County has not pointed to any concrete evidence that a full-time leave was, actually, better for Plaintiff's disability, and thus more likely to assist his return to full-time employment, than a reduced work schedule. If the County simply forced Plaintiff to take a full-time leave that was not mandated by his doctor nor medically better for Plaintiff in any event, a reasonable jury could conclude that the County's

accommodation was unreasonable.  Even if Plaintiff's full-time leave was not a reasonable accommodation, this alone does not establish Plaintiff's failure to accommodate claim.  Plaintiff must create a triable issue that a reasonable accommodation existed which he was denied.  *Nadaf-Rahrov*, 166 Cal. App. 4th at 979.

Viewing the evidence in the light most favorable to Plaintiff, the County could have permitted Plaintiff to remain on a reduced work schedule leave for some period of time, and at least until his entitlements to leave, including his entitlements under the FMLA and CFRA, ran out.  A reduced work schedule leave would have been more consistent with the doctor's certification, which did not explicitly restrict Plaintiff from working altogether, and hence better tailored to Plaintiff's medical needs.  Plaintiff also has evidence that working part-time was therapeutic for him and, accordingly, more likely to aid his recovery and return to full-time employment than a forced full-time leave.  Viewing the evidence in a light most favorable to Plaintiff, it is at least plausible (although by no means clear) that permitting Plaintiff to continue with his reduced work schedule could have facilitated Plaintiff's return to employment on some level of availability acceptable to the County. *See Hanson*, 74 Cal. App. 4th at 226 ("As long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform his job, an employer is liable for failing to attempt that accommodation.") (internal quotation marks omitted); *Nunes*, 164 F.3d at 1247 ("*Even an extended medical leave, or an extension of an existing leave period*, may be a reasonable accommodation if it does not pose an undue hardship on

the employer.") (emphasis added).  The County has not sufficiently demonstrated that permitting such an arrangement would have caused undue hardship.  Accordingly, Plaintiff's reasonable accommodation claim survives Defendants' motion for summary judgment.  As discussed above, however, a reasonable trier of fact could conclude that Plaintiff was provided a reasonable accommodation in that he was offered full-time leave and he took it without protest.  After his full-time leave ended, Plaintiff requested no further leave for his disability.  Accordingly, Plaintiff is not entitled to summary judgment on his reasonable accommodation claim.  Both parties' motions on the failure to accommodate claim are DENIED.

## 2.   Failure To Engage In The Interactive Process

Under the FEHA, it is unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." Cal. Gov't Code § 12940(n).   "I[t] is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one." *Spitzer v. Good Guys, Inc.*, 80 Cal. App. 4th 1376, 1384 (2000) (internal quotation marks omitted).

> [T]he interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees with the goal of identify[ing] an accommodation that allows the employee to perform the job effectively. . . . [F]or the process to work [b]oth sides must communicate directly, exchange essential information and neither side can delay or

> obstruct the process. When a claim is brought for failure
> to reasonably accommodate the claimant's disability, the
> trial court's ultimate obligation is to isolate the cause
> of the breakdown . . . and then assign responsibility so
> that [l]iability for failure to provide reasonable
> accommodations ensues only where the employer bears
> responsibility for the breakdown.

*Nadaf-Rahrov*, 166 Cal. App. 4th at 985 (alteration in original) (internal citations and quotation marks omitted). To succeed on an interactive process claim, the employee must show that a reasonable accommodation was available. *Id.* at 985.

There can be no dispute that Plaintiff requested to continue working on a reduced schedule. By Plaintiff's account, in response to his request, at the meeting on April 28, 2006, rather discuss possible accommodations, he was simply told to take a full-time leave which he never requested. Plaintiff has created a genuine dispute of material fact whether a reasonable accommodation existed (which the interactive process could have uncovered). By the County's account, Plaintiff was offered full-time leave, which the County preferred, and Plaintiff took it without protest. On these divergent facts, no party is entitled to summary judgment on Plaintiff's interactive process claim.

3. <u>Disability Discrimination</u>

Under the FEHA, it is unlawful for an employer "because of" a person's "physical disability, mental disability, [or] medical condition" to "refuse to hire or employ the person" or "to discharge or to bar the person from employment" or to "discriminate against the person in compensation or in terms, conditions, or privileges of employment." Cal. Gov't Code § 12940(a). To establish a prima

facie case of disability discrimination, Plaintiff must show: (1) that he suffered from a disability of which the employer was aware; (2) that, notwithstanding his disability, he could perform the essential functions of his job with or without reasonable accommodation, and (3) that he was subjected to an adverse employment action because of his disability.[22] *See Green v. State*, 42 Cal. 4th 254, 262, 264 (2007); *Nadar-Rahrov*, 166 Cal. App. 4th at 964; *Finegan v. County of Los Angeles*, 91 Cal. App. 4th 1, 7 (2001). To satisfy the third element, among other things, "a plaintiff must prove the employer had knowledge of the employee's disability when the adverse employment decision was made." *Brundage*, 57 Cal. App. 4th at 236-37; *see also Avila*, 165 Cal. App. 4th at 1248 ("[T]o show that Continental acted with discriminatory intent, plaintiff was required to produce evidence that the Continental employees who decided to discharge him knew of his disability.").

Plaintiff asserts that because of his disability, depression, he was removed from his chairmanship and his pay was cut, and his contract was not renewed. Because his FMLA/CFRA leaves of absence were for his depression (also a disability under the FEHA), Plaintiff claims that any adverse decision based on those absences is unlawful disability discrimination. *See Head v. Glacier Nw. Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005) ("[W]e hold that the ADA

---

[22] As discussed above, Plaintiff has met his burden of demonstrating that he had a mental condition which limited his ability to work. Plaintiff also has created a triable issue (but not conclusively established) that he could perform the essential functions of his job with or without reasonable accommodation for his disability.

outlaws adverse employment decisions motivated, even in part, by animus based on a plaintiff's disability or request for an accommodation-a motivating factor standard."); *Humphrey*, 239 F.3d at 1139-40 (recognizing that "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for" an adverse employment action, and giving, as an example, "excessive absenteeism caused by migraine-related absences"). Relatedly, Plaintiff argues because permitting him to continue working on a reduced schedule would have been a reasonable accommodation, then demoting Plaintiff for his complete absence from work during his full-time leave – when he would have been there at least part of the time if a reasonable accommodation were given – also constitutes discrimination because of his disability. *See Humphrey*, 239 F.3d at 1140 ("The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability."). These issue remain in dispute.

### a. Removal From The Chairmanship And Pay Cut

The evidence shows that Bryan had knowledge of Plaintiff's disability. Because the JCC adopted Bryan's recommendation, Bryan's knowledge of Plaintiff's disability is sufficient (Plaintiff need not separately prove the JCC also had the requisite knowledge at the time of the removal vote). *See Wysinger v. Auto. Club Of S. Cal.*, 157 Cal. App. 4th 413, 421 (2007) (recognizing that the "decision maker's ignorance does not categorically shield the employer from liability if other substantial contributors to the decision bore the

requisite animus" and stating "[b]ecause Kane was a motivating force in the selection, his animus is imputed to ASCS [the employer]").

There is a triable issue as to whether it was Plaintiff's absence from work during his protected leaves under the FMLA/CFRA, including his full-time leave, that prompted the removal decision, or whether it was his continued unprotected absence *after* his protected leave expired which prompted the removal decision. Plaintiff has not sufficiently demonstrated that his absence from work *after* his full-time leave expired was attributable to his disability. Indeed, it seems Bryan took it upon himself to place Plaintiff on Personal Necessity Leave for reasons unrelated to Plaintiff's depression – Plaintiff avulsed a ligament in his ankle. After his full-time leave ended, Plaintiff requested no further leave for his disability. For these reasons, the County survives Plaintiff's disability discrimination claim. This motion is DENIED.

### b. <u>Non-renewal</u>

To support his claim that the non-renewal of his contract was motivated by his disability, Plaintiff relies on the testimony of Watson:

> Q. So the question is: You've mentioned that for the nonrenewal one of the reasons was that Dr. Jadwin wasn't available for work; is that correct or
>
> A. My understanding was that he had -- he had been on medical leave, family leave, and had requested even more leave, and that for that reason and the fact that he was suing us, that we decided not to renew his contract.

(Watson Dep. 113:15-23.) Viewing this testimony in a light most favorable to the County, this testimony does not warrant summary judgment in Plaintiff's favor. As discussed above, a reasonable

interpretation of this testimony is "that reason" was a reference to Plaintiff's non-protected leave after his FMLA/CFRA leave expired. The evidence is insufficient to show that Plaintiff's absence, at that time, was attributable to his depression. It appears Bryan took it upon himself to place Plaintiff on Personal Necessity Leave for reasons unrelated to Plaintiff's depression. Plaintiff actually denies that he requested any further leave of absence from Bryan, whether because of his depression or otherwise, after his full-time leave expired. Because Watson's testimony can be reasonably interpreted as referring to Plaintiff's absence from work at a time when his absence was not attributable to his disability (depression), Plaintiff is not entitled to summary judgment on this disability discrimination claim. This motion is DENIED.

With respect to the County's motion for summary judgment, viewing this testimony and other evidence in a light most favorable to Plaintiff, the County is not entitled to summary judgment on this claim. Another reasonable interpretation of Watson's testimony is that Plaintiff's "medical leave," including his full-time leave, motivated, in part, the non-renewal decision. Of course, this alone is not sufficient to establish Plaintiff's disability discrimination claim. To survive summary judgment, Plaintiff must raise a triable issue that Watson and the other decision-makers[23] deciding upon Plaintiff's non-renewal had sufficient knowledge that Plaintiff's

---

[23] Bryan retired in September 2006 and did not participate in the non-renewal decision.

"medical leave" was attributable to an underlying disability.[24]

At his deposition, when asked about why he supported the removal of Plaintiff from his chairmanship, Watson explained that "he [Plaintiff] wasn't there *mentally* or physically." (Watson Dep. at 16:9) (emphasis added.) When asked about Plaintiff's "emotional health," Watson responded:

> A. My – my overall impression over the months from hearing verbal reports was that Dr. Jadwin was emotional and irrational, confrontational. I have never observed it. All I could rely on is what I was told.
>
> . . . .
>
> Q. What do you understand the term "emotional health" to mean?
>
> A. That he [Plaintiff] was highly reactive, highly emotional –
>
> Q. Yeah.
>
> A. – and just didn't seem to be rational.
>
> Q. Didn't seem to be rational?
>
> A. In his – in the way that he was dealing with people.

When asked about Plaintiff's medical leave, Watson responded that "*I know that he had some medical issues*." (Watson Dep. 68:22-25.) (emphasis added.) Watson further explained "From the – my understanding of the way he had been handling him selves – himself and asking for continued leaves of absence, I was under the impression that he really wasn't able to – *to function*, and I really

---

[24] Although Watson, in his declaration, now claims that "no such decision" on the non-renewal was made, the court cannot weigh the evidence and determine which version of the events the trier of fact is likely to believe. On summary judgment, the court must analyze the evidence in a light most favorable to the non-moving party.

didn't expect him to come back [after being removed from his chairmanship]." (Watson Dep. 80:22-81:2) (emphasis added.) Finally, when asked specifically about whether he knew Plaintiff had depression, Watson testified as follows:

> Q. Were you aware that Dr. Jadwin was suffering from depression, that he was a disabled individual?
>
> A. His specific diagnosis I was not aware of. I was aware that he seemed to be having some emotional issues of some kind.
>
> Q. Okay. And again, when did you – when did you become aware that Dr. Jadwin was having emotional issues of some kind?
>
> A. I could not tell you when. I think it was a part of a pattern that had been discussed over many months.

(Watson Dep. 85:3-14.)

"Liability for disability discrimination does not require professional understanding of the plaintiff's condition. It is enough to show that the defendant knew of symptoms raising an inference that the plaintiff was disabled." *Sanglap*, 345 F.3d at 520. Watson's testimony that he was aware Plaintiff was not there "mentally," was "emotional and irrational," was having "emotional issues of some kind[,]" "had some medical issues," that he "was asking for continued leaves of absence" and was thus "under the impression" that Plaintiff "wasn't able to – to function" and that his emotional issues were "part of a pattern that had been discussed over many months" is sufficient to create a triable issue that Watson had the requisite knowledge that Plaintiff's medical leaves of absence were attributable to some underlying mental condition. Viewed in a light most favorable to Plaintiff, Watson's testimony also creates an inference that Plaintiff's irrational behavior,

102

"pattern" of emotional issues and leaves of absence were common knowledge and/or discussed among decision-makers such that Watson and any others who participated in the non-renewal decision had sufficient knowledge that Plaintiff's absence from work was attributable to some underlying mental condition. Plaintiff's disability discrimination claim survives summary judgment. Defendant's motion is DENIED.

## F.   FEHA Retaliation Claim

Under the FEHA, it is unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." Cal. Gov't Code § 12940(h). To establish a prima facie case of retaliation under this section, a plaintiff must show: (1) he engaged in protected activity; (2) he was thereafter subject to adverse employment action; and (3) a causal link between the two. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005); *Mathieu v. Norrell Corp.*, 115 Cal. App. 4th 1174, 1185 (2004). "Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." *Morgan*, 88 Cal. App. 4th at 70 (internal quotation marks omitted).

Plaintiff argues that he engaged in protected activity under the FEHA by filing DFEH complaints and his initial federal complaint in this action which contained (and still contains) causes of action under FEHA, including the CFRA. Plaintiff contends that, because of this protected activity, his employment contract was not renewed.

103

In support of his theory, Plaintiff relies on the testimony of Watson that "[m]y understanding was that [Plaintiff] had – he had been on medical leave, family leave, and had requested even more leave, and that for that reason and *the fact that he was suing us*, that we decided not to renew his contract." (Watson Dep. 113:15-23) (emphasis added.)

Plaintiff's FEHA retaliation claim lacks sufficient evidence to warrant summary judgment in Plaintiff's favor. Watson's testimony does not demonstrate that those discussing and deciding upon Plaintiff's non-renewal were aware that Plaintiff's lawsuit involved his rights under the FEHA, including the CFRA. To demonstrate that the County retaliated against Plaintiff "because" he filed a complaint asserting his rights under the FEHA, the putative retaliators must have at least known that Plaintiff engaged in the protected activity, not just that Plaintiff "was suing us." The testimony from Watson similarly provides no strong indication that, even if the decision-makers were minimally aware of the protected activity, that it was the FEHA claims, as opposed to Plaintiff's combative nature as further exemplified by the fact that he "was suing us," which motivated the decision-makers.

While Plaintiff's evidence is not sufficient to warrant summary judgment in his favor, Plaintiff's evidence, when construed in a light most favorable to him, is sufficient to survive Defendants' motion for summary judgment. Watson testified that Plaintiff's contract was not renewed, in part, because Plaintiff "was suing us." As discussed above, for purposes of surviving summary judgment, Plaintiff has just enough evidence to infer that Watson and those

discussing and deciding upon the non-renewal were aware that Plaintiff had engaged in protected activity, i.e., that his lawsuit concerned his leave rights. Plaintiff's leave rights were (and are) embedded in the FMLA and CFRA, and the later is a part of the FEHA. Accordingly, Defendants' motion for summary judgment is DENIED.

## G. 42 U.S.C. § 1983 Claim – Procedural Due Process

Plaintiff's § 1983 is premised on an alleged violation of his procedural due process rights under the Fourteenth Amendment. Specifically, Plaintiff asserts that he was removed from his chairmanship and his pay was cut, he was placed on involuntary paid administrative leave and his contract was not renewed, all without affording him procedural due process under the Fourteenth Amendment.

Section 1983 creates a federal cause of action for the deprivation, under color of state law, of rights guaranteed by the United States Constitution. *San Bernardino Physicians Servs. Med. Group, Inc. v. County of San Bernardino*, 825 F.2d 1404, 1407 (9th Cir. 1987). There is no dispute that the conduct at issue in this case occurred under the color of state law. (Doc. 278 at 32.)

"The County, as a municipality, may be liable under section 1983 only if the alleged violation was pursuant to 'official municipal policy.'" *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F.2d 872, 878 (9th Cir. 1987) (*quoting Monell v. Dep't Of Soc. Servs.*, 436 U.S. 658, 691 (1978)). The official municipal policy must be the "'moving force' behind the constitutional violation." *Galen v. County of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007) (*quoting Monell*, 436 U.S. at 694-95). Individuals may

be liable under § 1983 only if they, in some manner, are personally involved in the alleged violation. *See Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) ("[P]laintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights. Liability under § 1983 must be based on the personal involvement of the defendant."); *see also Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) ("A supervisor can be liable under § 1983 if he set[s] in motion a series of acts by others . . . which he knew or reasonably should have known, would cause others to inflict the constitutional injury.") (internal quotation marks omitted) (alteration in original).

"The Fourteenth Amendment protects individuals against the deprivation of liberty or property by the government without due process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). In this case, Plaintiff claims a deprivation of a property interest. To prevail on his constitutional claim, Plaintiff must establish: "(1) a property interest protected by the Constitution; (2) a deprivation of the interest by the government; and a (3) lack of required process." *Ulrich v. City of San Francisco*, 308 F.3d 968, 974 (9th Cir. 2002).[25]

"[P]roperty interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that

---

[25] Plaintiff concedes that he "does not allege deprivation of liberty." (Doc. 275 at 18.)

secure certain benefits and that support claims of entitlement to those benefits." *Bd. Of Regents Of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). As explained in *Roth*:

> To have a property interest in a benefit [e.g., a job], a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Id.* Although property interests are not created by the federal Constitution, federal constitutional law helps determine whether an asserted interest "rises to the level of a legitimate claim to entitlement protected by the Due Process Clause." *Loehr v. Ventura County Cmty. Coll. Dist.*, 743 F.2d 1310, 1314 (9th Cir. 1984) (internal quotation marks omitted).

The Fourteenth Amendment's due process guarantee attaches when public employees have a property interest in their continued employment. *Ulrich*, 308 F.3d at 975. To have a protected property interest, "the decision to grant [or take away] the benefit" must be removed "from agency discretion." *Peacock v. Bd. Of Regents Of The Univs. & State Colls. Of Az.*, 510 F.2d 1324, 1327 (9th Cir. 1975). Thus, "a state law which limits the grounds upon which an employee may be discharged, such as conditioning dismissal on a finding of cause, creates a constitutionally protected property interest" in continued employment. *Dyack v. Commonwealth Of The Northern Mariana Islands*, 317 F.3d 1030, 1033 (9th Cir. 2003) (internal quotation marks omitted). On the other hand, where "a state employee serves at will, he or she has no reasonable expectation of continued employment, and thus no property right." *Id.* at 1033*; see also Clements v. Airport Auth. Of Washoe County*,

69 F.3d 321, 331 (9th Cir. 1995). A public employee may (or may not) have a property interest in a specific position, as opposed to a property interest in continued employment generally. *See Stiesberg v. State of California*, 80 F.3d 353, 356-57 (9th Cir. 1996); *Ross v. Clayton County, Ga.*, 173 F.3d 1305, 1307 (11th Cir. 1999); *Shoemaker v. County of Los Angeles*, 37 Cal. App. 4th 618, 632 (1995).

If there is a constitutionally protected property interest at stake, the next question is what process was due in connection with a deprivation of that property interest. *See Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S 532, 541 (1985) ("[O]nce it is determined that the Due Process Clause applies, the question remains what process is due") (internal quotation marks omitted). "The essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Id*. at 546. If a cognizable property interest is taken away by the government without the requisite due process, a constitutional violation occurs.

## 1. The County's Alleged Liability

Plaintiff argues that the KMC bylaws, which were incorporated into his employment contract, represent official policy of the County. Defendants do dispute that the bylaws represent official County policy. The bylaws were adopted the County Board of Supervisors. (Doc. 278 at 31.) This is sufficient to make them official policy of the County. *See Lake Nacimiento Ranch Co.*, 841 F.2d at 879 ("The Board of Supervisors may only establish official

policy [of the County] by a majority of the supervisors.") (citing Cal. Gov't Code § 25005).

Plaintiff's brief suggests he attempts to advance two species of *Monell* liability based upon the bylaws. In his briefing, Plaintiff states:

> The Bylaws [in effect] provided for extensive due process for core physicians in numerous scenarios like loss of hospital privileges, *but not for* (i) removal of physicians from department chairmanship, (ii) placement of physicians on administrative leave, or (iii) nonrenewal of physician employment contracts with Defendant County.

(Doc. 272 at 25) (emphasis added.) From this passage, it appears Plaintiff is claiming that the County's *failure* to have or require terms in the bylaws which provide due process rights in connection with the removal of physicians from department chairmanship, the placement of physicians on administrative leave, or the non-renewal of physician employment contracts, *caused* the alleged constitutional violations in this case. Where the municipal entity's liability is premised on a failure to act, there are specific elements that must be satisfied:

> To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'

*Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (*quoting City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989)); *see also Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004). Plaintiff has made no showing, nor even any effort to show, that the County's failure to

have or require specific provisions in the bylaws to provide due process rights in connection with department chair removals, administrative leaves, or the non-renewal of physician employment contracts amounts to a policy of deliberate indifference to Plaintiff's constitutional rights. Plaintiff's briefing, however, also suggests that he is claiming those responsible for his demotion, his administrative leave, and the non-renewal of his contract "were *acting* pursuant to the Bylaws" in taking such actions and, by these actions, they violated his due process rights. (Doc. 272 at 25.) This type of claim is *not* a failure to act claim; it is a claim that county actors were following the letter of express official policy and, in doing so, deprived Plaintiff of his constitutional rights.

### a. Removal From The Chairmanship

There can be no dispute that the JCC was acting pursuant to the bylaws in removing Plaintiff from his chairmanship. Bryan's memorandum to the JCC stated: "I therefore request that the Joint Conference Committee act pursuant to paragraph 9.7-4 of the Medical Staff Bylaws and, by majority vote, endorse my recommendation to rescind Dr. Jadwin's appointment as Chairman, Department of Pathology." (Doc. 266-2 at 32.) That paragraph of the bylaws reads:

**9.7-4 REMOVAL**

Removal of a department chair may occur with or without cause upon the recommendation of the chief executive officer with the majority vote of the Joint Conference Committee.

(Doc. 266 at 81.) No party disputes that Bryan was the chief executive officer. With respect to his removal, Plaintiff's due

process claim is premised on the theory that he had a cognizable property interest in his chair position, to which part of his base salary was tied, and that he was removed from his position without due process. Plaintiff's argument is erroneous.

"No constitutionally protected property interest can exist in the outcome of a decision unmistakably committed . . . to the discretion of the [public entity]*." Ulrich*, 308 F.3d at 976 (alteration in original) (internal quotation marks omitted). Where "a state employee serves at will, he or she has no reasonable expectation of continued employment, and thus no property right." *Dyack*, 317 F.3d at 1033. Plaintiff's employment contract with the County explicitly incorporates the bylaws and states that Plaintiff will be employed pursuant to the bylaws:

> 10.   EMPLOYMENT STATUS
>
> Core Physician shall be employed by the County of Kern pursuant to the terms of this Agreement and the medical staff bylaws of KMC. Core Physician acknowledges that he or she will not be deemed a classified employee, or have any rights or protections under the County's Civil Service Ordinance, rules or regulations.

(Doc. 266 at 23.)   In addition, Plaintiff's employment contract emphasizes that he will be "governed" by the bylaws.

> 13.   MEDICAL STAFF MEMBERSHIP
>
> Core Physician will at all times be a member in good standing of the medical staff of Kern Medical Center and governed as such by the medical staff bylaws.

(*Id.*)   As mentioned above, one of the bylaws explicitly permitted Plaintiff's removal from his chairmanship *with or without cause*. Accordingly, Plaintiff served in his chair position at-will and thus had no property interest in his chair position. *See Agosta v. Agor*,

111

120 Cal. App. 4th 596, 604 (2004) ("By definition . . . an express at-will contract allows an employer to sever the . . . relationship with or without cause."). The fact that the removal had to be preceded by Bryan's recommendation, and garner a majority vote, does not change the at-will status of his position or the fact that the voters retained unfettered discretion to remove Plaintiff from his chairmanship. *Cf*. *Stiesberg*, 80 F.3d at 357.

Plaintiff asserts that the bylaws deprived him of due process because his employment contract barred Defendants from "removing Plaintiff from [the] chair [position] or terminating or otherwise modifying the Contract at will, without cause, or without Plaintiff's consent." (Doc. 272 at 27.) In making this argument, Plaintiff ignores the fact that he was employed pursuant to the bylaws, which permitted his removal with or without cause, and instead he focuses on other language in his employment contract.

In a section entitled "Termination," Plaintiff's employment contract reads:

> A. Core Physician may terminate this Agreement, without cause, upon ninety (90) days' prior written notice to County.

> B. County may terminate this Agreement at any time for cause. Cause is defined as a violation of administrative policy of the County of Kern or KMC, unsatisfactory clinical performance, failure to meet department accountability or performance standards, or reduction of need. County may terminate this Agreement upon reduction of need upon ninety (90) days' prior written notice to Core Physician.

Plaintiff's reliance on this section is unpersuasive for several reasons. First, Plaintiff's removal from a specific position – department chair – did not effectuate a complete "termination" of

his employment with the County.  Second, and more important, this section does not trump the applicability of the bylaws.  Given pertinent rules of contract construction, the bylaws are controlling with respect to Plaintiff's removal from his chairmanship.

The employment contract specifically provides that "this Agreement will be construed pursuant to the laws of the State of California." (Doc. 266 at 21.)[26]  Section 1859 of the California Code of Civil Procedure Provides:

> In the construction of a statute the intention of the Legislature, and in the construction of the instrument the intention of the parties, is to be pursued, if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent will control a general one that is inconsistent with it.

In California, "under well established principles of contract interpretation, when a general and a particular provision are inconsistent, the particular and specific provision is paramount to the general provision." *Prouty v. Gores Tech. Group*, 121 Cal. App. 4th 1225, 1235 (2004); *see also McNeely v. Claremont Mgmt. Co.*, 210 Cal. App. 2d 749, 753 (1962).  Similarly, under California law, "particular expressions [in a contract] qualify those which are general." Cal. Civ. Code § 3534; *see also Kavruck v. Blue Cross of*

_____

[26]  A few sentences later, the employment contract contains a forum selection clause specifying that the "venue of any action relating to this Agreement shall be in the County of Kern." (Doc. 266 at 22.)  No federal court sits in Kern County.  Rather, the district court with jurisdiction over Kern County sits in Fresno County.  The parties seem content on waiving this provision of the employment contract.  In any event, this clause does not implicate subject matter jurisdiction, it is a matter of venue, and neither party has raised the issue of venue.

*Cal.*, 108 Cal. App. 4th 773, 781 (2003) ("In the interpretation of insurance contracts, a specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, even though the latter, standing alone, would be broad enough to include the subject to which the more specific provision relates.").

The term in the employment contract discussing "termination" deals with the general cessation of the employment relationship between the parties and grants the County right to terminate the entire relationship for cause. On the other hand, the bylaw provision, which is also a term of Plaintiff's contract, deals specifically with the removal of a department chair from his position and grants the power to remove a department chair at-will. Assuming the termination clause and the bylaw are inconsistent, with respect to the conduct at issue (i.e., the removal), the bylaw is far more specific and particularized than the termination clause. Accordingly, the bylaw controls. *See also* Restatement (Second) of Contracts § 203 cmt. e (1981) ("If the specific or exact can be read as an exception or qualification of the general, both are given some effect.").

The determination that the bylaw controls is also supported by other rules of contract construction. "The preferable approach is to interpret a contract in a manner which will give effect to all of its provisions," *In re Steven A.*, 15 Cal. App. 4th 754, 771 (1993), and "where two clauses of an agreement appear to be in direct conflict, it is the duty of the court to reconcile the two clauses to give effect to the whole of the instrument," *In re*

*Marriage Of Whitney*, 71 Cal. App. 3d 179, 182 (1977). Here, the termination provision and the bylaw can be reconciled. The employment contract provides in pertinent part:

> No *right* or remedy herein conferred on or reserved to the County is exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be *cumulative* of every other right or remedy given hereunder or now or hereafter existing by law or in equity or by statute or otherwise, and may be enforced concurrently from time to time.

(Doc. 266 at 23) (emphasis added.) The employment contract confers upon the County the power to terminate the entire employment relationship for cause as defined therein. The County's right of total termination is "cumulative of" and does not exclude the County's separate "right" under the bylaw to remove Plaintiff from his specific chair position at-will. Interpreting the employment contract in such manner reconciles the apparent conflict and gives each provision meaning consistent with rules of contract construction. For the foregoing reasons, the bylaw controls as to the chairmanship removal.

Plaintiff also points to other language in his employment contract in an effort to avoid the effect of the bylaw. Plaintiff cites to the provision in his contract on the "Review and Appeal Process" which states that "[r]eview and appeal of the decision to impose corrective action or terminate for cause shall follow the process set forth in the KMC Faculty Practice Board policy and procedure, title Corrective Action and Termination Review Process, or the medical staff bylaws, whichever is applicable." (Doc. 259-4 at 34.) Plaintiff's reliance on this provision is unpersuasive for

several reasons.

First, there is no evidence that Plaintiff's removal from his chairmanship was taken or designated as a corrective or disciplinary measure, and Plaintiff does not argue otherwise. Nor was Plaintiff's removal from his chairmanship a "termination" of his entire employment contract. Second, this provision imposes no substantive restraints on the County's discretion to remove Plaintiff from his chairmanship. Instead, this section provides Plaintiff with a review and appeal process, as set forth in other documents, from a decision already made. *See Sanchez v. City of Santa Ana*, 915 F.2d 424, 428-29 (9th Cir. 1990) ("A governing body does not create a property interest in a benefit merely by providing a particular procedure for the removal of that benefit" or "an avenue to appeal" a decision) (internal quotation marks omitted). Third, this section expressly refers to the "medical staff bylaws" which explicitly permit removal from chairmanship at-will. For these reasons, Plaintiff's reliance on this section is unavailing.

Finally, Plaintiff references the provision in his employment contract on modifications which provides that "[t]his Agreement may be modified in writing only, signed by the parties in interest at the time of the modification." (Doc. 266 at 24.) Plaintiff's reliance on this provision is unpersuasive. This provision places no substantive restraints on the County's right to remove Plaintiff from his chairmanship. This provision simply imposes a requirement that any modification to the contract be memorialized in writing.

Moving away from the employment contract, Plaintiff argues that the County "has not removed a department chair without cause since

at least October 2000." (Doc. 272 at 27.) Plaintiff contends that this history creates a "mutually explicit understanding" that he would not removed without cause.

In *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) the Supreme Court stated that, for due process purposes, "property" includes a person's interest in a benefit, such as employment, "if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." Referencing *Perry* and its "mutually explicit understandings" language, the Supreme Court explained in *Bishop v. Wood*, 426 U.S. 341, 344 (1976) (footnotes omitted) that a property interest can be created by an "implied contract":

> A property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law.

Here, the mere fact that the County has not removed a department chair without cause since at least October 2000 does not demonstrate Plaintiff has a cognizable property interest in his chair position.

First, the bylaws permit the removal of a department chair *with* or without cause. Plaintiff's evidence simply shows conduct in conformity with an express power. Second, "the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop*, 426 U.S. at 344. Under California law, "[t]here cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results." *Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620, 630 (1995) (internal quotation marks omitted). "The express term is

117

controlling even if it is not contained in an integrated employment contract. Thus, the . . . express at-will agreement preclude[s] the existence of an implied contract requiring good cause for termination." *Tomlinson v. Qualcomm, Inc.*, 97 Cal. App. 4th 943, 945 (2002) (internal citation and quotation marks omitted)[27]; *see also Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 337 (2000) ("*Where there is no express agreement*, the issue is whether other evidence of the parties' conduct has a 'tendency in reason' (Evid.Code, § 210) to demonstrate the existence of an actual mutual understanding on particular terms and conditions of employment.") (emphasis added). Here the bylaws, which are a part of an express employment contract Plaintiff signed, permit removal of a department chair at-will. This express agreement is controlling over an implied contract requiring good cause for removal from his chairmanship, which Plaintiff attempts to create by invoking the County's history of not removing department chairs absent cause.

For all the reasons discussed above, Plaintiff could be removed from his chairmanship at-will and thus had no cognizable property interest in his chairmanship position. The County is entitled to summary judgment on Plaintiff's claim that his removal from the chairmanship violated Plaintiff's procedural due process rights. The County's motion is GRANTED on this claim.

b. <u>Reduction In Pay</u>

Plaintiff argues that he a protectible property interest in his base pay and that he was deprived of this interest (at least

---

[27] Plaintiff's employment contract was integrated. (*See* Doc. 266 at 25) (setting forth a "Sole Agreement" provision.)

partially) without due process when his salary was reduced following his removal from his chairmanship. It is clear that Plaintiff's contract explicitly called for a base salary. (Doc. 266 at 10.) It is equally clear that a public employee can obtain a property interest in his or her earned or guaranteed compensation. *Orloff v. Cleland*, 708 F.2d 372, 378 (9th Cir. 1983); *Eguia v. Tompkins*, 756 F.2d 1130, 1138 (5th Cir. 1985). Notwithstanding these principles, Plaintiff's argument is erroneous.[28]

Plaintiff had no property interest in his chairmanship position. By extension, he had no property interest in the portion of his base salary tied to his chairmanship. *Cf. Sanchez*, 915 F.2d at 429 (concluding that an employee had a property interest in merit pay because a reduction in merit pay was considered a "demotion" under the applicable city charter, and a demotion was permitted for "certain specified reasons" thus restricting the "City's authority to demote an employee").

In support of his argument, Plaintiff cites to minutes from a JCC meeting held on September 2007. During that meeting, while discussing the potential fate of another physician, Dr. Leonard Perez, someone said, "[t]he problem is we have tied a portion of the chair's compensation to that position, that is a property right. Dr. Perez is entitled to due process hearing for this reason." (Doc. 277-2 at 225.)[29] This unidentified person's conclusory statements

---

[28] For *Monell* purposes, it is assumed that the bylaw which permitted Plaintiff's removal from the chairmanship with or without cause was the moving force behind Plaintiff's salary reduction.

[29] Dr. Perez was terminated for cause. (Doc. 267-2 at 145.)

of law are insufficient to create a genuine dispute. *See* Fed. R. Civ. P. 56(e)(2) (requiring a party opposing a summary judgment to set forth "specific *facts*" showing a genuine issue for trial) (emphasis added); *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008) ("Conclusory statements without factual support are insufficient to defeat a motion for summary judgment.").

When, as here, an employee has no property interest in continued employment in a position, he cannot have a property interest in his unearned compensation from that position. *See Lillehaug v. City of Sioux Falls*, 788 F.2d 1349, 1352 (8th Cir. 1986) (rejecting a City bandmaster's claim that a reduction in his salary violated due process, reasoning "[t]he ordinances and statute make plain that the City Commission may discharge Lillehaug [the bandmaster] by majority vote and without cause. Lillehaug thus has no property interest in his continued employment, nor in any particular term of his employment, such as the level of compensation."). Plaintiff's employment contract called for him to perform the duties of department chair. Plaintiff's expectation that he would continue to be paid for duties he no longer performed is a "unilateral expectation," *Roth*, 408 U.S. at 577, that does not create a property interest.

Because Plaintiff had no property interest in his chair position he had no corresponding property interest in the compensation tied to his chairmanship. Plaintiff has not created, or even attempted to create, a triable issue that the reduction in his compensation was unconnected to his chairmanship. (See Doc. 272 at 27; Doc. 272-2 at 8.). For these reasons, the County's motion

for summary judgment is **GRANTED** on Plaintiff's claim that the reduction in his salary violated Plaintiff's procedural due process rights.

### c. <u>Administrative Leave</u>

Plaintiff argues that he had a cognizable property interest in professional fees which he was deprived of when he was placed on administrative leave. These professional fees are separate and apart from his base salary. Plaintiff's employment contract states that his compensation will be "composed of a base salary paid by the County, professional fee payments from third-party payors, and potential other income . . . ." (Doc. 266 at 10.) Plaintiff's employment contract further provides that "[p]rofessional fees include all professional fee collections or payments associated with direct patient care by Core Physician." (Doc. 266 at 12.) In other words, in addition to base salary, Plaintiff generated professional fees by performing services. In 2004, Plaintiff's professional fees were $131,709,; for 2005, they were $103,444; and for 2006, they were $28,596. Plaintiff contends that by forcing him onto administrative leave, the County deprived him of a property interest in professional fees.

Plaintiff does not point to any provision in the bylaws which discuss administrative leave. To show that Culberson, who put Plaintiff on administrative leave, was acting pursuant to official policy of the County, Plaintiff must point to that official policy. Plaintiff notes that in Defendants' motion for summary judgment they admit that "Plaintiff was placed on paid administrative leave on

121

December 7, 2006, pursuant to the Kern County Policy and Procedures Manual." (Stmt of Undisp. Fact. ¶¶41, 41a)." (Doc. 253 at 33.) The section of the Kern County Policy and Procedures Manual (the "Manual") on "Administrative Leave With Pay" reads, in pertinent part, as follows:

> A department head may place an employee on administrative leave with pay if the department head determines that the employee is engaged in conduct posing a danger to County property, the public or other employees, or the continued presence of the employee at the work site will hinder an investigation of the employee's alleged misconduct or will severely disrupt the business of the department. During the administrative leave, the employee shall be ordered to remain at home and available by telephone during the normally assigned work day. A department head may, if necessary, adjust the employee's work schedule to provide availability during normal business hours, Monday through Friday, 8:00 AM to 5:00 PM. A department head may not order an administrative leave with pay for a period in excess of five assigned workdays within a single pay period without the written authorization of the Employee Relations Officer in the County Administrative Office.

(Doc. 259-10 at 40.) For *Monell* purposes, no party disputes that the County's Manual constitutes an official policy of the County. Plaintiff's employment contract states that he must "comply with all applicable KMC and County policies and procedures." (Doc. 266 at 22.) The County obviously takes the position that the Manual applied to Plaintiff's employment. The question remains whether Plaintiff's administrative leave, pursuant to the Manual, deprived him of a cognizable property interest in professional fees.

Unquestionably, Plaintiff had a property interest in his guaranteed base salary (which he was paid in full while on administrative leave). Plaintiff's asserted property interest in his professional fees is more problematic. Plaintiff was not

guaranteed any specific amount of professional fees, and if he showed up to work, he was not guaranteed that he would earn them – it was up to him to generate independent professional fees. Moreover, the County did not agree to provide source of this compensation – professional fees came from third parties, not the coffers of the County. "An interest that gives rise to an entitlement is always a conditional interest, but not all conditional interests in governmental benefits give rise to entitlements. To create an entitlement, the law must remove the decision to grant the benefit from agency discretion." *Peacock*, 510 F.2d at 1327. Because the County was not the source of professional fees, the County was never in a position to make a decision to grant or deny them – whether professional fees were earned was up to Plaintiff. "A mere opportunity to acquire property . . . does not itself qualify as a property interest protected by the Constitution." *Head v. Chi. Sch. Reform Bd. Of Trs.*, 225 F.3d 794, 802 (7th Cir. 2000).

For these reasons, Plaintiff has not created a triable issue that he had a cognizable property in any unearned professional fees standing alone. This, however, does not preclude Plaintiff from demonstrating that the loss (if provable) of professional fees is economic harm occasioned by the deprivation of some property interest. *See Bordelon v. Chi. Sch. Reform Bd. Of Trs.*, 233 F.3d 524, 520 (7th Cir. 2000) (stating, in an employment case, "to recover for a deprivation of a property interest, Bordelon [the employee] must show some economic loss from the Board's actions, or at least establish an identifiable impact on his future income or

economic benefits.").

Plaintiff had a term employment contract giving him a right to be employed as a core physician for five years (from October 5, 2002 to October 4, 2007).  According to the terms of his contract, his employment relationship could be terminated "at any time for cause." No other part of the contract gave the County the right to terminate his employment relationship without cause.  Therefore, Plaintiff had a property interest in his continued employment relationship at least through the remainder of his term.  This, however, does not resolve the issue.  Plaintiff *was* continuously employed, albeit on leave, through the remainder of his term.  To have a viable claim then, he must demonstrate that his property interest in continued employment included a property right in "active duty," *Deen v. Darosa*, 414 F.3d 731, 734 (7th Cir. 2005), or, as the Ninth Circuit has suggested, a "property interest in avoiding placement on administrative leave with pay." *Qualls v. Cook*, 245 F. App'x 624, 625 (9th Cir. 2007).

Plaintiff has submitted evidence which creates a triable issue that he had such an interest.

His employment contract specified that he was subject to "all applicable KMC and County policies and procedures." (Doc. 266 at 22.)  Once such policy was the Manual which provided that Plaintiff could be placed on paid administrative leave with pay under certain specified circumstances including when "the department head determines that the employee is engaged in conduct posing a danger to County property, the public or other employees, or the continued presence of the employee at the work site will hinder an

**124**

investigation of the employee's alleged misconduct or will severely disrupt the business of the department." No other provision of Plaintiff's employment contract granted the County the right to place Plaintiff on paid administrative leave. By specifying the grounds on which Plaintiff could be placed on paid administrative leave, and by not contractually providing for any other right to place Plaintiff on paid administrative leave, the County implicitly limited its authority to place Plaintiff on paid leave to the specific reasons. *See Sanchez*, 915 F.2d at 429. A reasonable trier of fact could conclude that this limitation significantly constrained the County's authority, thus supporting a claim that Plaintiff's property right in continued employment included a property right in active duty.

Plaintiff's history of professional fee earning, of which the County was aware, further supports a claim that his property right in continued employment included a property right in active duty. A deprivation that leads to only *de minimis* harm does not create an actionable due process claim. *Bordelon*, 233 F.3d at 530 ("[T]o be actionable under the due process clause, the deprivation of a public employee's property interest in continued employment must be more than *de minimis*."). Given Plaintiff's history of professional fee earnings, it cannot be said that his loss of potential professional fees is *de minimis* harm. In addition, given that his contract expressly provided that he could earn professional fees and that his fees would be a part of his total compensation, both Plaintiff and the County certainly envisioned that Plaintiff would be in a position to earn professional fees so that Plaintiff could obtain

the fruits of his bargain.

Finally, there is some California authority that a physician who is employed under a fixed term contract with a County and who is acting lawfully and complying with the terms of his contract cannot be prevented "from performing the duties incumbent on him" for arbitrary reasons. *Grindley v. Santa Cruz County*, 4 P. 390, 393 (Cal. 1884). While ancient and in no way dispositive, this case lends support to the position that, by having a fixed term contract with the County with a general property right in continued employment, Plaintiff may have had a concomitant property right in active duty during the term of his employment.

For all the reasons set forth above, Plaintiff has created a triable issue (but not conclusively demonstrated) that his property right in continued employment included the property right to active duty such that he would be in a position to earn professional fees. Accordingly, the next inquiry is what process was due in connection with Plaintiff's placement on administrative leave. Here, however, the precise contours of what process was due need not be delineated. Plaintiff did not receive essential attributes of due process. Plaintiff was placed on administrative leave without any explanation as to what he had done or any opportunity to respond. The County's motion is DENIED as to Plaintiff's claim that he was denied procedural due process in connection with his placement on paid administrative leave.

d. <u>Non-renewal</u>

Plaintiff claims that his property right to continued employment extended beyond the fixed term of his contract and

included a property interest in a renewed contract.  Nothing in his employment contract provides Plaintiff with any expectation that he would have his contract renewed.[30]  Plaintiff argues instead that the there was a "common law of re-employment" pursuant to which he can claim a legitimate entitlement to a renewed contract.  In *Roth*, the Supreme Court concluded that a university professor hired under a fixed term contract had no property interest in re-employment because his contract "did not provide for contract renewal absent 'sufficient cause.'" 408 U.S. at 578.  In fact, it "made no provision for renewal whatsoever." *Id*. In addition, there was not any "state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it." *Id*.  In a footnote, however, *Roth* left open the possibility that an employee in such a case may nonetheless be able to establish a property interest in re-employment:

> To be sure, the respondent does suggest that most teachers hired on a year-to-year basis by Wisconsin State University-Oshkosh are, in fact, rehired. But the District Court has not found that there is anything approaching a 'common law' of re-employment, *see Perry v. Sindermann*, 408 U.S. 593, at 602, 92 S.Ct. 2694, at 2705, 33 L.Ed.2d 570, *so strong* as to require University officials to give the respondent a statement of reasons and a hearing on their decision not to rehire him.

408 U.S. at 578 n.16 (emphasis added).  Plaintiff claims that there is an unwritten common law of re-employment fostered by the County with respect to re-employing medical staff who work at KMC.  In support of this theory, Plaintiff points to evidence that, since

---

[30]  The County admits that *it* made a decision not to renew Plaintiff's contract. (Doc. 278 at 7.)  For *Monell* purposes, this is sufficient.

October 2000, the County has not renewed the contract of only one other member of the medical staff. (Several other physicians resigned, retired or were terminated.) Plaintiff also points to deposition testimony from Bryan that he regards "core physicians" as "permanent" employees.

> A. A core physician, as it evolved, was someone who dedicated their time and energies towards Kern Medical Center and generally had teaching, administrative, and clinical duties, and that's how we define a core physician.
>
> . . . .
>
> Q. Would you characterize core physicians as being permanent physicians of Kern Medical Center?
>
> A. Essentially, that's correct, yes.

(Bryan Dep. 38:23-39:2; 39:6-8.) Pursuant to his employment contract, Plaintiff was a "core physician."

Plaintiff's evidence is insufficient to create a triable issue that he had a property interest in renewed employment. The fact that Plaintiff and other physicians enjoyed a long history of working for the County does not create a property interest in renewed employment. "Longevity alone does not create a property interest." *Bollow v. Fed. Reserve Bank Of S.F.*, 650 F.2d 1093, 1099 (9th Cir. 1981); *see also Guz*, 24 Cal. 4th at 342 ("[L]ongevity, raises and promotions are their own rewards for the employee's continuing valued service; they do not, in and of themselves, additionally constitute a contractual guarantee of future employment security. A rule granting such contract rights on the basis of successful longevity alone would discourage the retention and promotion of employees.") (emphasis omitted). Similarly, the fact that, in the

past, the County may have renewed the employment contracts of most non-retiring, non-terminated, non-resigning physicians does not, by itself, create a property interest in renewed employment. *See Smith v. Bd. Of Educ.*, 708 F.2d 258, 264 (7th Cir. 1983) ("The Supreme Court has . . . rejected the argument that a state teacher with a one-year employment contract has a property right in being rehired just because the state has in the past rehired him and most other teachers it employ[]s on a year-to-year basis."). Furthermore, "[t]here is nothing to suggest that the [County] follows any set of standards when it considers whether to rehire a[] [core physician] and that it considers itself bound to apply that same set of standards every time a[] [core physician's] contract is up for renewal." *Smith*, 708 F.2d at 265; *see also Doran v. Houle*, 721 F.2d 1182, 1186 (9th Cir. 1983) (declining to find a property interest in the renewal of a permit where "no published criteria for choosing among qualified applicants or *specific standards for determining whether to renew* a previously issued permit" existed) (emphasis added). The most that can be inferred from Plaintiff's renewal evidence is that, in the past, the County had been satisfied with the performance of certain of its employees. "That the [County] had been satisfied in the past was, of course, no guarantee that it would always remain so." *Smith*, 708 F.2d at 265. Plaintiff's renewal evidence is insufficient, and Bryan's testimony that core physicians are essentially "permanent" does not change the result.

There is no indication that to the County or to Bryan a "permanent" core physician means a physician who, despite having a fixed term contract with no provision on contract renewal, is a

permanent fixture who can legitimately expect a renewal absent cause. Bryan's brief testimony cannot be imbued with such meaning. Testimony from another core physician with the County –  Dr. Shertukde – affirms this point:

> Q. Okay. So when you become a core physician, you're becoming a permanent physician. Correct?
>
> A. That's right.
>
> Q. And you get a permanent contract. Correct?
>
> A. Yeah.
>
> Q. Permanent contract just like yours. Right?
>
> A. Yeah.
>
> Q. Okay. And then you expect that as a core physician -- core physicians expect to continue working at Kern Medical Center for the rest of their careers. Correct?
>
> A. No. I think many of them have certain years contract. Like some people, like, you know, heads of departments probably have a five-year contract.
>
> Q. Okay.
>
> A. Or some people have a four-year contract, people have a three-year contract, things like that.

(Shertukde Dep. 206:7-24.)  Plaintiff's evidence in insufficient to create a triable issue that the County fostered "anything approaching a 'common law' of re-employment . . . *so strong* as to require [County] officials to give [Plaintiff] a statement of reasons and a hearing on their decision not to rehire him." *Roth*, 408 U.S. at 578 n.16 (emphasis added).  Accordingly, the County is entitled to summary judgment on this claim.  The County's motion is GRANTED.

## 2. Liability of Individual Defendants

### a. Bryan

Defendant Bryan is sued in his individual capacity and in his official capacity. As discussed above, with respect to the removal, pay cut and non-renewal, there was no constitutional violation as Plaintiff was not deprived of a constitutionally cognizable property interest. Summary judgment in favor of Bryan in his individual and official capacities is warranted on Plaintiff's due process claims insofar as they are based on the removal, pay cut and non-renewal.

With respect to Plaintiff's placement on paid administrative leave, Bryan had no personal involvement in that action. Accordingly, to the extent Plaintiff's due process claim is asserted against Bryan in his individual capacity based on Plaintiff's placement on administrative leave, Bryan is entitled to summary judgment in his favor. Plaintiff also asserts an official capacity claim against Bryan "in his official capacity as a member of the JCC." (Doc. 241 at 37.) Bryan had no involvement individually or in his official capacity as a member of the JCC in a decision to place Plaintiff on paid administrative leave. Moreover, an official capacity claim for Plaintiff's placement on paid administrative leave pursuant to the Manual would be redundant of Plaintiff's surviving claim against the County. *See Megargee v. Wittman*, 550 F. Supp. 2d 1190, 1206 (E.D. Cal. 2008). Bryan's motion for summary judgment is GRANTED.

### b. Harris

Harris is sued in his individual capacity only. As discussed above, with respect to the removal, pay cut and non-renewal, there

was no constitutional violation as Plaintiff was not deprived of a constitutionally cognizable property interest. Summary judgment in favor of Harris is warranted on Plaintiff's due process claims insofar as they are based on the removal, pay cut, and non-renewal.

With respect to the placement of Plaintiff on administrative leave there is some evidence that Harris had personal involvement in that decision. Harris has moved for summary judgment on the grounds of qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. __, 129 S. Ct. 808, 815 (2009) (internal quotation marks omitted). "[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). As discussed above, Plaintiff may be able to establish that his constitutional right of continued employment included a right to active duty, or, as the Ninth Circuit has suggested, a "property interest in avoiding placement on administrative leave with pay." *Qualls*, 245 F. App'x at 625. In *Qualls*, the Ninth Circuit declined to affirmatively decide whether such a property interest was cognizable and instead assumed it was and found no violation of the plaintiff's procedural due process rights. *Id*. at 626. Since *Qualls*, it does not appear the Ninth Circuit has revisited the issue and Plaintiff points to no authority suggesting otherwise. Because there is no Ninth Circuit (or Supreme

Court) authority on point, whatever property interest Plaintiff had in avoiding placement on administrative leave with pay, this interest was not clearly established at the time of the alleged deprivation. With respect to Plaintiff's claim that his placement on paid administrative leave violated procedural due process rights, Harris is entitled to qualified immunity on this claim and thus summary judgment in his favor. *See Wheaton v. Webb-Petett*, 931 F.2d 613, 619 (9th Cir. 1991) (concluding that qualified immunity was appropriate where, in light of the current state of the law, "it would not have been apparent to a reasonable official that [the employee] had a property interest in his management service employment."). Harris' motion for summary judgment in his individual capacity is GRANTED.

## H.  Affirmative Defenses

Plaintiff seeks summary judgment as to certain of Defendants' affirmative defenses enumerated below. Defendants provided no briefing in support of any of their affirmative defenses. At oral argument on the motion, Defendants' counsel stated that the affirmative defenses were not "at issue." From the lack of briefing and the not "at issue" statement, it appears Defendants have abandoned their affirmative defenses. Notwithstanding the Defendants' apparent concession to the lack of merit in the affirmative defenses, the propriety of granting summary judgment on the affirmative defenses must be analyzed.

### 1.  Subject Matter Jurisdiction

Defendants' second affirmative defense asserts that this "Court lacks subject matter jurisdiction over Plaintiff's alleged claims

and should refuse to exercise jurisdiction over Plaintiff's state law claims because they predominate and all the alleged federal claims are insubstantial." (Doc. 246 at 12.)   Federal question jurisdiction exists over Plaintiff's remaining federal claims and whether to exercise supplemental jurisdiction is within the court's discretion.   Summary judgment on this affirmative defense is GRANTED.

### 2.   Peer Review Defense

Plaintiff seeks summary judgment on Defendants' third affirmative defense which asserts a form of peer review privilege under California law.   The third affirmative defense asserts that the Defendants actions were privileged "in that Defendants' action were in furtherance of medical peer review . . . ."   (Doc. 246 at 12.)   As noted by Plaintiff, the Ninth Circuit has not recognized, and has rejected the adoption of, a peer review privilege under federal law. *Agster v. Maricopa County*, 422 F.3d 836 (9th Cir. 2005).   As stated in *Agster*, "[w]here there are federal question claims and pendent state law claims present, the federal law of privilege applies." *Agster*, 422 F.3d at 839 (citing F. R. Evid. 501 advisory committee note, and *Wm. T. Thompson Co. v. Gen Nutrition Corp.*, 671 F.2d 100, 104 (3rd Cir. 1982)).   Under *Agster*, because the federal law of privilege applies and because federal law does not recognize a peer review privilege, Defendants' peer review privilege defense is unavailing.   To the extent Defendants' third affirmative defense asserts a state-law peer review privilege, summary judgment in favor of Plaintiff is GRANTED.

### 3.   Immunity

Defendants' fourth affirmative defense is that "California Civil Code § 47(a) and (b) immunizes Defendants and each of them from liability." (Doc. 246 at 12.) These sections provide:

A privileged publication or broadcast is one made:

(a) In the proper discharge of an official duty.

(b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure, except as follows . . . .

Plaintiff suggests that these sections are inapplicable to statutory causes of action. This proposition is dubious. *See Ribas v. Clark*, 38 Cal. 3d 355, 364-65 (1985). Nevertheless because Plaintiff argues and concedes that he is not asserting any claims which would permit the proper invocation of these sections,(Doc. 272 at 32), and given Defendants' silence in response, summary judgment on the fourth affirmative defense is GRANTED.

4.    "Contributory Negligence"

Defendants' fifth affirmative defense is that "during Plaintiff's employment at Kern Medical Center, Plaintiff was arrogant, disagreeable, uncooperative, intimidating, overbearing, self-righteous and unfriendly; that Plaintiff refused to work collaboratively or professionally with the medical staff at Kern Medical Center; that he made unfounded, frivolous and repetitive complaints and criticisms of Kern Medical Center, its policies and procedures; and made unfounded and frivolous complaints against members of the medical staff at Kern Medical center and that

135

Plaintiff's behavior contributed to and was the direct and proximate cause of any stresses, disabilities or injuries that Plaintiff believes he sustained." (Doc. 246 at 12.)  Plaintiff labels this affirmative defense as "contributory negligence" and then asserts that none of his claims allege negligence.  Plaintiff's assumption that this affirmative defense is one for "contributory negligence" is not persuasive.

In essence, this affirmative defense asserts that Plaintiff's own behavior caused the injuries he claims.  In some instances, this type of defense is not truly an "affirmative defense."  For example, if Plaintiff's own behavior caused the adverse employment actions he claims, then his behavior destroyed the alleged causal link between any protected status or activity and any adverse employment action.  Causation is an element of Plaintiff's claims the negation of which is not an affirmative defense.  This does not mean, however, that summary judgment should be granted.

This affirmative defense can be fairly read as pleading the affirmative defenses of unclean hands and/or equitable estoppel, albeit without those discrete labels.  "To prevail on an unclean hands defense, the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims."  *Bros. Records, Inc. v. Jardine*, 318 F.3d 900, 909 (9th Cir. 2003).  At minimum, the fifth affirmative defense put Plaintiff on fair notice of alleged inequitable conduct on his part and that such conduct related to the subject matter of his claims.  Plaintiff does not make any argument or showing that there is no evidence to support an unclean hands theory.   Nor does

Plaintiff argue that this theory is not assertable with respect to any of Plaintiff's claims. Plaintiff has not met his burden at the summary judgment stage and summary judgment on this affirmative defense is DENIED.

### 5. Statute Of Limitations

Defendants' sixth affirmative defense is that "Plaintiff's injuries, as alleged in the Second Amended Complaint occurred more than one year before Plaintiff commenced this action and that Plaintiff's claims are, therefore, barred by the statute of limitations established in California Code of Civil Procedure § 340." (Doc. 246 at 12.) Defendants's seventh affirmative defense is that Plaintiff's claims are barred by the two-year statute of limitations set forth in California Code of Civil Procedure § 335.1. There is no indication or argument that these statute of limitation apply or that, if they do, Plaintiff has not complied with them. Summary judgment on these affirmative defenses is GRANTED in favor of Plaintiff.

### 6. Administrative Exhaustion

Defendants' eighth affirmative defense is that Plaintiff has failed to exhaust his administrative remedies. In their concurrently filed Rule 12© motion for judgment on the pleadings, Defendants explicitly conceded that Plaintiff exhausted his administrative remedies (which they also conceded in discovery). Summary judgment is GRANTED on this affirmative defense in favor of Plaintiff.

### 8. Qualified Immunity

Defendants' ninth affirmative defense is that "Defendants and each of them have qualified immunity for each and every claim

alleged in the Second Amended Complaint." (Doc. 246 at 12.) As discussed above, this affirmative defense is applicable in this case. Summary judgment on this affirmative defense is DENIED.

### 9. Workers' Compensation Preclusion

Defendants' tenth affirmative defense is that Plaintiff's "injuries, as alleged in the Second Amended Complaint, arose within the scope of Plaintiff's employment and that Plaintiff's sole and exclusive remedy lies under the California Workers Compensation Act." (Doc. 246 at 13.) As discussed above, this affirmative defense lacks merit. Summary judgment on this affirmative defense is GRANTED in favor of Plaintiff.

## I. Spoliation

In opposition to Defendants' motion for summary judgment, Plaintiff argued that Barbara Patrick, former Chair of the Kern County Board of Supervisors, David Culberson former CEO of KMC, and, Scott Ragland, former President of the medical staff at KMC, destroyed evidence purportedly relevant to Plaintiff's case. Plaintiff did not assert a claim for spoliation of evidence in his second amended complaint. Plaintiff attempts to use the evidence of spoliation to create a negative inference against Defendants in hopes of surviving Defendants' motion for summary judgment. (Doc. 275 at 4.). With respect to many claims, Plaintiff has survived Defendants' motion for summary judgment. To the extent his claims fail to survive, Plaintiff has not adequately shown that the infirmity in his claims have a sufficient connection to improper evidence destruction. Accordingly, for purposes of summary judgment, Plaintiff's spoliation argument is unpersuasive and does

not warrant a denial of summary judgment.

J.     <u>Evidentiary Objections</u>

Plaintiff has filed various evidentiary objections to the evidence submitted by Defendants' in support of their motion for summary judgment.  The court granted summary judgment in favor of Defendants on some claims because Plaintiff's evidence failed to create a triable issue.  In granting summary judgment in Defendants' favor on the claims specified, no reliance was placed on inadmissible evidence properly objected to by Plaintiff.  For these reasons, Plaintiff's evidentiary objections are moot.

## V.   CONCLUSION

For the foregoing reasons:

1.    Summary judgment in favor of Defendants is GRANTED on Plaintiff's claim for a violation of § 1278.5 of the Health & Safety Code.  Plaintiff's motion is DENIED.

2.    Summary judgment in favor of Defendants is GRANTED on Plaintiff's claim for a violation of § 1102.5 of the Labor Code. Plaintiff's motion is DENIED.

3.    Summary judgment is DENIED for all parties on Plaintiff's claim for interference under the FMLA.

4.    Summary judgment is DENIED for all parties on Plaintiff's FMLA retaliation claim.

5.    Summary judgment is DENIED for all parties on Plaintiff's CFRA retaliation claim.

6.    Summary judgment is DENIED for all parties on Plaintiff's claim for interference with/denial of CFRA rights.

7.    Summary judgment is DENIED for all parties on Plaintiff's

FEHA reasonable accommodation claim.

8.    Summary judgment is DENIED for all parties on Plaintiff's FEHA interactive process claim.

9.    Summary judgment is DENIED for all parties on Plaintiff's FEHA disability discrimination claim.

10.    Summary judgment is DENIED for all parties on Plaintiff's FEHA retaliation claim.

11.    Summary judgment is GRANTED in favor of the County with respect to Plaintiff's § 1983 claim to the extent Plaintiff is asserting a deprivation of due process in connection with his removal from his chairmanship, reduction in pay, and the non-renewal of his contract.  The County's motion for summary judgment is DENIED with respect to Plaintiff's § 1983 claim to the extent Plaintiff is asserting a deprivation of due process in connection with his placement on paid administrative leave.  The individual defendants' motion for summary judgment is GRANTED on Plaintiff's § 1983 claims. Plaintiff's motion is DENIED.

13.    Summary judgment on the second affirmative defense is GRANTED in favor of Plaintiff.

14.    Summary judgment on the third affirmative defense, to the extent it asserts a peer review privilege, is GRANTED in favor of Plaintiff.

15.    Summary judgment on the fourth affirmative defense is GRANTED in favor of Plaintiff.

16.    Summary judgment on the fifth affirmative defense is DENIED.

17.    Summary judgment on the sixth affirmative defense is

1    GRANTED in favor of Plaintiff.

2        18.    Summary judgment on the seventh affirmative defense is

3    GRANTED in favor of Plaintiff.

4        19.    Summary judgment on the eighth affirmative defense is

5    GRANTED in favor of Plaintiff.

6        20.    Summary judgment on the ninth affirmative defense is

7    DENIED.

8        21.    Summary judgment on the tenth affirmative defense is

9    GRANTED in favor of Plaintiff.

10

11   SO ORDERED

12   Dated:  April 8, 2009

13

14                          /s/ Oliver W. Wanger
                            Oliver W. Wanger
15                      United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28
                              141