1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID F. JADWIN, D.O.,<br><br>                    Plaintiff,<br><br>         v.<br><br>COUNTY OF KERN,<br><br>                    Defendant. | 1:07-CV-00026-OWW-DLB<br><br>MEMORANDUM DECISION RE: POST-TRIAL MOTIONS (Docs. 424, 425) |

## I.   INTRODUCTION.

This case arises out of Plaintiff's former employment at the Kern Medical Center, an acute care teaching hospital owned and operated by the County of Kern, California.  Plaintiff David F. Jadwin, D.O. ("Plaintiff") claimed, among other things, that the County and its employees retaliated and discriminated against him in contravention of federal and state law.  The employment issues were tried before the Court and a jury from May 14, 2009 to June 4, 2009.  On June 5, 2009, the jury returned verdicts in favor of Plaintiff.  On August 4, 2009, Findings of Fact and Conclusions of Law were issued on the claims tried to the court alone.  On May 4, 2010, Final Judgment was entered in favor of Plaintiff and against Kern County in the amount of $505,457, plus $1 in nominal damages on his civil rights claim.  At trial, Plaintiff requested over $4.2 million in economic damages.

1

1    Before the Court for decision are several post-trial motions.

2   Plaintiff has moved to amend the judgment to incorporate his bill

3   of costs and for prejudgment interest.   He has also moved to

4   recover $3,944,818.00 in attorneys' fees pursuant to 42 U.S.C. §

5   1988, 29 U.S.C. § 2617(a)(3) and California Government Code §

6   12965.[1]  Defendants have moved for a new trial under Rule 59(e)

7   and, separately, to amend the judgment to reflect to reflect the

8   dismissals of several individually-named defendants.

9    Oral argument on these motions was held on July 28, 2010.   The

10  Court, pursuant to *Moreno v. City of Sacramento*, 534 F.3d 1106 (9th

11  Cir. 2008), a Ninth Circuit case establishing the rules for

12  evaluating an attorney's fee request under 42 U.S.C. § 1988,

13  directed Plaintiff to supplement, organize, and refine his motion

14

15

_____

16   [1]  During the July 28, 2010 oral argument the Court noted that
17  Plaintiff's fee motion was the highest it had received in over
    nineteen years:
18

19       I suppose it bears noting that in an application for
         fees, with the multiplier, this is the highest fee award
20       that I've ever been asked to make in over 19 years.   And
         that includes public interest cases involving water and
21       the environment, where thousands of hours, water supply
         for most of the State of California is involved and
22       legions of lawyers, approximately 30 to 40 representing
         the diverse interests in those cases have, under the
23       Equal Access to Justice Act, sought fees against the
         United States under statutory authority.   And the
24       difference in the amount is a multiplier of at least
         three in this case over anything that's ever been
25       requested, let alone awarded.

26  (RT, July 28, 2010, 121:4-121:15.)

27
     Plaintiff requested $3,944,818 in fees in his original motion,
28  filed on June 1, 2010.   (Doc. 425.)

**2**

for attorneys' fees.[2]   In particular, it was determined that Plaintiff's counsel's documentary evidence concerning the hourly rates and tasks performed was materially non-specific and limited the district court's ability to meet *Moreno*'s exacting and mandatory standards imposed on district judges for calculating fee awards.   *See id*. at 1111 ("[w]hen the district court makes its award, it *must explain how it came up with the amount*.") (emphasis added).[3]   Plaintiff filed his supplemental and reply briefs, more than 500 pages of argument and billing information, on August 16 and September 16, 2010.  Defendants opposed the supplemental motion on September 3, 2010.  The motions are now submitted for decision.

---

[2] Supplemental briefing was also requested on the issue of prejudgment interest. (Doc. 440.) Plaintiff argues that prejudgment interest should be awarded on the entire jury award at the state law 7% interest rate.  Defendants disagree.

[3] For example, the Court, pursuant to a minute order, requested that counsel "include task and billing totals in their supplemental applications for attorneys fees."   (Doc. 440.) However, Plaintiff's lead counsel, Mr. Eugene Lee, did not provide this itemized information in his supplemental briefing. Rather, he printed out his "Excel" billing sheet, which captured only thirty characters of text.  This was not helpful.  Mr. Lee's purported "documentary support" is especially problematic given the Court's recitation to counsel of the Ninth Circuit case law, including *Moreno,* during oral argument and the fact that his co-counsel's (Ms. Herrington) declaration correctly contained the required billing support necessary to calculate the Lodestar.  Mr. Lee is again reminded that "[t]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."   *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  As a result of Plaintiff's counsel's continued oversights, which are unexplained given the number of opportunities he had been provided to amend his billing information, part of the County's billing analysis is adopted to calculate the Lodestar figure.

**3**

1

## II.  **BACKGROUND**.

2       The relevant facts and procedural history are summarized in

3   the Court's previous Memorandum Decisions in this case, filed on

4   April 8, 2009 and March 31, 2010, in brief:[4]   In this employment

5   case, trial commenced on May 14, 2009 and concluded on June 5,

6   2009.   The jury returned verdicts, entered on June 8, 2009, in

7   favor of Plaintiff. (Doc. 384.)   The jury found that Defendant

8   County: (1) retaliated against Plaintiff for engaging in certain

9   activities in violation of the Family and Medical Leave Act

10  ("FMLA") and the California Fair Employment and Housing Act

11  ("FEHA");   (2) retaliated against Plaintiff for taking medical

12  leave under the FMLA and the California Family Rights Act ("CFRA");

13  (3) discriminated against Plaintiff on the basis of his mental

14  disability in violation of the FEHA;   (4) failed to reasonably

15  accommodate Plaintiff's mental disability in violation of the FEHA;

16  and  (5) failed to engage in an interactive process with Plaintiff

17  in violation of the FEHA.   The jury found against the County on its

18  defense that Plaintiff's employment contract was not renewed by

19  reason of his conduct and alleged violation of the employer's rules

20  and contract requirements and/or that Plaintiff's improper behavior

21  was the cause of the nonrenewal of his contract.   The jury awarded

22  damages as follows:

23          Mental and emotional distress and          $0.00
24             suffering.

25

26

27       [4] *Jadwin v. County of Kern*, 2010 WL 1267264 (E.D. Cal. Mar.
    31, 2010);  *Jadwin v. County of Kern*, 610 F. Supp. 2d 1129 (E.D.
28  Cal. Apr. 08, 2009)

**4**

| | |
|---|---|
| Reasonable value of necessary medical care, treatment, and service received to the present time. | $30,192.00 |
| Reasonable value of necessary medical care, treatment and services which with reasonable probability will be required in the future. | $0.00 |
| Reasonable value of earnings and professional fees lost to the present time. | $321,285.00 |
| Reasonable value of earnings and professional fees with which reasonable probability will be lost in the future. | $154,080.00 |
| Total damages | $505,457.00 |

Certain claims were not submitted to the jury, specifically, Plaintiff's claim for interference with his rights under the FMLA/CFRA and a deprivation of Plaintiff's due process rights under the Fourteenth Amendment (made actionable by 42 U.S.C. § 1983).[5] On August 4, 2009, Findings of Fact and Conclusions of Law were issued on those claims. As to the FMLA/CFRA claim, it was determined that Plaintiff lacked standing to assert his claim or, *arguendo*, assuming standing existed at the time of the operative pleading, the claim was moot. As to the procedural due process claim, it was determined that Plaintiff's due process rights were violated and he was awarded nominal damages. On May 4, 2010, Final judgment was entered in favor of Plaintiff and against Kern County in the amount of $505,457, plus $1 in nominal damages on

---

[5] The parties stipulated that these claims should be tried by the court sitting without a jury, and each party, pursuant to Federal Rule of Civil Procedure 38(d); voluntarily and knowingly waived on the record in open court any right to try these claims to a jury. The stipulation was accepted on the twelfth day of the jury trial, June 6, 2009, and a corresponding order entered.

Plaintiff's due process claim, and any costs as permitted by law.

On May 28, 2010, Defendant filed two post-trial motions.  The first, to amend the Final Judgment to incorporate the dismissals of several individually-named defendants.  (Doc. 414.)  According to the County, these individually-named defendants are "prevailing parties" in this action and are entitled to recover their costs of suits.   The motion concerns the following individually-named defendants, who were named in the original and first amended complaint: Dr. Eugene Kercher, Dr. Jennifer Abraham, Dr. Scott Ragland, Dr. William Roy, Dr. Irwin Harris, Toni Smith and Peter Bryan.[6]  Defendant's second post-trial motion was for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.  (Doc. 415.)  The County argues that Ninth Circuit case law mandates a new trial based on Plaintiff's counsel's wrongful misconduct during trial.

Plaintiff also filed two post-trial motions.  On May 28, 2010, Plaintiff moved to amend the Final Judgment to incorporate in the final judgment, prejudgment interest and his recoverable costs.  (Doc. 424.)  On June 1, 2010, Plaintiff moved for attorney's fees of $3,944,818.00 pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 2617(a)(3), Cal. Gov't Code § 12965, and E.D. Local Rule 54-293.  (Doc. 425.)

Oral argument on the post-trial motions was held on July 28,

---

[6] Defendant's "Motion to Amend the Judgment" to incorporate the dismissals of several individually-named defendants was resolved pursuant to Court Order on August 12, 2010.  (Doc. 445.)  The motion was granted as to Defendants Peter Bryan and Irwin Harris only.  Defendant's motion was, in all other respects, denied.  The Final Judgment is amended to reflect the dismissals with prejudice of Mr. Bryan and Mr. Harris.

2010.  At the conclusion of the hearing, it was determined that supplemental briefing and specific justification was necessary to resolve the motions for prejudgment interest and attorney's fees. (Doc. 450.)   Opening supplemental briefs/oppositions on these issues were filed on August 6, 13, 16, and 18, 2010.  (Docs. 444, 447-49.)   The final opposition and reply briefs were filed on September 3 and 16, 2010.  (Docs. 450 and 451.)

## III.  **DISCUSSION**.

**A.   New Trial Motion**

   **1.   *Introduction and Argument***

The County moves for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.[7]  The County argues that there are several independent reasons to grant a new trial, including: the intentional attorney misconduct of Plaintiff's counsel, Mr. Eugene Lee, during trial; Mr. Lee's repeated use of the word "demotion" in violation of an in limine order and despite numerous admonitions during trial; Mr. Lee and his co-counsel's inappropriate gesturing, mocking, and disruptive behavior at Plaintiff's counsel table in the juries' presence during trial; Mr. Lee's interference with the County's attempt to evaluate Plaintiff during discovery; and Mr. Lee's intentional "blurring" to the jury of Plaintiff's employment-based claims, which allegedly resulted in an erroneous award of "front pay" and a violation of the "primary rights" doctrine.

---

[7] An Order denying the County's Motion for New Trial was entered on August 12, 2010.  (Doc. 446.)   The merits are discussed in this Memorandum Decision to fully develop the record.

The County filed its motion for a new trial on May 28, 2010.[8] In support of its motion, Defendant submitted: (1) a Memorandum supporting the County's motion; (2) the declaration of Mark A. Wasser, the County's lead counsel; (3) the declaration of Karen S. Barnes, an in-house attorney for Kern County, who was present throughout and testified at trial; (4) the declaration of Amy Remly, Mr. Wasser's paralegal;  (5) the declaration of Joanne DeLong, an attorney who observed the entire trial in the courtroom; (6) the declaration of Dr. Robert Burchuk, the County's medical expert; (7) the declaration of Dr. Irwin Harris, who provided expert testimony during trial; and (8)  the declaration of Renita Nunn, who testified on May 20 and June 2, 2009.  (Docs. 417-423.)

The declarations describe Mr. Lee's conduct during trial, including his alleged gesturing and scoffing during witness examinations in front of the jury; his inappropriate and inflammatory comments during closing argument; and his apparent "confusion" over yet repeated use of the term "demotion" as it relates to Dr. Jadwin's removal from his Pathology Department chairmanship position at Kern County Medical Center.  The declarations and other supporting Rule 59 evidence are delineated by topic:

### a. *Use of Word "Demotion" at Trial*

#### 1.  Mr. Wasser

Early in trial, Mr. Lee began using the words "demoted" and "demotion" to refer to Plaintiff's removal from his chairmanship position at Kern County Medical Center

---

[8] It is undisputed that the County's motion is timely under Rule 59(b).  *See* Fed R. Civ. Proc. 59(b) ("A motion for a new trial must be filed no later than 28 days after the entry of judgment.").

despite the absence of any evidence that Plaintiff was demoted. Every time he used these words, I objected. The Court sustained all of my objections. After Mr. Lee's third or fourth continued usage of the words, the Court admonished Mr. Lee and told him he was dangerously close to being held in contempt. Mr. Lee never stopped using the words. He even used them in his closing argument, prompting yet another admonition from the Court. On at least one occasion, Mr. Lee sought to excuse his misconduct by claiming it was his first trial.

(Doc. 417 at ¶ 6.)

### 2.   Joanne Delong

During the course of the trial, in the presence of the jury, Plaintiff's attorney, Eugene Lee, used the word "demotion" several times in reference to Plaintiff's removal from the chairmanship of the Pathology Department at Kern Medical Center. On at least one occasion, after trial had concluded for the day but before the attorneys were dismissed, the Court admonished Mr. Lee for his continued use of the word "demotion." I remember the admonishment was lengthy and quite stern.

(Doc. 420 at ¶ 3.)

### 3.   Karen Barnes

Ms. Barnes' declaration mirrors that of Ms. Delong's. (See, e.g., Doc. 418 at ¶ 3)("During the course of the trial, in the presence of the jury, Plaintiff's attorney, Eugene Lee, used the word "demotion" several times in reference to Plaintiff's removal from the chairmanship of the Pathology Department at Kern Medical Center.").

### b.   *Gesturing, Shrugging, and Scoffing*

### 1.   Amy Remly

During the trial, I sat in the gallery. I had an unobstructed view of the Plaintiff's counsel table. Mr. Lee often became agitated and, when he did, he frequently threw himself back into his chair and threw his arms up

9

into the air.  Joan Herrington frequently turned her face toward Mr. Lee and made facial expressions in response to witness' testimony.   She rolled her eyes, arched her eyebrows and shook her head.   This behavior lasted throughout the trial.

(Doc. 419 at ¶ 2.)


### 2.  Dr. Irwin Harris

I testified in this case on Friday, may 15, 2009, and Tuesday, May 19, 2009.

When I was being questioned about acts by the Plaintiff at Kern Medical Center, regardless of whether the acts were little or big events, the Plaintiff shaking his head "no" with facial expressions of disappointment in me. For the Plaintiff's attorney, Eugene Lee, to allow his client to behave in such a manner was very disturbing to me […]

Every few minutes, Plaintiff's other attorney, Joan Herrington, would respond to my answers by raising her eyebrows, looking surprised, and then she would lean over and whisper into the ear of Mr. Lee, who would suspend that line of questioning until another approach was taken with that line of questioning.  I found these pauses to be filled with drama, and it disturbed my concentration.

(Doc. 422 at ¶ 3-4.)


### c.  *Trial Witnesses: "Uncomfortable" and "Huffing Sounds"*

Karen Barnes and Renita Nunn, two trial witnesses, submitted sworn declarations describing similar conduct by Plaintiff's counsel during trial.  (Docs. 418 & 423.)  According to Ms. Barnes, she was "uncomfortable" and "distracted" by the constant gesturing, facial grimaces, and snickers from Plaintiff and his attorneys. (Doc. 418 at ¶ 4.)   Renita Nunn states that Mr. Lee and Ms. Herrington made "huffing sounds" and rolled their eyes when they

10

disagreed with a witness or opposing counsel.  (Doc. 423 at ¶ 3.)
Ms. Nunn further recounts an incident where Mr. Lee was admonished
by the court after he yelled "come on" in response to one of her
answers.  (Id. at ¶ 4.)  She also states that Mr. Lee "threw his
arms about" and engaged in "theatrics" during trial.  (Id. at ¶ 3.)

### d. *Inappropriate Comments During Closing Argument*

The County argues that Mr. Lee improperly appealed to bias,
prejudice and emotion in his closing argument by referring to the
County's size and power.  According to the County, this was a
"clear theme" to Mr. Lee's trial strategy and supports its Rule 59
motion for a new trial.  During his closing argument, Mr. Lee
stated:

> And you know, we've heard Dr. Jadwin, how he is
> supposedly a millionaire, this and that.  You know, in
> the end, he's just an individual, it's just one person
> against an entire County and all of its resources that we
> faced in this case.  But I will tell you, it's very
> important that even a powerful organization such as the
> County understand that in a court of law, everybody's
> equal.

(RT, June 4, 2009, 81:10-81:17.)

The Court, *sua sponte*, immediately instructed the jury to
disregard Mr. Lee's statement:

> And I must say, ladies and gentleman, that an appeal to
> status, big versus little, strong versus weak, is
> improper under the law and you should disregard any such
> suggestion.

(RT, June 4, 2009, 81:23-82:1.)

Each time Mr. Lee was admonished he apologized and on more
than one occasion stated that it was his first trial and he was

"trying."[9]   The court's response, in keeping with its duty to recognize the inexperience of counsel, attempted to balance Mr. Lee's violation of rudimentary rules of trial decorum, against the rights of all parties to a fair trial, and refrained from interfering with or chilling Mr. Lee's advocacy while reminding him of his professional responsibility to abide by the rules.   Mr. Lee, notwithstanding, continued to violate the rules.

     2.   *Merits*

     Rule 59(a) of the Federal Rules of Civil Procedure provides that a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."   Fed. R. Civ. P. 59(a).   Rule 59 does not specify the grounds on which a motion for a new trial may be granted.   *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003).   Rather, the court is "bound by those grounds that have been historically recognized."   *Id.*   Historically recognized grounds for a new trial include a verdict that is against the weight of the evidence, damages that are excessive, or a trial that was not fair

---

[9] On June 2, 2009, following Mr. Lee's cross-examination of a defense expert witness, the Court, outside the presence of the jury, reminded Mr. Lee that Courtroom Decorum Rule No. 13 states: "counsel shall not repeat, comment on or echo the answer given by the witness."   Mr. Lee responded:

> Your Honor, I will -- I will eliminate the behavior from this point forward.   And the only thing I'll say is that, Your Honor, it's completely inadvertent.   I must emphasize this is really my first trial and a lot of stuff is going on.   But that's not an excuse and it will stop, Your Honor. It will stop.

(RT, June 2, 2009, 35:8-35:13.)

to the moving party. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). A new trial may be granted only if, after weighing the evidence as the court saw it, "the verdict is contrary to the clear weight of the evidence, is based upon false or perjorious evidence, or to prevent a miscarriage of justice." Molski, 481 F.3d at 729 (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n. 15 (9th Cir. 2000)). The decision whether misconduct of trial counsel has been so egregious to require a new trial is committed to the broad discretion of the court. *See Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987); *see also Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) ("The authority to grant a new trial [...] is confided almost entirely to the exercise of discretion on the part of the trial court."

The County argues that Plaintiff's attorneys committed "grievous misconduct" throughout the trial, leading to an improper and inconsistent jury award. The County explains:

> Plaintiff's counsel's misconduct, their continuing misbehavior and breach of courtroom decorum, their refusal to abide by or respect the Court's ruling, the puree of commingled legal theories thrown to the jury, combined with Plaintiff's ever-shifting dance to reconcile his inconsistent positions, substantially prejudiced the County and renders the resulting verdict flawed to the point a new trial is required.

(Doc. 433 at 5:19-5:23.)

Plaintiff's counsel is critical of the County's characterization of his behavior during trial. According to Mr. Lee, there was "no misconduct which permeated the entire proceeding so as to prejudice the jury" and, even if there was, "Defendant failed to object [...] This bars relief." Defendant also disputes

13

the County's interpretation of Ms. Herrington's alleged gesturing and misconduct, which he describes as minimal and not impacting the Rule 59 analysis.

The County's Rule 59 motion also argues that Plaintiff's counsel continually committed gross prejudicial misconduct during closing argument when he "aggressively appealed to a bias against big organizations." According to the County, the references to the County's supposed "power and size" were so numerous that they created "a clear theme to his argument." Defendant argues that Plaintiff's counsel's "plan" or "theme" culminated in closing argument when he characterized the County as "powerful" and described his client's interaction with his employer as "one person against an entire County and all of its resources."

Here, Plaintiff's counsel's comments concerning the County's size and available resources were improper, as he readily concedes. (RT, July 28, 2010 at 88:2-88:3)("the Court gave an admonition at that time, sua sponte [...] and Mr. Lee accepted the admonition [..] He apologized."). However, there is no indication that Mr. Lee's comments so permeated the trial that the jury was necessarily prejudiced, as required by *Settlegoode v. Portland Pub. Schs*, 371 F.3d 503 (9th Cir. 2004). First, immediately following Mr. Lee's comments, the Court, *sua sponte*, instructed the jury to disregard Mr. Lee's statement about size and the County's power. It did so in a neutral and dispassionate manner to avoid emphasizing any prejudice and so as to not reflect adversely on either party. The law presumes that the jury carefully follows the instructions given to it. *See Doe v. Glanzer*, 232 F.3d 1258, 1270 (9th Cir. 2000); *see also United States v. Sarkisian*, 197 F.3d 966 (9th Cir. 1999)

**14**

("Given that the district court sustained the objection, coupled with the district court's earlier instruction to the jury ..., if there was any error, it was harmless."). Here, the prejudicial effect on the jury, if any, was minimal and a new trial is not warranted on that basis. *See Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286 (9th Cir. 1986) (explaining that the trial court is in the best position to gauge the prejudicial effect of improper comments).

As the Court stated during oral argument on the Motion for New Trial on July 28, 2010, the comment was improper but was immediately and appropriately remedied:

> talking about the powerful organization and the -- it's just us, one against the powerful County, the entire County and all its resources faced in this case, the Court gave an admonition at that time, sua sponte. And Mr. Lee accepted the admonition. He apologized.
>
> And I believe that that did cure and minimize the prejudice that could be caused. Because such a remark can be prejudicial. Referring to big versus little. Referring to have versus have not, powerful versus weak, David v Goliath. Those are all classic hyperbolic type arguments that are recognized in the cases and involve improper argument.
>
> But again, it was isolated. The theme wasn't repeated. And the Court, again, did not have a motion for mistrial and acted as promptly and as even handedly as possible. In other words, I didn't raise my voice. I didn't express any disapproval or anger. I rather simply -- I gave [an] admonition.

(RT, July 28, 2010, 87:24-88:15.)

Second, the "size" comments alleged to have deprived the County of a fair trial were isolated rather than persistent. They occurred only during closing argument. *See Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1107 (9th Cir. 1991) (declining to grant a motion for a new trial where "the alleged misconduct

15

occurred only in the argument phase of the trial ... most of counsel's comments were not objected to at trial and appellants did not move for a mistrial at the end of the argument"). The misconduct complained of in this case is substantially different from the "closing argument misconduct" supporting a new trial in *Bird v. Glacier Electric Coop. Inc.*, 255 F.3d 1136 (9th Cir. 2001). In *Bird*, the Ninth Circuit concluded that counsel's closing arguments offended fundamental fairness because counsel: (1) argued in inflammatory terms; (2) linked the defendant's behavior to white racism in exploitation of Indians; (3) appealed to historical racial prejudices of or against the white race; and (4) used incendiary racial and nationalistic terms to encourage the all-tribal member jury to make an award of damages against the non-Indian defendant. *Id.* at 1152. *Bird* is distinguishable.

Lastly, had defense counsel believed that any prejudice to the jury was not cured by the Court's *sua sponte* admonition and instruction, he should have objected, assigned misconduct to Mr. Lee, requested additional instruction or moved for a mistrial. However, Defendant chose not to do so.

The County next argues that Plaintiff's counsels' gesturing, grimacing, and scoffing during witness questioning deprived the County of a fair trial. The County explains:

> Both Plaintiff's attorneys, Mr. Lee and Ms. Herrington, while seated at counsel table listening to witnesses testify, grimaced, sighed, snickered, rolled their eyes, shook their heads, huffed, made facial expressions of disapproval, and feigned exaggerated looks of exasperation. Ms. Herrington constantly arched her eyebrows and shook her head. Mr. Lee made guttural sounds and grunts and would lean back in his char, throw his arms up and slap the armrests when he did not like an answer. While he examined witnesses, Mr. Lee routinely repeated the witness' answers back to the witness. He

1

2

**was admonished several times by the Court to stop it.  He made sarcastic statements like, 'of course you would say that' and 'come on' […]**

**(Doc. 416 at 6:6-6:18.)**

According to the County, this conduct continued through the entire trial and had a distracting, disturbing, and infuriating impact on witnesses.  Plaintiff and his counsel disagree.

The starting point is the County's failure to object to these alleged gestures, facial expressions, or grunts during trial.  The objections are made for the first time in the County's motion for a new trial.  The "non-objection" issue was discussed during the July 28, 2010 oral argument, at which point the Court stated that it did not observe the alleged inappropriate gesturing and mocking, in part because defense counsel did not bring the conduct to the Court's attention.  Rather, the Court was focused primarily on the witness, jury, trial exhibits, real-time testimony on the Court's monitor, and its taking of trial notes; not on Plaintiff's attorneys or the individuals sitting near Plaintiff's table.[10] Defense counsel stated that he did not personally witness the conduct because he "was examining the witness [...] [the gesturing and comments] it's behind me."  (RT, July 28, 2010 at 80:18-80:23.)

_____

[10] With respect to witnessing the alleged improper trial conduct, the Court stated:

> And so, again, those things shouldn't occur. But I'm focused on the witness, I'm also looking at the jury, I'm also taking notes, and I take copious notes during every trial.  So my head is down a lot of the time as I'm taking my notes.  And I didn't see those gestures. I didn't see those facial expressions.  I didn't hear the comments being made.

(RT, July 28, 2010 at 80:18-80:23.)

This explains why no objection was then raised, but does not explain why the subject was not raised at a recess or the close of the court day, to give the judge an opportunity to address the claim.  Nor was a motion for mistrial made.

The Ninth Circuit holds that a new trial should only be granted where the "flavor of misconduct ... sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict."  *Settlegoode*, 371 F.3d at 516-17.  An even higher threshold governs where, as here, defendant failed to object to the alleged misconduct during trial.[11]  *Id*. at 518.  Under those circumstances, the Ninth Circuit reviews for "plain or fundamental error," which requires: "(1) an error; (2) that the error be plain or obvious; (3) that the error have been prejudicial or affect substantial rights; and (4) that review be necessary to prevent a miscarriage of justice."  *Id*.

### a.   Counsel's Misconduct.

Here, the conduct at issue does not meet this high threshold.  *See, e.g., A.D. v. Cal. Highway Patrol*, No. C-07-5483-SI, 2009 WL 1817004, at 5 (N.D. Cal. June 23, 2009) (finding that defendants did not meet *Settlegoode*'s high threshold).

---

[11] In *Settlegoode*, the Ninth Circuit stated that a higher threshold is necessary for two reasons: "First, raising an objection after the closing argument and before the jury begins deliberations 'permit[s] the judge to examine the alleged prejudice and to admonish ... counsel or issue a curative instruction, if warranted.  This was not done.  Second, allowing a party to wait to raise the error until after the negative verdict encourages that party to sit silent in the face of claimed error."  *Id*. at 516-17 (internal quotations omitted).

As to the objections that were made at trial, the County claims that Mr. Lee's conduct was "part of an overall strategy to compromise the integrity of the trial to emotion and bias."  To support its argument, the County submits several declarations describing an admonishment of Mr. Lee for "making guttural sounds." The declarations also portray a reprimand of Mr. Lee for making a sarcastic remark to a witness.  With respect to these statements and conduct, defense counsel's objections were sustained and the jury was given a curative instruction.  *See, e.g., Messick v. Patrol Helicopters Inc.*, 360 F. App'x 786, 789 (9th Cir. 2009) ("Plaintiffs' counsel erred [...] however, the district court gave the jury a curative instruction subsequent to that argument, and a jury is presumed to follow the district court's instructions.").

Defendant did not raise the issue of cumulative prejudice and did not move for a mistrial or request further jury instruction on the issues, nor raise concerns that the County was forced to make repeated objections, which cast the County in the light of being obstructionist.

None of the objected-to conduct satisfied the *Settlegoode* standard; it did not permeate the entire proceeding so as to influence and/or prejudice the jury.  A review of the record reveals that Mr. Lee's cross-examination of several witnesses was contentious and at times sarcastic, particularly as to Plaintiff's former professional colleagues at Kern Medical Center.  However, the discordant nature of the examination was often brought on by the witnesses, who themselves argued or were adverse in response to points Defendant sought to establish.  Further, the record does not indicate that Mr. Lee's extraneous comments were actually heard by

1  any member of the jury.  It is also possible that the jury viewed

2  Plaintiff and his counsel in a less favorable light by observing

3  the complained-of behavior.

4      The same reasoning applies to the argument that "Mr. Lee's

5  continued use of the word 'demotion' was prejudicial to the County

6  because it implied Plaintiff was punished even though neither party

7  introduced evidence to support such a finding."  The objections

8  were sustained and, as the County explains: "the Court gave Mr. Lee

9  a lengthy admonition and warning, outside the presence of the jury,

10 for his continued use of the word [...] Mr. Lee extravagantly

11 apologized and assured the Court he would stop."  Contrary to the

12 County's assertions, there is no evidence in the record that Mr.

13 Lee made "insincere apologies" to the Court or that his language

14 choice was "calculated and pervasive in nature."  Rather, the

15 record demonstrates Mr. Lee's misstatements were due to his total

16 inexperience as a trial attorney and unfamiliarity with the federal

17 rules of evidence.[12]

18     Here, in contrast to cases such as *Cadorna v. City and County*

19

20     [12]  With respect to the "demotion" issue, the Court stated
21 during oral argument on July 28, 2010: "And so on this issue, and
   particularly the use of the term 'demotion,' the Court sustained
22 the objections and did not admonish Mr. Lee in front of the jury.
   And so I don't think there was any prejudice to the plaintiff. And
23 since the objections were sustained and -- it was a close issue,
   and an arguable point, the Court doesn't  believe that either
24 cumulatively, or standing alone, that that was the kind of
   intentional black-hearted misconduct that can essentially -- those
25 cases are where the attorney very purposefully and with malice
   aforethought, knowing what the off limits areas of the Court are,
26 are knowing that what the attorney's going to appeal to, matters
   that are categorically inadmissible, that are prejudicial, sets
27 out, if you will, on a course to flout and violate the orders to do
   nothing  but  prejudice  the  jury."   (RT,  July  28,  2010  at
28 73:7-73:21.)

*of Denver, Colorado*, 245 F.R.D. 490 (D. Colo. 2007) and *Ballarini v. Clark Equipment Co.*, 841 F. Supp. 662 (E.D. Pa. 1993), there is no evidence that counsel flouted the Court's rulings or that the conduct served to "plant in the jury's minds that the Federal Rules of Evidence were inconvenient devices to conceal the truth." *Cardorna*, 245 F.R.D. at 495. Under the totality of the circumstances, there is insufficient evidence to conclude that the alleged misconduct permeated the trial with prejudice against the County. The general level of courtroom etiquette returned to normal after counsel was admonished.

### b.   Confusing Federal and State Front Pay Claims

The County also moves for a new trial or, in the alternative, to alter, amend, or obtain relief from judgment based on Mr. Lee's confusion over the applicability to his case and, particularly, the employment-based claims he prevailed on at trial. The County advances three arguments to support its position. First, the jury's verdict for the reasonable value of earnings and professional fees which with reasonable probability will be lost in the future should be amended because the basis for such an award is unclear. Second, Plaintiff's counsel equivocated on Plaintiff's claims during closing argument, which "encouraged juror confusion and denied the County of its right to have the jury treat each claim separately and accurately. Third, Plaintiff allegedly violated the primary rights doctrine by alleging violation of several legal theories when there was only one injury.

The County's first argument is an extension of the "liquidated damages" analysis contained in the March 31, 2010 Memorandum

21

1   Decision.   The Memorandum Decision explained that the statutory

2   basis for the claimed "reasonable value of earnings and

3   professional fees" award was unintelligible, therefore liquidated

4   damages were not available.   It also discussed the impact of the

5   general jury verdict in the context of prejudgment interest, which

6   was unavailable for the same reasons.   Here, the County adds an

7   additional element to the analysis:   If liquidated damages were

8   improper because the foundation for "future damages" was unclear,

9   then the entire "future damage" award is infirm.

10   This issue is discussed in detail in the "prejudgment

11   interest" section, § III(B)(1), *infra*.   Both parties argue that the

12   award must be modified (upward or downward) because the jury did

13   not award damages based on federal (FMLA) or state (FEHA or CFRA)

14   violations.   According to the County, the entire future damage

15   award must be thrown out because "it might be based on the FMLA."

16   It does not follow that the entire "future" damage award is infirm.

17   While the federal FMLA does not provide for "front pay," the award

18   of reasonable value of earnings and professional fees is properly

19   supported under the state FEHA and CFRA claims.   Although Mr. Lee

20   did not make this explicitly clear during trial, the County did not

21   object to Mr. Lee's statements at that time.   More critically, Mr.

22   Lee's intermingling of the statutory frameworks did not result in

23   Rule 59 error; the jury award is supported by state statutory law.[13]

24

25       [13] It is undisputed that the jury heard evidence to properly

26   support an award for future losses.   The March 31, 2010 Memorandum
    Decision provides:

27

28           At trial, Plaintiff put on evidence of his future
             losses through his economist, Stephanie Rizzardi, who

1    The County's second argument, that counsel "equivocated"

2  during closing argument, is resolved under the "misconduct"

3  framework, discussed in detail above.  Here, the "equivocation"

4  allegedly took place during closing arguments and was not objected

5  to by the County.  On these facts, there is no basis to grant a new

6  trial.  *See Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103,

7  1107 (9th Cir. 1991) (declining to grant a motion for a new trial

8  where "the alleged misconduct occurred only in the argument phase

9  of the trial [...] most of counsel's comments were not objected to

10 at trial and appellants did not move for a mistrial at the end of

11 the argument").  Defendant did not move for a mistrial based on the

12 Plaintiff's arguments.  Taking Mr. Lee's "equivocation"

13 independently or in the aggregate, there is insufficient evidence

14 to conclude that this alleged misconduct permeated the trial and

15 irreversibly prejudiced the County.  Mr. Lee's (mis)expressions in

16

17              testified that she calculated future losses based on
              the salary and other forms of compensation (such as
18            professional fees) Plaintiff lost by virtue of not
              having his contract renewed, i.e., what he expected
19            to receive had he remained employed with the County.
              Plaintiff's damages expert projected this loss out to
20            February 2016, Plaintiff's worklife expectancy.  The
              expert also prepared a damages report, which was
21            submitted into the evidence. (Exhibit No.
              451.1-451.6.)  Given the nature of Plaintiff's
22            evidence regarding future losses, it is apparent that
              the $154,080 the jury awarded for the "[r]easonable
23            value of earnings and professional fees which with
              reasonable probability will be lost in the future"
24            represents an award of front pay.  Accordingly, even
              assuming it stems from an FMLA violation, the
25            $154,080 amount is not eligible for inclusion in a
              liquidated damages computation under the FMLA.
26

27 *Jadwin v. County of Kern*, 2010 WL 1267264, at 11 (E.D. Cal. 2010).

28
                                  23

1  this area are indicative of counsel's inexperience, not gross

2  incompetence or intentional misconduct.

3

4          c.   Primary Rights Doctrine.

5          The County's final argument is that Plaintiff's "redundant"

6  claims ran afoul of the "primary rights" doctrine.  The California

7  Supreme Court explained that the primary rights theory:

8          [P]rovides that a "cause of action" is comprised of a
           "primary right" of the plaintiff, a corresponding
9          "primary duty" of the defendant, and a wrongful act by
           the defendant constituting a breach of that duty. The
10         most salient characteristic of a primary right is that it
           is indivisible: the violation of a single primary right
11         gives rise to but a single cause of action.

12  *Mycogen Corp. v. Monsanto Co.*, 28 Cal.4th 888, 904 (2002)

13  (citations omitted).  A party may bring only one cause of action to

14  vindicate a primary right.  *Id.* at 897.  Claims not raised in this

15  single cause of action may not be raised at a later date.  *Id*.

16         The foundation for the County's primary rights argument, which

17  was raised for the first time in its third round of post-trial

18  briefing, is that Plaintiff's August 10, 2009 motion "revealed for

19  the first time that Plaintiff's claims all arose from the same set

20  of employment actions."  The County states that: "had it known that

21  Plaintiff believed his claims all arose from the same facts, it

22  would have moved in limine or otherwise to narrow or eliminate

23  redundant claims."

24         The County's argument incorporates language from the Ninth

25  Circuit's decision in *Manufactured Home Communities Inc. v. City of*

26  *San Jose*, 420 F.3d 1022 (9th Cir. 2005), discussing the primary

27

28                              24

rights doctrine:

> MHC's claims in federal and state court all involve a
> single primary right: the right to receive a fair return
> on its investment at Westwinds.   They all stem from a
> single injury MHC claims to suffer. See Takahashi v. Bd.
> of Trs., 783 F.2d 848, 851 (9th Cir.1986) (holding the
> plaintiff's statutory mandamus proceeding in state court
> barred the plaintiff's constitutional claims in federal
> court because both actions stemmed from a single primary
> right:   the contractual right to employment).   MHC's
> claims all relate to a single Ordinance and the City's
> application of that Ordinance to MHC's petition for a
> rent increase.   MHC's different Counts are simply
> different legal theories under which MHC may recover.
> Different theories of recovery are not separate primary
> rights. Mycogen Corp., 28 Cal.4th at 897, 123 Cal.Rptr.2d
> at 438, 51 P.3d at 307; see also Slater v. Blackwood, 15
> Cal.3d 791, 795, 126 Cal.Rptr. 225, 226-27, 543 P.2d 593,
> 594-95 (1975)

*Id.* at 1031-31.

Plaintiff responds that the County "fundamentally misunderstands the primary rights theory."   Plaintiff relies on *Agarwal v. Johnson*, 25 Cal. 3d 932 (1979) for the proposition that "one adverse employment action could involve the violation of more than one primary right."

On this point, Plaintiff also cites *Los Angeles Branch NAACP v. Los Angeles Unified School Dist.*, 750 F.2d 731 (9th Cir. 1994): "As both *Mattson* and *Agarwal* indicate, the single most important factor in determining whether a single course of conduct has violated more than one primary right is whether plaintiff suffered injury to more than one interest."   Plaintiff then recounts eight "interests," including the right to a reasonable accommodation in employment; right to a workplace free from discrimination; right to an interactive process; and right to workplace free from retaliation as separate "interests," involving distinct primary

rights, which were included in the second amended complaint.

Plaintiff argues that the case involved a "set of facts" that violated several "rights" or "interests."  The County frames the issue as: "there was only one injury, therefore there was only one claim for relief."  The County does not specify the "single injury" allegedly suffered by Plaintiff.  In this case, contrary to the County's arguments, Plaintiff possessed a number of legally protectable "interests" under different statutes.  Uncertainty over *what* statutory violation(s) - federal or state - led to the damage award, cuts against the County's arguments.

The jury verdict contains several damage awards that reflect the jury determined that Plaintiff experienced multiple violations of his different federal and state statutory rights.   Given the jury's findings and the lack of legal authority supporting the County's position, there is no basis to find that Plaintiff violated the primary rights doctrine.   As the Court explained during oral argument on July 28, 2010:

> So there's five separate primary rights that were identified by claims, that were separately stated correctly in the complaint. And so I don't believe that there's only one injury or only one primary right that was at issue in the case, or on which the jury could have found a basis to award damages.

> So that's my tentative ruling there [...] There was a way to make this very clear if the County wanted to break it down.  And that is that -- and there's a good reason not to do this, a good strategic reason, but it certainly is within your ability to ask for a verdict form that would have defined, if you will, the harms and the primary rights violated, and have findings in the verdict form on each of those.  But candidly, it would have been accentuating and emphasizing those [separate claims and bases for recovery] to the jury.

> And again, an experienced trial lawyer makes strategic

decisions. And if I'm defending that case, I may just as likely say "I don't want to go there" and have it in black and white, here's five separate primary rights being violated, and makes your [separate] findings on [each of] those.   Maybe you end up, if there's a plaintiff's verdict, with more damages or worse findings.

And so certainly we didn't have the specific findings on those, but there was a way to address that.   And no party requested that the Court give any further instructions of law or have any different or additional verdict forms to address that.

(RT, July 28, 2010 at 94:10-95:13.)

It was within the County's ability to request answer to such clarifying questions by jury instruction and verdict form with specific findings.  The County did not ask for such findings in the verdict forms to separately identify which primary rights were violated.


### 3.   *Conclusion on the County's Motion for a New Trial*

The trial of this case culminated in a result that was supported by substantial evidence.  The testimony of members of the Medical Board of Kern Medical Center show that they had personal disputes with and animosities toward the Plaintiff arising out of conflicts.   Trial testimony given by members of the Board could have been perceived by the jury as condescending, if not arrogant, and unduly critical of the Plaintiff.  Even accepting the defense theory that the Plaintiff was a difficult colleague to interact with; unreasonable in his insistence on conformity with his views as to medical quality assurance;   and unduly sensitive in withdrawing from professional practice at the hospital;   there was

27

1  countervailing evidence that demonstrated that Plaintiff was well

2  thought of by nurses and other Department of Pathology staff; that

3  he was a dedicated scientist and committed in good faith to medical

4  quality assurance.   That his personal idiosyncracies were not

5  consonant with the culture of the Board and Medical Directors at

6  Kern Medical Center, in the jury's view did not justify removing

7  him from medical practice in the Department of Pathology, even if

8  his removal as the Director was required by his chronic absences.

9  It is also likely that the jury did not accept the Defendant's view

10  that Dr. Jadwin was "too disruptive" to be permitted to continue in

11  residence in the practice of pathology at the hospital.

12     Throughout this case, the level of contentiousness between

13  counsel was unprecedented.   Substantial unnecessary court time was

14  required to resolve discovery disputes, personal quarrels, and

15  logistical issues between counsel.   This hostility continued at

16  trial.

17     This was Plaintiff's lead counsel's (Mr. Lee) first trial.

18  His inexperience was obvious, he violated a number of the

19  applicable Rules of Court Decorum that governed the trial.   A copy

20  is attached to this opinion marked Exhibit A and incorporated

21  herein by this reference.[14]   Mr. Lee was disputatious, ultimately

22  _____

23     [14]   The Court's Rules of Courtroom Decorum were served on all
counsel on April 23, 2009, before the trial commenced.   Rules 4 and
24  16 provide, in relevant part:

25     4.  Avoid disparaging personal remarks or acrimony toward
opposing counsel and/or parties.   Remain detached from
26  any ill feeling between the litigants or witnesses [...]

27

28                                28

unaccepting of the Court's guidance, and quarrelsome with opposing counsel and with the Court's rulings.  His performance in closing argument was at the limit of acceptable professional conduct.  He crossed the line a number of times, however, the Court accommodated his inexperience and undue contentiousness to endeavor to assure a fair trial to both sides.

Defense counsel was very competent and experienced.  The defense made numerous strategic choices to not object, to not assign misconduct, not move for a mistrial, or otherwise request admonitions or jury instructions that would have addressed the specific problems now raised by the now-surfacing post-trial objections to the trial conduct of Plaintiff's counsel.  As the law of this Circuit cited in this decision pellucidly establishes, the time to address and to cure trial counsel's misconduct is when it occurs.  There are many strategic reasons not to do so, all within the sound judgment of an experienced trial lawyer.  Such reasons include not alienating the jury;  not wishing to appear obstructionist;  not repeatedly objecting to the point that the jury is disaffected;  not appearing to be unduly hostile toward opposing counsel which may engender an adverse response from the jury;  not wishing to emphasize a negative comment from the judge

_____

16.  Counsel shall admonish all persons at counsel table and parties present in the courtroom that gestures, facial expressions, laughing, snickering, audible comments, or other manifestations of approval, disapproval or disrespect during the testimony of witnesses are prohibited.

(Doc. 319.)

29

or conduct which would unduly prejudice the jury; and attempting to focus the jury on the points the defense sought to establish, rather than concentrating on the Plaintiff's arguments and contentions.  The Court attempted not to intervene, except where absolutely necessary, and attempted to treat counsel for both sides with respect and courtesy.  The Court did not use a raised voice, did not express anger, irritation, was neutral in addressing each counsel, and ultimately endeavored to focus counsel and the parties on the merits of the case.

The County's Rule 59 motion for a new trial is DENIED.[15]

**B.    Remaining Post-Trial Motions**

Having decided the County is not entitled to a new trial under Rule 59, Plaintiff's requests for prejudgment interest, attorney's fees and costs remain to be decided.

**1.    Prejudgment Interest**

Plaintiff moves to amend or correct the Final Judgment to include prejudgment interest of $32,286.39.  Plaintiff first moved for an award of prejudgment interest on August 10, 2009, citing *Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 922 (9th Cir. 1995), *Criswell v. Western Airlines, Inc*. 709 F2d 544, 556-557 (9th Cir.

---

[15] As stated by the Ninth Circuit, a civil litigant is "entitled to a fair trial, [he is] not entitled to a perfect trial, for there are no perfect trials."  *In re First Alliance Mortgage Co.*, 471 F.3d 977, 991 (9th Cir. 2006) citing *United States v. Payne*, 944 F.2d 1458, 1477 (9th Cir. 1991).  The parties received a fair trial in this case.

1983), *Currie v. Workers' Comp. Appeals Board*, 24 Cal.4th 1109, 1115, (2001) and California Civil Code § 3287(a). That motion was denied on March 31, 2010 on grounds that the jury did not allocate the amount of damages attributable to the federal (FMLA) or state (FEHA or CFRA) violations. Nor did the jury itemize damages by each adverse employment action. These two "shades of grey" precluded an award of prejudgment interest:

> Here, the jury did not specifically allocate the amount of damages attributable to a FMLA violation, making it impossible to select any amount on which to award prejudgment interest exclusively under the FMLA. The only amount on which prejudgment interest could be theoretically awarded under the FMLA is the $321.285 the jury awarded for the reasonable value of earnings and professional fees lost to the present time. As to the other amounts, because this is a compensation loss case under § 2617(a)(1)(A)(i)(I), the jury's award of $30,192 for the "[r]easonable value of necessary medical care, treatment, and services received to the present time" is not recoverable as damages under the FMLA and, by extension, interest could not be awarded on this amount under the FMLA. Because the $154,080 the jury awarded for the "[r]easonable value of earnings and professional fees which with reasonable probability will be lost in the future" represents an award of front pay, this amount falls under § 2617(a)(1)(B) and could not be included in a prejudgment interest computation under § 2617(a)(1)(A)(ii) [...]

> As to his state law claims, citing Currie v. Workers' Comp. Appeals Board, 24 Cal.4th 1109, 1115 (2001) and California Civil Code § 3287(a), Plaintiff argues that "in an action to recover backpay, interest is recoverable on each salary or pension payment from the date it was due." (Doc. 399 at 8.) Currie determined that, pursuant to California Civil Code § 3287, prejudgment interest could be recovered on a backpay amount awarded to a plaintiff who was wrongfully denied reinstatement. There, the employer's refusal to reinstate the plaintiff violated California Labor Code § 132a [...]

> Plaintiff's reliance on Currie and California Civil Code § 3287(a) is nevertheless problematic because, even assuming any backpay awarded in this case is linked to a FEHA/CFRA violation, the jury awarded backpay in one lump sum - $321,285 - without specifying which particular

adverse employment action(s) caused what amount of backpay damages. Because this case involves multiple adverse employment actions that occurred at different points in time - not just a one-time wrongful denial of reinstatement as in Currie - the generalized backpay award makes it difficult to compute prejudgment interest.

Under California Civil Code § 3287(a), Plaintiff can, in theory, recover prejudgment interest on backpay awarded to him.  This interest runs from the day the right to recover the backpay "vested in him." § 3287(a).  The jury's verdict does not, however, specify the particular adverse employment action(s) on which they based their backpay award, nor the amount of backpay attributable to any particular adverse employment action(s), making it difficult to determine when Plaintiff's entitlement to any discrete amount of the awarded backpay "vested in" Plaintiff.  In this case, at least three adverse employment actions that could have lead to an award of backpay are Plaintiff's wrongful removal from his position as Chair of the Pathology Department, his wrongful placement on administrative leave, and the wrongful non-renewal of his contract, all of which occurred on different dates (July 2006, December 2006, and October 2007 respectively).  To the extent the $321,285 the jury award consists of backpay damages caused by these different events, what amount of backpay did the jury attribute to each event? The current state of the briefing does not adequately address these issues and prejudgment interest cannot be computed at this time.

Whether construed as a motion directed to the court's inherent authority to modify a non-final order or a motion under Rule 54(b), Plaintiff's request for prejudgment interest is DENIED WITHOUT PREJUDICE.

*Jadwin v. County of Kern*, 2010 WL 1267264, at 16-7 (E.D. Cal. 2010).

Plaintiff renewed his motion for prejudgment interest on May 28, 2010.  The second time around, Plaintiff argues that the $505,457.00 damage award does not include "front pay," which is not recoverable under the FMLA, but rather "past damages" and "future

damages" which are both recoverable under Civil Code § 3287(a).[16] Applying Plaintiff's reasoning, state law violations, not federal, provided the basis for the damage award, therefore he is entitled to prejudgment interest on the entire $505,457.00, not $321,285. Plaintiff's restyled theory, however, overlooks the fact that the jury did not assign damages based on federal (FMLA) or state (FEHA or CFRA) violations.  Plaintiff's new argument also ignores the fact that he previously argued, in his trial brief, that he was entitled to "front pay" damages under the FMLA, (Doc. 325 at 11:20-11:21)("Plaintiff is also entitled to back pay, front pay, liquidated damages and compensatory damages on his FMLA claim"), and introduced "front pay evidence" at trial, *see Jadwin v. County of Kern,* 2010 WL 1267264, at 11 ("Given the nature of Plaintiff's evidence regarding future losses, it is apparent that the $154,080 the jury awarded for the '[r]easonable value of earnings and professional fees which with reasonable probability will be lost in the future' represents an award of front pay.").[17]

---

[16] Civil Code § 3287(a) provides, in relevant part: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any such debtor, including the state or any county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state."

[17] Specifically, as discussed in the March 31, 2010 Memorandum Decision: "At trial, Plaintiff put on evidence of his future losses through his economist, Stephanie Rizzardi, who testified that she calculated future losses based on the salary and other forms of

1    **Without any guidance from the verdict form or case law,**
2    **Plaintiff now asks the Court to ignore the FMLA claims and evidence,**
3    **which he failed to differentiate for the jury and failed to request**
4    **separate verdict findings on each state and federal claim to**
5    **eliminate the ambiguity of what the jury findings are on these**
6    **claims, and to calculate interest under the "prejudgment interest**
7    **friendly" FEHA and CFRA.   This is unprecedented and requires**
8    **impermissible post-trial judicial interpretation of a "stipulated"**
9    **general verdict form.   Contrary to Plaintiff's arguments, there is**
10   **no basis to conclude that the damage award was based on state law**
11   **violations, or vice versa.[18]   On the present record, the Court**
12   **cannot interpret and give meaning to a general verdict form that did**

13

14   compensation (such as professional fees) Plaintiff lost by virtue
15   of not having his contract renewed, i.e., what he expected to
     receive had he remained employed with the County. Plaintiff's
16   damages expert projected this loss out to February 2016,
     Plaintiff's worklife expectancy.   The expert also prepared a
17   damages report, which was submitted into the evidence. (Exhibit No.
     451.1-451.6.) [...]   Accordingly, even assuming it stems from an
18   FMLA violation, the $154,080 amount is not eligible for inclusion
     in a liquidated damages computation under the FMLA." *Jadwin v.*
19   *County of Kern*, 2010 WL 1267264, at 11.

20   [18]   To support his latest round of arguments, Plaintiff
21   disingenuously submits that there was no mention of "front pay"
     during trial and the jury did not have authority to award "front
22   pay" under the FMLA.   First, in his original motion, Plaintiff
     argued that prejudgment interest was proper based on both the
23   federal and state law violations, which is inconsistent with his
     current position.   Second, even if the term "front pay" was not
24   used, the jury awarded "future" damages for lost earnings and did
     not differentiate between federal and state law violations.   That
25   determination was based on the "front pay" evidence presented by
26   Plaintiff's counsel at trial. Plaintiff's argument is inconsistent
     with his original position and merely incorporates a correct
27   recitation of the law, which was first brought to his attention in
     the March 31, 2010 Memorandum Decision.

28
                                    **34**

not allocate damages based on the underlying statutory violations and adverse employment actions.[19]   Plaintiff's argument that the entire jury award can be characterized as a Civil Code § 3287(a) damage award is without merit.   The jury's verdict did not so specify, and such an award is inconsistent with Plaintiff's evidence and argument at trial.[20]   Moreover, no formula or other finite predetermined calculation formula was introduced into evidence.

Plaintiff next offers a "solution" for the adverse employment actions issue, i.e., *what* adverse employment action formed the basis for the jury's damage award:

> A reasonable basis for approximating interest would be to calculate interest on past and future economic damages from the date on which the jury rendered its verdict, 6/9/09, up through the date of entry of judgment, 5/4/10. This is a conservative method by any measure as the jury was not instructed to include interest on past damages "to the present time", and so the jury's past damages

---

[19] Contrary to Defendant's arguments, there is no support to deny prejudgment interest in its entirety based on the general jury finding.  As stated in the March 31, 2010 Memorandum Decision, "[b]ecause prejudgment interest is theoretically available on all of Plaintiff's claims submitted to the jury, the fact that the jury did not specifically allocate the damages among Plaintiff's various claims does not outright preclude an award to Plaintiff for prejudgment interest."  *Jadwin*, 2010 WL 1267264, at 15.

[20] The record reveals that the parties expressly agreed to the use of a single verdict question on the issue of damages and, specifically, that the County agreed to the "undifferentiated jury verdict."  As in *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001), the parties could have objected to the verdict form after the verdict was announced, before the jury was excused, but did not.  As stated by the Ninth Circuit, "[b]y waiting until post-trial motions to raise its specific contentions, Deckers prevented the court from correcting any problems ex ante and, for some of these contentions, prevented the development of an adequate record."  Id. at 1110.  That language applies with equal force here.

35

1

**award likely did not include interest.**

2

(Doc. 424 at 6:19-6:23.)

3

    **Plaintiff    offered    the    following    prejudgment    interest**

4

**calculation:**

5

    **1.    333 days/365 days x 7% interest x 505,557 = 32,286.39**

6

(Id. at 6:25.)

7

    **Plaintiff's proposal is a reasonable solution to a unique**

8

**problem, i.e., absence of itemized damages referable to each adverse**

9

**employment action or identifying the underlying theory of recovery.**

10

**The general approach submitted by Plaintiff is adopted to calculate**

11

**prejudgment interest.   Plaintiff's specific calculations, however,**

12

**are rejected as they are based on the entire jury award,**

13

**$505,457.00.   As discussed in detail in this Memorandum Decision,**

14

**in open court on July 28, 2010, and in the March 31, 2010 Memorandum**

15

**Decision, the jury did not allocate the amount of damages**

16

**attributable to the federal or state violations.   There is nothing**

17

**in the record to ascertain whether the jury's damage award was based**

18

**entirely on state law violations.   The jury, pursuant to its general**

19

**findings on June 5, 2009, established that the "principal" amount**

20

**of damages for any potential claim for prejudgment interest is**

21

**$321,285.[21]   Plaintiff has been unable to present, after three**

22

23

24

        [21] The $321,285 represents the "reasonable value of earnings
25      and professional fees lost to the present time," the only amount
        for which prejudgment interest is available.  *See Jadwin*, 2010 WL
26      1267264, at 15 ("The only amount on which prejudgment interest
        could be theoretically awarded under the FMLA is the $321.285 the
27      jury awarded for the reasonable value of earnings and professional
        fees lost to the present time.").

28

rounds of briefing, any binding or persuasive authority to support his arguments, which conflict with the jury's unanimous verdicts.

This does not the end the analysis.  The parties dispute whether federal or state law provides the applicable prejudgment interest rate.  Plaintiff originally argued that the correct rate was 10% per annum, the maximum state law rate for post judgment interest; but has since revised his request to 7% per annum.  Plaintiff argues that this is the correct interest rate because "state law is controlling with regard to the prejudgment interest rate."  (Doc. 449 at 4:17-4-18.)  In support, Plaintiff cites *Evanston Ins. Co. v. OEA, Inc.*, 566 F.3d 915 (9th Cir. 2009) and the March 31, 2010 Decision, which stated that "prejudgment interest is substantive for Erie purposes [...] that makes California law applicable to prejudgment interest on Plaintiff's state law claims."  (Doc. 408 at 32:12-32:13.)

Plaintiff once again ignores the seminal dispute in this case, that the jury did not allocate the amount of damages attributable to the federal or state violations.  Without a specific jury determination on that issue, there is no basis to support an omnibus "state law" prejudgment interest calculation to the exclusion of the federal rate.  To illustrate, a 7% interest rate is appropriate in diversity cases, when a party prevails on a state law claim.[22]  It is undisputed that *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) and its progeny supply the relevant interest rate in that instance.  However, this case is different.  Here, the jury determined that

[22] This hypothetical assumes that the forum employs a 7% interest rate to calculate prejudgment interest.

both Plaintiff's federal and state law employment rights were violated, without distinction as to the separate claims for relief. Plaintiff explicitly acknowledged as much in his August 6, 2010 supplemental brief: "Here, the jury found that medical leave was a 'motivating factor' in all 4 of the adverse actions taken by Kern County against Plaintiff, in violation of the FMLA (as well as the California Family Rights Act) and awarded Plaintiff both past and future lost wages." (Doc. 444 at 3:12-3:14.)

The Defendant's reciprocal contention is unavailing.[23] Like the state interest rate arguments, the federal interest rate, statutory or prime, cannot be adopted in its entirety because it is unclear whether the award was based on federal or state law violations. The jury award *could* be based on federal violations, but it is also arguable that the entire award was based on violations of the FEHA/CFRA.

There is no clear solution on how to best to calculate prejudgment interest in this case. If the jury award was based purely on state law, a 7% interest rate applies. *See Pro Value Properties, Inc. v. Quality Loan Service Corp.*, 170 Cal.App.4th 579, 582 (2009). On the other hand, if the jury award was based solely on the FMLA, prejudgment interest must be calculated according to either the rate of interest published by the Board of Governors of

---

[23] According to Defendant, the Court cannot award 7% prejudgment interest because "it is impossible to differentiate the state and federal claims, determine when they accrued and which adverse employment actions they were based on [and] to the extent the claims are co-mingled in the verdict they bear interest at different rates." This contention is without merit.

the Federal Reserve System, 28 U.S.C. § 1961(a),[24] or the "prime rate."[25]  *See Hite v. Vermeer Mfg. Co.*, 361 F. Supp. 2d 935, 949 (S.D. Iowa 2005) (discussing potential prejudgment interest rate calculations under the FMLA), aff'd 446 F.3d 858 (8th Cir. 2006); *see also Bell v. Prefix, Inc.*, No. 05-74311, 2010 WL 4260081, at 2 (E.D. Mich. Oct. 22, 2010) (applying the federal reserve interest rate to determine prejudgment interest in an FMLA case).  Defendant argues for a federal "prime rate" of 3.25%.  In view of the historical reduction of interest rates while this case has been pending, this is a fair measure for the federal prime rate.

The Ninth Circuit has made clear that prejudgment interest is an element of compensation, not a penalty, and has the primary goal of making an aggrieved party whole.  *See generally Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 988 (9th Cir. 2001); *accord Drumm v. Morningstar, Inc.*, 695 F. Supp. 2d 1014, 1022 (N.D. Cal. 2010)("The purpose of prejudgment interest 'is to provide just compensation to the injured party for loss of use of the award

---

[24] Under 28 U.S.C. § 1961(a), the applicable interest rate is "the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of judgment."  28 U.S.C. § 1961(a).  This rate may be found by referring to the Federal Reserve website, located at: http://www.federalreserve.gov/RELEASES/h15/.   Here, the relevant Weekly Average 1-year constant maturity treasury yield is .44%.

[25] The prime rate is the rate that banks charge for short-term unsecured loans to credit-worthy customers. *Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450 (D.C. Cir.), cert. denied, 519 U.S. 1028 (1996).   The prime rate set by the Federal Reserve for the relevant period is 3.25%, http://www.federalreserve.gov/releases/h15/data/Daily/H15_PRIME_N A.txt.

during the prejudgment period - in other words, to make the plaintiff whole as of the date of the injury.'")(citing *Lakin v. Watkins Assoc.'d Indus.*, 6 Cal.4th 644, 663 (1993)).[26]   Based on such a compensatory rationale, some district courts have determined that the federal statutory interest rate did not fulfill the purpose of awarding prejudgment interest, *see, e.g., Perez v. Cozen & O'Connor Group Long Term Disability Coverage*, No.07-cv-0837-DMS-AJB, 2008 WL 6693714, at 2 (C.D. Cal. Aug. 19, 2008) and *Hite*, 361 F. Supp. 2d at 949, while others have found that the federal rate prescribed in 28 U.S.C. § 1961 appropriately compensated the aggrieved party, *see, e.g., Traxler v. Multnomah County*, No. 06-1450-KI, 2010 WL 3069340, at 1 (D. Or. Aug. 2, 2010) and *Austin v. Jostens, Inc.*, No. 07-2380-JAR, 2009 WL 902417 (D. Kan. Mar. 31, 2009).   As no clear guidepost exists and the parties have not offered a reasonable solution on how to calculate prejudgment interest in this case, the Ninth Circuit's preferred "compensatory approach" governs.   To properly compensate Plaintiff and to account for the possibility that the jury returned a verdict supported only by the FMLA or the FEHA/CFRA, Plaintiff is entitled to prejudgment interest at the average of the "prime rate," 3.25%, and the California rate, 7%, for an average rate of 5.125%.   Although this rate does not correlate exactly with either the federal (prime) or state (statutory) rates, it is reasonably proximate to both, and it will ensure Plaintiff is fully compensated.

---

[26] Although *Dishman v. UNUM Life Ins. Co. of America*, 269 F.3d 974 is not on all fours with this case - it was decided under ERISA -, it did analyze the rationale and purpose behind prejudgment interest awards.

1    Plaintiff is awarded prejudgment interest from the date of the

2    jury's verdict, June 5, 2009, to the date of entry of final

3    judgment, May 4, 2010.   However, based on the uncertainty in the

4    jury's general verdict award, which was proposed, given, and

5    accepted by the parties without objection, or request for an

6    alternate verdict form, Plaintiff is awarded prejudgment interest

7    at a rate of 5.125% on the principal damages award of $321,285.  The

8    total prejudgment interest award is $15,022.27.[27]  The May 4, 2010

9    Judgment is amended to include this amount.

10

11          **2.   Post-Judgment Interest**

12    The parties agree that the Plaintiff is entitled to an award

13    of post-judgment interest at the federal treasury rate, from the

14    date of the judgment to the date of satisfaction of the judgment.

15    (RT, July 28, 2010, 58:24-59:24.)

16    Plaintiff's request is GRANTED and the judgment is AMENDED to

17    include an award of post-judgment interest at the federal treasury

18    rate, from the date of the judgment to the date of satisfaction of

19    the judgment.

20

21          **3.   Attorney's Fees**

22               **a.   *Introduction***

23    Plaintiff requests an award of attorney's fees under both

24    Federal law (42 U.S.C. § 1988 and 29 U.S.C. § 2617(a)(3)) and

25

26    _____

27         [27] Graphical representation:  333 days/365 days x 5.125%
      interest x 321,285 = $15,022.27.

28                                      **41**

California law (Cal. Gov't Code § 12965).[28]  Plaintiff seeks a total of $3,944,818.00 in attorneys' fees, broken down as follows: a lodestar of $1,972,409.00 in fees, with a 2.0 multiplier for extraordinary litigation efforts and expertise in the area of employment law.[29]   The total amount requested is based on the work of four counsel at out-of-town hourly rates:   (1) lead counsel Eugene Lee, $400/hr.;  (2) counsel Joan Herrington, $500/hr.;  (3) contract counsel Marilyn Minger, $385/hr.;  (4) fee counsel David Hicks, $660/hr.

The statutes cited by Plaintiff provide that a district court, in its discretion, may award reasonable fees to the prevailing party.  *See* 42 U.S.C. § 1988 ("In any action or proceeding to enforce a provision of section ... 1983 of this title, ... the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs...."); *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 295 (4th Cir. 2009) ("The FMLA directs the award of reasonable attorneys' fees to a prevailing plaintiff [...] [t]he amount of attorneys' fees awarded is at the trial court's discretion.") (citations omitted); see also Cal. Gov't Code § 12965(b) ("the court, in its discretion, may award to the prevailing party reasonable attorney's fees and costs.").

The County does not dispute that Plaintiff is the prevailing party under the cited statutes and case law, however, it argues that

[28] Generally, litigants "are required to bear the expenses of their litigation unless a statute or private agreement provides otherwise." *Carbonell v. I.N.S.*, 429 F.3d 894, 897-98 (9th Cir. 2005).

[29] (See Doc. 451 at 23:18-23:25.)

1  the motion should be denied in its entirety due to Plaintiff's

2  counsel's unprofessional conduct/behavior and egregious

3  over-litigation and limited success.[30]   In the event fees are

4  awarded, the County asserts that Plaintiff is not entitled to

5  recover the total amount of fees requested because such amount is

6  unreasonable and the Court should, instead, reduce Plaintiff's

7  attorney's fees request to between $125,000 and $250,000.[31]

8

9              b.   *Should the Fee Request Be Denied in its Entirety?*

10      Acknowledging that Plaintiff is a prevailing party under

11  the relevant federal and state statutes, the County still argues

12  that no attorney fees should be awarded because his fee request was

13  poorly documented and overstated.  The County also asserts that a

14  complete denial is support by Plaintiff's counsel's "substantial and

15

16      [30]  In the typical attorney's fees case, the analysis begins
17  with the definition of "prevailing party" set forth by the Supreme
    Court in *Buckhannon Board & Care Home, Inc. v. West Virginia*
18  *Department of Health & Human Res.*, 532 U.S. 598, 600 (2001).  In
    *Buckhannon*, the Supreme Court noted that prevailing party status
19  requires that a party "received a judgment on the merits, or
    obtained a court-ordered consent decree."   532 U.S. at 605
20  (citations omitted).  Additionally, such relief must "create the
    material alteration of the legal relationship of the parties
21  necessary to permit an award of attorney's fees." *Id.* at 604.
    Applying *Buckhannon* to the facts of this case, it is clear that
22  Plaintiff is the "prevailing party."   Because Plaintiff is the
    prevailing party, he is entitled to attorneys' fees under both
23  federal and state law.

24

25      [31]  Specifically, the County asserts that the "amount awarded
    should be reduced to a small fraction of Plaintiff's request."
26  (Doc. 432 at 1:20-1:21.)  The County argues that "a reasonable fee
    in this matter is in the range of $125,000 to $250,000."  (Id. at
27  1:22-1:23.)

28

continuing misconduct and unprofessional behavior." The County cites *Serrano v. Unruh*, 32 Cal.3d 621, 635 (1982), for the proposition that a trial court may "reduce the award or deny one altogether" if the fee request "appears unreasonably inflated."

Here, while the litigation was contentious and counsel was inexperienced, there are no facts to justify a complete denial of attorney's fees under either Federal or California law. Courts in both fora have limited the complete denial of fee awards to cases involving "special circumstances."[32] *See Chavez v. City of Los Angeles*, 47 Cal.4th 970, 976 (2010) ("[FEHA] has been interpreted to mean that in a FEHA action a trial court should ordinarily award attorney fees to a prevailing plaintiff unless special circumstances would render a fee award unjust.") (citations omitted)*; see also Child Evangelism Fellowship of Greater San Diego v. Acle*, No.05-CV-1166-IEG-WMc, 2009 WL 484204, at 4 (S.D. Cal. Feb. 24, 2009) ("the Court finds the Plaintiff's success in this case was not merely de minimus or technical and there are no 'special circumstances' warranting a complete denial of fees"). For example, in *Young v. Exxon Mobil Corp.*, 168 Cal.App.4th 1467 (2008), it was determined that "special circumstances" existed because the fee award was "unjust." The *Young* Court stated: "[J]ust as there are circumstances in which a prevailing plaintiff, who ordinarily should recover attorney fees, may not recover them - when special circumstances make an award unjust - the same is true of a

---

[32] Although arising in a slightly different context, the Ninth Circuit's discussion of "special circumstances" in *Saint John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054 (9th Cir. 2009) is instructive.

1  prevailing defendant in a frivolous case [...] [t]his is just such
2  a case: where the fee award to the prevailing defendant would
3  redound to the benefit of another defendant who is not entitled to
4  recover fees." *Id.* at 1575-76.  There are no "unjust" facts to
5  support a complete denial of fees in this case.

6       *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115 (9th Cir. 2000)
7  provides the closest specific context.  There, the district court
8  denied Plaintiff's request for attorney's fees on grounds that he
9  was not the "prevailing party."  The district court alternatively
10 stated that even if he had prevailed, the motion was infirm because
11 the request was excessive and poorly documented.  The Ninth Circuit
12 reversed the district court, finding that "[a]lthough each one of
13 these [deficiencies] may ultimately provide the district court with
14 a reason to reduce the fee, we do not believe that they provide the
15 court with a valid basis for denying the fee application in its
16 entirety." *Id.* at 1121.  The Ninth Circuit stated that Plaintiff's
17 fee application met the "basic requirements," which included a
18 "summary of the time spent on a broad category of tasks such as
19 pleadings and pretrial motions (16.5 hours), settlement (4.2 hours),
20 and court appearances (1.5 hours)." *Id.*  The Ninth Circuit
21 concluded that if the district court felt that it needed more
22 detailed information, it "should have either requested the
23 information or simply reduced the fee to a reasonable amount." *Id.*

24      The same approach was followed here.  Although Plaintiff's
25 counsel's fee request is less detailed and developed than the

26
27
28                              **45**

1  prevailing party in *Fischer*,[33] there are no special circumstances to

2  justify a complete denial of attorney's fees.  Rather, the remedy

3  is a reduction of any fee award, not, as the County seeks, complete

4  denial of a fee award.  The facts of this case are distinguishable

5  from those involving attorney misconduct or "unjust" fee recovery.

6  *See Meyler v. Commissioner of Social Sec.*, No.04-CV-4669-GEB, 2008

7  WL 2704831, at 3 (D.N.J. July 7, 2008) (cataloging "special

8  circumstances" cases).  Plaintiff's counsel, while inexperienced and

9  apparently unwilling to follow the Federal Rules of Evidence and

10  Civil Procedure, has not attempted to deceive the Court and has not

11  been duplicitous or dishonest.  Although Mr. Lee made many errors,

12  some repeated after admonition, his overall conduct as a vigorous

13  advocate does not raise to the level of intentional bad faith

14  misconduct.  The fee request is excessive.  A complete denial of

15  attorney fees is not authorized.

16

17            c.  *Legal Standards - The Lodestar Calculation*

18     Once a determination is made that attorney's fees are

19  appropriate, the standard to be applied in calculating an award of

20  attorney's fees is that of "reasonableness."  Whether under the

21

22     [33] In contrast to the plaintiff in *Fischer*, Plaintiff's counsel
    in this case did not provide a "summary of the time spent on a
23  broad category of tasks such as pleadings and pretrial motions."
    Not a single task total is provided in this case.  That omission
24  frustrated any attempt to compose a Memorandum Decision on the many
    issues raised in post-trial briefing.  In addition, unlike the
25  plaintiff in *Fischer*, Plaintiff's counsel was given three
    opportunities to produce a properly documented fee motion, to no
26  avail.  Because his motion fails to meet the clear standards for
    fee awards, after three attempts, the Court is required to analyze
27  what was provided.

28
                              **46**

California state law, or federal law, a determination of reasonableness generally involves a two-step process. First, the court calculates the "lodestar figure" by taking the number of hours reasonably expended on the litigation and multiplying it by a reasonable hourly rate. *See, e.g., Ketchum v. Moses*, 24 Cal.4th 1122, 1131-32; *PLCM Group, Inc. v. Drexler*, 22 Cal.4th 1084, 1095 (2000); *see also McGrath v. County of Nevada*, 67 F.3d 248, 252 (9th Cir. 1995). In determining the lodestar amount, the California Supreme Court has "expressly approved the use of prevailing hourly rates as a basis for the lodestar." *Ketchum*, 24 Cal.4th at 1132. The "relevant legal community" in the lodestar calculation is generally the forum in which the district court sits. *Mendenhall v. NTSB*, 213 F.3d 464, 471 (9th Cir. 2000).

Second, the court may adjust the lodestar upward (via fee enhancer or "multiplier") or downward based on an evaluation of certain factors, including, among other things, the time and labor required; the novelty and difficulty of the questions involved; the skill requisite to perform the legal service properly; the preclusion of other employment by the attorney due to acceptance of the case; and whether the fee is fixed or contingent. *See id.; cf. Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). Not all factors are always relevant in determining whether an award is reasonable. The party seeking a fee enhancement bears the burden of proof. *See Ketchum*, 24 Cal.4th at 1138.

Courts may reduce a requested fee award, or deny one altogether, where a fee request appears unreasonably inflated. *See id.* at 1137; *see also Hensley v. Eckerhart*, 461 U.S. at 434 (court

1  may deny compensation for "hours that are excessive, redundant, or
2  otherwise unnecessary").

3      The fee applicant bears the burden of documenting the
4  appropriate hours expended in the litigation and must submit
5  evidence in support of those hours worked. *Hensley*, 461 U.S. at
6  437. The party opposing the fee application has a burden of
7  rebuttal that requires submission of evidence to the district court
8  challenging the accuracy and reasonableness of the hours charged or
9  the facts asserted by the prevailing party in its submitted
10 affidavits. *Toussaint v. McCarthy*, 826 F.2d 901, 904 (9th Cir.
11 1987).

### d.   *Lodestar - Hours Reasonably Expended*

#### 1.   *Introduction*

15     Plaintiff argues that 4,026.1 hours expended by Mr. Lee and the
16 862 hours expended by Ms. Herrington were reasonable.[34] Defendant
17 responds that Mr. Lee and Ms. Herrington should be awarded "no more
18 than 1396 hours [] 1145.2 hours for Mr. Lee and 250.5 for Ms.
19 Herrington."[35] According to Defendant, the number of hours spent by
20 Plaintiff's attorneys should be reduced because Plaintiff's counsel
21 expended an excessive amount of time:  (1) drafting complaints;  (2)
22 noticing, attending and conducting more than forty depositions,

---

24     [34] (See Doc. 451 at 40:16-40:17.)

25     [35] Defendant accumulated and revised the billing totals because
26 Plaintiff's counsel did not adequately respond to the Court's July
   28, 2010 oral requests and subsequent Minute Order.  Several of the
27 County's billing figures are incorporated into the lodestar
   analysis.

**48**

including Plaintiff's; (3) preparing Plaintiff's motion for summary judgment; (4) opposing Defendant's motion for summary judgment; (5) researching and drafting the motion to strike Defendant's fifth affirmative defense; (6) researching and drafting motions for reconsideration; (7) preparing for the pre-trial conference and drafting the joint pre-trial statement; (9) composing and objecting to proposed jury instructions and verdict forms; (10) filing a reply to Defendant's objections to Plaintiff's motion for costs; (11) drafting an 88-page opposition to an ex parte application to shorten time, which was granted on May 7, 2008; (12) alleging spoilation of evidence; (13) communicating with his client; (14) advancing "whistleblowing" claims; and (15) researching appellate procedure and extraordinary writs.[36]   Defendant also argues that the attorneys' fee award should be reduced for the administrative or secretarial work undertaken by Plaintiff's attorneys.

To determine the hours reasonably expended, it is necessary to profile the post-trial briefing in this case, namely the documentation used to support Plaintiff's motion for attorneys' fees.   Here, the voluminous documentary evidence submitted by Plaintiff's counsel is inadequate to support an attorney's fee petition in this Circuit, especially one that requests nearly $4 million from a public entity.[37]   While Plaintiff's counsel's

_____

[36] These subject areas are not exhaustive.  Other time entries and subjects are addressed as relevant to the analysis.

[37] The analysis focuses on Mr. Lee's deficient documentation and billing records, as well as his confusion over the Court's requests for specific billing information and task totals.   As explained on July 28, 2010, co-counsel Ms. Herrington provided

49

inexperience and unnecessarily adversarial practices have been noted throughout this Memorandum Decision, his refusal to provide a properly documented fee motion continuing adequate descriptions of hours expended for specific services provided on identifiable subject matter. This includes failing to provide a functional delineation of the number of hours spent litigating this case with a description of the services performed.

Based on the state of law in the Ninth Circuit, including *Moreno v. City of Sacramento*, 534 F.3d 1106, it is difficult to understand why Plaintiff's lead counsel submitted voluminous billing records without delineating a specific total for each of the categories of work he performed.[38] Unlike the prevailing party in *Fischer,* lead counsel's fee request in this case consisted of a bare request for $4 million dollars and more than 500 pages of "Excel" or "Quick Books" spreadsheets. Not a single task total was provided

---

discrete task totals in her declaration consistent with generally accepted billing practices and documentation for fee requests in fee litigation. Mr. Lee, lead counsel, did not provide a single task total in his request for over 4,000 fee hours. Given the fact that Ms. Herrington provided task totals and the Court specifically requested them, Mr. Lee's confusion and omissions are incomprehensible.

[38] The Ninth Circuit has previously held that "plaintiff's counsel can meet his burden - although just barely - by simply listing his hours and identify[ing] the general subject matter of his time expenditures." *Fischer*, 214 F.3d at 1121. This low production threshold does not completely sync with *Moreno*, especially in cases involving voluminous requests for fees, here, lengthy briefs/objections, hundreds of pages of billing records and nearly 5,000 hours requested. *Cf. Perez v. Safety-Kleen Systems, Inc.*, No. C-05-5338 PJH, 2010 WL 934100, at 7-8 (detailing the difficulties presented by plaintiffs' failure to set forth detailed billing statements).

in his hundreds of pages of supporting documentation.  In addition,
most of the original spreadsheets were limited to thirty characters,
further frustrating any attempt to calculate an accurate lodestar.

During oral argument on July 28, 2010, the Court explained
Ninth Circuit law on fee motions and that Plaintiff's documentary
support foreclosed any attempt to meet that standard:

> All right.  Let's move on now to the subject of
> attorney's fees.  And let me start by talking about some
> law that nobody cited.  Because the subject of attorney's
> fees is changing in the Ninth Circuit.  And there is a
> sea change that is occurring.
>
> It used to be that trial judges were viewed as experts in
> the matter of attorney's fees, both as to the rate, as to
> the services performed, as to what was reasonably
> necessary to accomplish the result, and essentially, were
> evaluators, without having to call other experts to
> provide that kind of information.
>
> As is often the case in law, the world appears to be
> changing, at least as Chief Judge Kozinski is there, it's
> going to change.  In Moreno versus the City of
> Sacramento, which is found at 534 Fed 3d 1106, case about
> two years old now, it's a July of 2008 decision.  Here's
> what has happened in the Ninth Circuit.  In this case,
> Judge Levy was hearing a civil rights case brought
> against Sacramento City involving inverse condemnation,
> substantive due process, Fourth Amendment unreasonable
> search and seizure and procedural due process violations
> in a case where an owner's building was demolished. And
> Judge Levy, based on his experience and understanding and
> knowledge, made some across the board reductions, 25
> percent to the requested hours for legal research, 50
> percent reduction for trial preparation hours, 33 percent
> reduction in actual appeal preparation hours, 50 percent
> reduction for hours spent interviewing and investigating,
> 50 percent per hour reduction in the hourly rate, which
> the panel found was impermissible double counting.
>
> So the starting point in a civil rights case, or a case
> where statutory attorney's fees are being recovered, is
> that he starts out, "Lawyers must eat, so they generally
> won't take cases without a reasonable prospect of getting
> paid.  Congress has recognized that private enforcement
> of civil rights legislation relies on the availability of
> fee awards.

51

If private citizens are to be able to assert their civil rights, and if those would violate the nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it cost them to vindicate these rights in court. At the same time, fee awards are not negotiated at arms length. So there is a risk of overcompensation. A district court thus awards only the fee that it deems reasonable." And it cites the case of Hensley v Eckerhart, 461 US 421 at 433 [...]

And there's one more case that preliminarily I will refer you to. And that is Lahiri, L-A-H-I-R-I, v Universal Music & Video Distribution Corporation, 606 Fed 3d 1216. In Lahiri, the concept of block billing, B-L-O-C-K, was used. And in Lahiri, the Court reduced 80 percent of the billable hours for attorneys and paralegals by 30 percent. And that court, the Ninth Circuit, found that was a permissible reduction citing California State Bar's Committee on Mandatory Fee Arbitration Report that block billing may increase time by 20 to 30 percent.

The Court further excluded fees incurred because the Court requested supplemental information that made an additional 10 percent across the board reduction for excessive and redundant work, which was found to be a reasoned exercise of discretion.

And in the Lahiri case, which was a Lanham Act case, for infringement of copyright. And the ultimate reduction in that case ended up being about 25 percent gross. So we now turn to the plaintiff's motion for attorney's fees. And the present request involving a two times multiplier is for $3,944,818 in attorney's fees. And we have certain declarations and some billing records that are submitted.

What the Court must say, as the starting point in the Ninth Circuit or an attorney's fee award, an application of a lodestar is that specific billing records are absolutely required. And that block billing records -- or in this case, for some reason it appears that the program that the plaintiff used cuts off characters in the billing statement.

And so there are gaps in what the Court has been provided, which the plaintiff is going to have to supplement because we simply can't make sense nor do we have a complete basis for the backup, the records that are normally and now essentially required.

Because there's no way a district court, as we are commanded by the Ninth Circuit, can make a painstaking

52

and exacting analysis of the basis for a lodestar award without having a comprehensive description of services and allocation of time, normally to the tenth of an hour, spent on all matters with a designation of the identity of the attorney and/or the paralegal who is performing the services.

And so in the Court's experience, that is the minimum that is required to enable calculation of the lodestar.

(RT, July 28, 2010, 109:14-111:11, 116:1-117:18.)

Also on June 28, 2010, the Court, pursuant to a Minute Order, requested that counsel "include task and billing totals in their supplemental applications for attorneys fees."[39] (Doc. 440.) Task totals were requested to facilitate a thorough and careful review of the lengthy objections/arguments and voluminous billing records in this case. *See Moreno*, 534 F.3d at 1111 ("[w]hen the district court makes its award, it must explain how it came up with the amount.").

Plaintiff filed supplement billing information on August 16, 2010. (Doc. 448.) In particular, Plaintiff filed a Memorandum of Points and Authorities and Mr. Eugene Lee's supplemental

---

[39] The Court in *Smith v. District of Columbia*, 466 F. Supp. 2d 151, 158 (D.D.C. 2006) stated:

> To be sure, the trial court must be 'practical and realistic' regarding how attorneys operate; if attorneys 'have to document in great detail every quarter hour or half hour of how they spend their time [...] their fee[s] [...] will be higher, and the lawyers will simply waste precious time doing menial clerical tasks.'

While mindful of this language and without elevating form over substance, it is not unreasonable to request more detailed post-trial billing records to calculate an accurate lodestar. *See, e.g., Fischer v. SJB-P.D. Inc.*, 214 F.3d at 1121.

declaration, a 76-page amendment to his original 96-page declaration.[40] (Doc. 448-1.) The supplemental filing, however, did not improve on the original fee motion. None of the billing information requested in open court or via Minute Order was included.

The County opposed the supplemental briefing based on Plaintiff's counsel's lack of detailed billing records and task totals, as requested on July 28, 2010 in open court and, later, pursuant to Minute Order. In its opposition, the County correctly observed that Plaintiff's counsel did not provide the information requested by the Court on July 28, 2010. To remedy these deficiencies and reach a final fee total, the County prepared appropriate task totals:

> Plaintiff's new filing suffers from the same filings that prevented the Court from considering the motion on July 28. Contrary to the Court's direction, the revised time records do not include task or billing totals. In fact, they provide no totals. Surprisingly, unlike the time records appended to the first filing, the revised time records Mr. Lee submitted with his new filing are not even in chronological order. This makes them even harder to analyze- or group into tasks. To aid the Court in considering the motion, the County has prepared spreadsheets that group time entries into tasks and provide totals.

(Doc. 450 at 7:21-7:28.)

In a last ditch attempt to meet Ninth Circuit fee standards, Plaintiff filed a reply on September 16, 2010.[41] In his reply,

---

[40] Plaintiff also filed the declarations of David Hicks, Lawrence Bohm, and Christina Krasomil. (Docs. 448-2 to 448-4.)

[41] Plaintiff's most recent supplemental fee brief, (Doc. 451), provides several unexplained and untethered fee totals. While

**Plaintiff admits that the requested task and billing totals were not included, apologizing to the Court for yet another "oversight." (Doc. 451 at 7:18-7:20 ("In its August 4 Minute Order, the Court wrote, 'Counsel are requested to include task and billing totals in their supplemental applications for attorneys' fees' [...] Plaintiff's counsel did not do that [...] [t]his was an oversight for which Plaintiff apologizes.")) Plaintiff nonetheless suggests that the Court and Defendant had enough information to calculate an accurate Lodestar.[42]   Mr. Lee also attached a third "fee" declaration to his reply, the latest iteration/addendum totaling 366 pages. While the declaration includes sporadic and unexplained task totals - the first time doing so after three rounds of briefing -, it omitted the critical task totals/subtotals and other billing analysis requested on July 28, 2010.[43]**

_____

Plaintiff argues that this effort is adequate, he overlooks that the complete failure to follow the Court's July 28, 2010 Order or adhere to Ninth Circuit law (which was explained to him during the hearing). He further neglects to consider the burden these actions had on the Court, as well as Defendant's ability to file an opposition. However, when a subtotal was provided by Plaintiff, an attempt was made to analyze it within the lodestar framework.

[42]  (See Doc. 450 at 7:18-7:20)("Plaintiff would point out that it appears Defendant was able to calculate these totals anyway.") Plaintiff's counsel is reminded that the Court presides over one of the heaviest caseloads in the nation, over 1,220 criminal and civil cases.

[43]  Plaintiff intersperses certain task totals throughout the latest reply brief.  These subtotals are not helpful as they are incomplete, infrequent and not calibrated to the total hours billed.  For example, Plaintiff states that Mr. Lee and Ms. Herrington recorded 453.8 hours (327.2 and 126.6 hours) preparing and attending depositions.  The deposition subtotal, one of the few subtotal amounts included in the reply, is not separately broken

The United States Supreme Court has made clear that "[t]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  Plaintiff has not met that burden in this case.  As a result of Plaintiff's counsel's continued oversights, which are unexplained given the number of opportunities he has been afforded to amend his billing information and the Court's recitation of the relevant legal standards, an independent calculation of an accurate lodestar is required.

## 2.    *Specific Legal Standard*

Although district courts have discretion to determine the amount of a fee award, "it remains important ... for the district court to provide a concise but clear explanation of its reasons for the fee award."  *Hensley*, 461 U.S. at 437.  The district court should give at least some indication of how it arrived at the amount of compensable hours for which fees were awarded to allow for meaningful appellate review.  *Cunningham v. County of Los Angeles*,

---

down by deponent, location, related expenses, in relation to the total billed amount.  They are not separately tallied to produce an omnibus total, i.e., "added together" in a spreadsheet, text box, graph or separately delineated in the body of the reply brief. Plaintiff does not satisfy his burden by producing a few task totals in his third supplemental brief, while ignoring the bulk of the remaining task totals (which encompass most of the billed time).  It is impossible to calculate an accurate lodestar on Plaintiff's evidence, the house spent on each item of legal work billed for, which, after three rounds of supplemental briefing, is nearly a thousand pages of unorganized argument, declarations and computer spreadsheets.  It is not the Court's duty to organize and order the underlying records that provide the basis for the lodestar calculation.

879 F.2d 481, 485 (9th Cir. 1988) ("Courts need not attempt to portray the discretionary analyses that leads to their numerical conclusions as elaborate mathematical equations, but they must provide sufficient insight into their exercises of discretion to enable [the appellate court] to discharge our reviewing function"). "When the district court makes its award, it must explain how it came up with the amount [...] [t]he explanation need not be elaborate, but it must be comprehensible." *Moreno*, 534 F.3d at 1111.

"The fee applicant bears the burden of documenting the appropriate hours expended in litigation and must submit evidence in support of those hours worked." *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992).  A court must guard against awarding fees and costs which are excessive and must determine which fees and costs were self-imposed and avoidable.  *INVST Fin. Group v. Chem-Nuclear Sys.*, 815 F.2d 391, 404 (6th Cir.1987)).  A court has "discretion to 'trim fat' from, or otherwise reduce, the number of hours claimed to have been spent on the case." *Soler v. G & U, Inc.*, 801 F. Supp. 1056, 1060 (S.D.N.Y. 1992)(citation omitted). Time expended on work deemed "excessive, redundant, or otherwise unnecessary" shall not be compensated. *See Gates*, 987 F.2d at 1399 (quoting Hensley, 461 U.S. at 433-34).

### 3.   *Merits*
#### a.   *Preface*

Determining the appropriate fee award in a case involving voluminous fee materials and resistance by the moving party to

comply with the law will inevitably be imprecise.  To the extent possible, an attempt was made to address each time entry and objection filed by the parties.  If an entry or objection was not addressed, it was either incorporated into a task total without specific reference or, alternatively, was too vague and unnecessary to consider.  *See Ravet v. Stern*, No. 07CV31-JLS-CAB, 2010 WL 3076290, at 6 (S.D. Cal Aug. 6, 2010)(explaining the "vague entry" case law and excluding fees because "the Court cannot reasonably ascertain whether these conversations were pertinent or irrelevant to the [fee motion].").  A number of time entries were excluded based on the Supreme Court's decision in *Hensley v. Eckerhart*, 461 U.S. 424:

> [T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.  The applicant should exercise 'billing judgment' with respect to hours worked and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims.

*Id.* at 437.

The confusion and resistance of Plaintiff's counsel to organize and chronologically catalogue and/or describe the specific service giving rise to the fees in this case further complicated an already arduous undertaking.


### b.  *Complaint Drafting*

According to Defendant, Plaintiff's counsel spent an excessive number of hours drafting the original, amended and supplemental complaints.  Defendant argues that the Court should "substantially

reduce" the claimed number of hours spent on these tasks, which it

estimates at 415 hours:

> Mr. Lee and Ms. Herrington together recorded nearly 155
> hours researching and drafting the first version of the
> complaint.   Mr. Lee spent an additional 260 hours
> researching, drafting, writing, and filing two
> supplemental complaints and a second amended complaint.

(Doc. 450 at 21:3-21:5.)

Defendant also claims that Court should exclude in its

entirety: (1) the time associated with the (mis)filing of the first

amended complaint; and (2) the time associated with filing the third

supplemental complaint, which was withdrawn three weeks after it was

filed.

> Plaintiff rejoins:

> A review of Ms. Herrington's and Mr. Lee's declarations
> reveals that Ms. Herrington spent a total of 59.8 hours
> researching and drafting the first complaint while Mr.
> Lee spent a total of 46.6 hours reviewing and drafting
> the complaint.   The total for both attorneys is 106.4
> hours [...]

> Defendant is arbitrarily categorizing all billing items
> prior to filing of the complaint as complaint-related,
> including items such as phone calls, correspondence, and
> research into non-complaint related items such peer
> review privilege in discovery.   There are additional
> discrepancies in Defendant's calculations.   Exhibit G
> includes 174 hours of research which it correctly
> describes as "Additional research after filing
> complaint".   But Defendant then includes this post-
> complaint research in the 260 hrs which Defendant claims
> Plaintiff spent researching the supplemental and amended
> complaints.   This is contradictory and wrong. Defendant
> also appears to have lumped all research time entries
> together and deemed them complaint-related.

(Doc. 451 at 34:26-35:12.)

Plaintiff's arguments lack merit.   As to Mr. Lee's briefing,

there was an easy fix to this problem: he could have provided the

1   necessary documentation during the first two rounds of briefing,
2   filed on June 1, 2010 and August 16, 2010, specifying the specific
3   hours spent research and drafting the complaint and subsequent
4   amendments/supplements.  Having decided not to do so, after several
5   rounds of briefing and a lengthy instruction on the relevant legal
6   standards, Plaintiff has not satisfied the Moreno standard.

7        Even considering the merits of his third and most recent
8   supplemental filing, Mr. Lee's supporting documentation is
9   incomplete and underdeveloped.  In particular, Plaintiff argues that
10  Defendant incorrectly includes non-complaint research time into the
11  "complaint" total.   Plaintiff, however, does not separately
12  accumulate or relate this "uncategorized" time to the complaint,
13  instead offering an artificially reduced "original" complaint total
14  of 106.4 hours.  More problematic is that Mr. Lee responds with task
15  totals for the "complaint" and "third supplemental complaint," but
16  does not follow a similar procedure for other iterations of the
17  complaints:  the two supplemental complaints or the "uncategorized
18  research."   There is no explanation for Mr. Lee's selective task
19  totaling, which resulted in another layer of confusion.

20       The preparation of the complaints, including research, should
21  have taken Mr. Lee no more than 80 hours.  The various iterations
22  of the complaint were nearly identical and of limited complexity.
23  The gravamen of the litigation was that the County violated
24  Plaintiff's rights, as contract department chair and pathologist
25  within the Kern County Medical Center's hospital, under the FMLA,
26
27
28

60

the FEHA, the CFRA, and 42 U.S.C. § 1983.[44]  (Doc. 2 at ¶¶ 137-212; Doc. 15 at ¶¶ 142-221;  Doc. 24 at ¶¶ 152-231;  Doc. 30 at ¶¶ 153-232;  Doc. 242 at ¶¶ 158-224.)  These statutes are customary and familiar to any employment lawyer in California.  Mr. Lee was not breaking new ground.  No attorney with thirteen years of experience – with "an excellent reputation in the California employment law community and demonstrated skill and success" – should need to spend more than 100 hours drafting three nearly identical complaints and two minor supplements.  Plaintiff's counsel also erred in attaching exhibits and uploading complaints to ECF.  These administrative errors are excluded from the fee award in their entirety.  With respect to all complaint-related tasks, including research, correspondence and drafting, Mr. Lee is entitled to 80 hours.

According to Ms. Herrington's declaration, she expended 17.3 hours researching the complaint and 42.5 hours drafting the complaint, for a total of 59.8 hours. [45]  Billing nearly 60 additional hours *as co-counsel* is excessive given Ms. Herrington's extensive experience, her specialty in employment law, and the marginal legal complexity of this case and the original complaint. Ms. Herrington's complaint-related task total is reduced from 59.8 hours to 40 hours.  This totals 120 hours spent on complaint-related

---

[44] Various state law claims, namely a claim for defamation, were alleged but later withdrawn.  (Doc. 15 at ¶¶ 204-214.)  As discussed on July 28, 2010, Plaintiff also advanced claims against five individual defendants, but later omitted these individuals from the second amended complaint.

[45] According to her declaration, Ms. Herrington did not work on either the supplemental or amended versions of the complaint. (Doc. 452-2 at ¶ 18.)

1   tasks.

2

3                        c.   *Travel Time*

4        Defendant argues that Mr. Lee cannot recover a single hour of

5   his travel time.  Defendant cites the "blending" together of Mr.

6   Lee's travel time and his time spent on purely legal tasks.  This

7   amalgamation allegedly made it impossible to quantify Mr. Lee's

8   travel time, thus the time is not recoverable:

9        Mr. Lee charged at his full requested rate.  However,
         Mr. Lee frequently lumped his travel time in with the
10       time he spent on other tasks, thereby making it
         impossible to identify the discrete time he actually
11       spent traveling.  The Court asked Mr. Lee to revise his
         time records to show tasks and avoid "block billing" but
12       Mr. Lee did neither.  The County submits none of Mr.
         Lee's travel time should be compensated.
13   Doc. 450 at 9:27-10:7.)

14       Plaintiff responds by stating that Defendant *could* deconstruct

15   the different time tasks/totals, but simply chose not to do so:

16       [Calculating travel time] is not impossible.  Simply
         deduct the 4 hours round trip travel time required to
17       travel between Los Angeles and Bakersfield from any such
         entry.
18

19   (Doc. 451 at 9:9-9:11.)

20       Plaintiff misses the point.  Under *Hensley*, 461 U.S. 424 and

21   *Deukmejian*, 987 F.2d 1392, <u>*it is Plaintiff's burden*</u> to document his

22   hours, including travel, and submit evidence to support the hours

23   billed.  It is not incumbent on the Court or opposing counsel to

24   isolate, itemize, break down, and attempt to categorize by legal

25   activity Plaintiff's counsel's billing records.  *See Kearney v.*

26   *Foley and Lardner*, 553 F. Supp. 2d 1178, 1185 (S.D. Cal. 2008)("The

27   Court must have 'substantial evidence' to support the fee award.").

28
                                   62

Ninth Circuit law does not require a district court to work backwards and sift through thousands of pages of billing records and excel spreadsheets. Rather, the Ninth Circuit provides that, in situations involving inadequate fee documentation, the district court may request supplemental billing information from the moving party. *See, e.g., Fischer*, 214 F.3d 1121. That approach was initially taken in this case. Plaintiff, however, chose not to comply with the Court's specific requests, communicated to counsel in open court and pursuant to Minute Order, giving him the opportunity to do so. It is difficult to understand Plaintiff's confusion on this point.

Nearly all of Mr. Lee's travel time is incorporated into the subtotals for depositions, summary judgments, motions in limine, and depositions. The Court's independent research revealed only two "miscellaneous" travel entries, on December 17, 2007 and October 8, 2008. This time, 13.8 hours, is reasonable and awarded. The remaining travel time, if any and to the extent it can be identified, is excluded on the ground the vague and imprecise billing entries do not allow the Court to determine "how much time ... [was] spent on particular claims, and whether the hours were reasonably expended." *Ravet v. Stern*, 2010 WL 3076290, at 6 (citation and quotation omitted).

Defendant does not object to Ms. Herrington's well-documented request for 39 hours of travel time.[46]

---

[46] Ms. Herrington's travel hours are calculated by multiplying the travel rate, $200, and the requested travel time, 39 hours, to reach a total of $7800. The reduced travel rate also applies to calculate Mr. Lee's travel time, 13.8 hours.

d. *Fifth Affirmative Defense*

Defendant argues that the 91 hours billed by Mr. Lee and Ms. Herrington in conjunction with Defendant's "Fifth Affirmative Defense" was unnecessary and wasteful. The fifth affirmative defense was advanced in Defendant's June 21, 2007 Answer.[47] Plaintiff moved to strike the defense on grounds that it was "an insufficient defense" and "scandalous matter" under Rule 12(f). Plaintiff supported the motion to strike with several declarations, amended declarations, a Memorandum of Points and Authorities, proposed orders, corrected orders and a request for judicial notice. (Docs. 32-40.)

The motion was denied in a brief 8-page decision on October 23, 2007. (Doc. 64.) The Court explained:

> Plaintiff reads the fifth affirmative defense narrowly and argues that it asserts only contributory negligence. The court is not persuaded by plaintiff's argument, because it is based on a faulty premise. The problem with plaintiff's premise is that it characterizes the fifth affirmative defense as exclusively contributory negligence and ignores the fact that it concerns other defenses as well. The substance of the fifth affirmative defense is that plaintiff's own misconduct created the situation that resulted in his injuries. An allegation that a party has acted inequitably or asserted a claim in bad faith gives rise to an unclean hands defense. An allegation that a party has sought to benefit from his own wrongdoing gives rise to an equitable estoppel. Both are apparent in the fifth affirmative defense. Given that the court is obliged to

---

[47] The fifth affirmative defense alleges: "As and for a fifth affirmative defense, Defendants allege that, during Plaintiff's employment at Kern Medical Center, Plaintiff was arrogant, disagreeable, uncooperative, intimidating, overbearing, self-righteous and unfriendly and that Plaintiff's behavior contributed to and was the direct and proximate cause of any stresses, disabilities or injuries that Plaintiff believes he sustained. (Doc. 31 at 12:18-22.)

64

1
2
3
4

view the fifth affirmative defense in the light most favorable to defendants and to resolve any doubt regarding the sufficiency or relevancy of the defense in defendants' favor, the court does not subscribe to plaintiff's narrow interpretation of the defense.

(Doc. 64 at 5:18-6:3.)

Plaintiff filed a motion for reconsideration of the October 23, 2007 Order, (Doc. 68), which was denied without prejudice on December 17, 2007, (Doc. 81).  The Court stated that the "evidence of Plaintiff's conduct is relevant to the totality of the circumstances underlying Plaintiff's allegations, including his allegation of a hostile work environment."  (Id. at 3:5-3:7.) Plaintiff was given the opportunity to re-file if discovery revealed different facts.

Although those facts never developed, Plaintiff moved to dismiss the fifth affirmative defense four additional times, in his motion for summary judgment, (Doc. 263), twice *in limine*, pre-trial and during trial, (Docs. 324 & 376), and during the Rule 51 conference, (Doc. 381).  These requests/motions were all denied.

As explained to Plaintiff on a number of occasions, several times in written decisions, there was no question that the evidence of Plaintiff's misconduct was relevant to whether he was subjected to unlawful adverse employment actions and a hostile work environment.  The fifth affirmative defense was one of Defendant's key litigation strategies, i.e., Plaintiff's alleged mistreatment of hospital employees and disagreeable nature precipitated and justifies the employment actions taken against him.  Although the jury did not ultimately agree, Plaintiff's alleged misconduct was

65

1    highly relevant to determine motive, as it was supported by the

2    hospital Board chairs and some Department heads.

3        That the law recognized Defendant's ability to assert such a

4    defense should have been abundantly clear to competent employment

5    law counsel;  at a minimum, after reviewing the Memorandum Decision

6    re: Cross-Motions for Summary Judgment.  Any subsequent billed time

7    to prepare reconsideration motions is excluded from the fee total

8    as unnecessary.  The issue was fully presented and the repeated

9    reassertion of the motions were meritless disguised motions for

10   reconsideration.  In addition, the total time billed is excessive

11   for the work performed.  The preparation of the preceding motions

12   should have taken no more than 40 hours.  Plaintiff's counsel also

13   committed a number of administrative errors when he filed the

14   original motion to strike.  This time - 1 hour - is excluded.  For

15   these reasons, among others, the time spent litigating the fifth

16   affirmative defense is reduced from 91 hours to 40 hours.[48]

17

18                      e.   *Motions for Reconsideration*

19        Defendant argues that the Court should exclude the 59 hours

20   spent preparing Plaintiff's four motions for reconsideration.

21   Plaintiff disagrees.  Citing *Emery v. Hunt*, 272 F.3d 1042, 1047-48

22   (8th Cir 2001), Plaintiff argues that the entire 59 hours are

23   recoverable because "a prevailing party is entitled to recover fees

24   for all hours reasonably spent in pursuit of the litigation,

25   including hours spent on unsuccessful motions."  (Doc. 451 at 12:13-

26   ───────────────

27        [48] The number of hours spent on this task is broken down as
     follows: Ms. Herrington is awarded 15 hours and Mr. Lee 25 hours.

28
                                  **66**

12:14.)

Plaintiff's arguments are largely unpersuasive as they omit the linchpin of the Eighth Circuit's analysis: that the hours be *reasonably spent in pursuit of the litigation*. That is not the case here. For example, on May 5, 2008, Plaintiff filed a motion for reconsideration concerning the Court's denial of his request to telephonically appear at a Mandatory Settlement Conference. (Doc. 114.)   The motion was withdrawn the same day.   (Doc. 115.) Plaintiff spent several hours drafting this motion, which he claims is reasonable.  Plaintiff is wrong.  The Standing Order of the Court requires the presence of counsel and client at a settlement conference for good reason.  The motion and the time spent drafting it were unreasonable and unjustified.  It is excluded from the fee request.

Plaintiff argues that the remaining motions for reconsideration were necessary based on Magistrate Judge Goldner's "controversial nature" and alleged bias against him:

> Magistrate Goldner issued several controversial rulings before recusing herself to become County Counsel for Kern County.  At one point, after Plaintiff had filed a motion for reconsideration, Goldner reversed her own controversial order granting Defendant's request for a special master at 50% cost to Plaintiff.  Plaintiff objected that, among other things, Goldner was appointing her "friend", Kenneth Byrum, from Bakersfield, despite the fact that remaining depositions were to occur in Los Angeles.  The controversial nature of Goldner's rulings necessitated Plaintiff's motions for reconsideration.

(Doc. 451 at 15:7-15:13.)

Plaintiff's arguments are unsupported.  Plaintiff's counsel has shown a proclivity to personally criticize any judge who has ruled

against Plaintiff's counsel.  There is no indication that Magistrate Judge Goldner's rulings were improperly influenced, as they conformed with the Supreme Court and Ninth Circuit precedent.  (See, e.g., Doc. 81; Doc. 174; Doc. 222.)  Plaintiff's counsel's unduly contentious conduct during discovery and conflicts with opposing counsel made necessary the intervention of the magistrate judge on a number of occasions.  The arguing and conflict between the attorneys at depositions justified discovery sanctions and the need for a master, even if not implemented.  Plaintiff conveniently overlooks the fact that discovery had degenerated to the point where counsel could not civilly communicate.  Judicial intervention was required to complete discovery based on the animosity that existed between Mr. Lee and Mr. Wasser.

In any event, each one of the motions for reconsideration was denied.[49]  Plaintiff has not accused the District Judge of bias.  None of the unsuccessful motions for reconsideration were appealed to the Ninth Circuit.

In addition, Plaintiff's motions for reconsideration demonstrated manifest confusion of the relevant legal standards, the likely explanation Plaintiff's lack of success.  As discussed in the Court's September 11, 2008 Order denying Plaintiff's motion for reconsideration:

> Pursuant to Rule 72-303, a District Judge upholds a Magistrate Judge's ruling on a referred matter unless it is "clearly erroneous or contrary to law." See Rule 72(a), Federal Rules of Civil Procedure; 28 U.S.C. §

---

[49]  Plaintiff also neglects to mention that he prevailed on a number of motions before Magistrate Judge Goldner. (See, e.g., Doc. 113.)

636(b)(1)(A).  The "clearly erroneous" standard applies to a Magistrate Judge's findings of fact. Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 508 U.S. 602, 623 (1993).  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. at 622.  The "contrary to law" standard allows independent, plenary review of purely legal determinations by the Magistrate Judge.  FDIC v. Fidelity & Deposit Co. of Md., 196 F.R.D. 375, 378 (S.D. Cal. 2000); Haines v. Liggett Group, Inc., 975 F.2d 81, 91 (3rd Cir. 1992).  "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure."  DeFazio v. Wallis, 459 F.Supp.2d 159, 163 (E.D.N.Y. 2006).

Plaintiff's request for reconsideration is DENIED. The record establishes that the conduct of both attorneys during depositions is at fault and that the protective order issued by the Magistrate Judge is well within her discretion and necessary to manage the process of discovery in this action.  The mutual protective order is not clearly erroneous or contrary to law. Plaintiff's requests for sanctions were denied without prejudice by the Magistrate Judge because Plaintiff failed to document the requested amounts.  These rulings also are not clearly erroneous or contrary to law.

(Doc. 222 at 2:4-3:5.)

Here, Plaintiff seeks to recover almost 60 hours in fees for filing several motions for reconsideration.  One of these motions was withdrawn, several were without a legal basis, and all were denied.  This warrants a reduction in the amount of fees recovered for these motions.  See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Management, No. 04-CV-2293-SMG, 2009 WL 5185808, at 7 (E.D.N.Y. Dec. 23, 2009)("plaintiff did not prevail on its motion for reconsideration, and this warrants a reduction in the amount of fees recovered.").  To account for Plaintiff's lack of success, the confusion over the relevant legal standards, the frivolity of the May 5, 2008 motion and the excessive time spent preparing the

1    motions, the total number of hours are reduced by 50%, from 59 hours

2    to 29.5 hours.

3

4                    **f.   *Depositions***

5         Defendant next contests the number of hours spent noticing,

6    conducting and defending the more than forty depositions in this

7    case, including Plaintiff's deposition.   Defendant contends that

8    many of the depositions were not needed and Mr. Lee wasted countless

9    hours on "useless questioning about subjects that were not in issue

10   and arguing with witnesses."   (Doc. 450 at 11:20.)   Defendant

11   requests a reduction from 657 hours to 329 hours for deposition-

12   related tasks.

13        Plaintiff rejoins that Defendant is "wrong" about the number

14   of deposition hours billed by his attorneys:

15            Mr. Lee recorded 327.2 hours in deposition-related
             tasks.   Ms. Herrington's tally was 126.6 hours.   The
16           total is 453.8 hours, far less than the number quoted by
             Defendant.
17

18   (Doc. 451 at 16:26-27.)

19        The deposition transcripts reveal that both counsel were

20   combative and aggressive.[50]   Both parties are at fault for the

21

22          [50] For example, Mr. Lee accused Mr. Wasser of "tapping his
     feet" during a deposition, with the intent to provoke a certain
23   response from the witness (Ms. Antoinette Smith). As a result, Mr.
     Wasser directed one of Mr. Lee's two webcams to his feet. Mr. Lee
24   responded: "if you touch my camera again, you're not going to like
     what happens."   Mr. Lee made several additional statements
25   concerning what would happen to Mr. Wasser in the event he touched
     his web camera.   Mr. Wasser replied that he would do what was
26   necessary to verify the room conditions.   This dispute, among
     others, is chronicled in the "Order on Letter Request Regarding
27   Discovery Dispute," (Doc. 207).

28                              70

breakdown of communication and uncivil decorum, which exposed a number of witnesses to disputatious and offensive commentary and conduct by counsel in this case.  It was also unnecessarily imposed on the Court.  The need for judicial oversight was unfortunate and a waste of resources.  (See Doc. 207, "Order on Letter Request Regarding Discovery Dispute," at 7:9-7:10)("It should not be necessary for any court to have to regulate the type of conduct which has been exhibited in Ms. Smith's deposition.")  Plaintiff's figure of 453.8 hours is accepted as a starting point to determine the number of hours billed for deposition-related tasks.

The substance of the County's arguments are that two counsel were not necessary to defend depositions.  Plaintiff fails to acknowledge that any duplication of efforts existed in this case, arguing that Defendant "failed to rebut Ms. Herrington's evidence that, throughout this litigation, including at the depositions, she undertook different, complementary tasks."  Such a position is not supported by Plaintiff's briefing.  Excluding the deposition of Regina Levison, it is unclear why Ms. Herrington's presence was necessary.  She did not separately pose questions or lodge objections;  she did not conduct the deposition or defend the witness, Mr. Lee did.  Ms. Herrington's declaration is similarly vague, listing only her attendance at certain depositions, not her participatory role or most notably what preparation she did.  Ms. Herrington did not question, lead, defend or object during depositions, she does not describe her "complementary" role.

To account for such unjustified duplication of efforts, among other reductions, the total number of deposition hours are reduced

by 30%.   *See Wheeler v. Coss*, No. 3:06-CV-00717-RAM, 2010 WL 2628667, at 6 (D. Nev. June 22, 2010)(reducing the requested deposition amount by 30.33 hours based on the Court's discretion and its litigation knowledge.).   The number of hours spent on all deposition-related tasks are reduced from 453.8 to 317.7, broken down as follows: Ms. Herrington is awarded 88.7 hours and Mr. Lee is awarded 229 hours.[51]

### g.   *"Manifestly Ineligible"*

Defendant argues that three categories of time are "manifestly ineligible" from inclusion in the fee award: (1) attorney-client non-litigation work;   (2) secretarial and clerical work; and (3) researching appellate procedures.   According to Defendant, Plaintiff spent 57.2 hours on the first unexplained task, 169.1 hours on the second and on 14.5 the third.   Defendant provides a separate index of the time spent by Plaintiff's counsel on these tasks.   (Doc. 450-1.)

Defendant first argues that the Plaintiff spent 57.2 hours on "tasks [that] have nothing to do with prosecuting Plaintiff's claims."   (Doc. 450 at 9:17.)   Plaintiff responds that the tasks were "directly related" to the litigation and, in any event, Defendant did not carry his burden to provide specific evidence to challenge the reasonableness and accuracy of the hours billed. Plaintiff ignores that it is the moving party who carries the initial burden to support his fee motion, which was not done in this

---

[51] This figure includes any time spent traveling to depositions and preparing the "Master Deposition Exhibit."

**72**

case. Plaintiff's failure to properly document and support his motion directly impacted the ability to respond/evaluate the motion.

Defendant's primary argument is not entirely accurate. Most of the alleged "non-litigation" time constitutes electronic communications between Plaintiff and his counsel, as well as research of employment issues, specifically, time spent researching Plaintiff's FMLA eligibility and reviewing employment and buyout documents. Time spent on these tasks is recoverable. However, a number of the entries are excluded, including Mr. Lee's conversations with a TV reporter and phone calls between Mr. Lee and Ms. Herrington to discuss Mr. Lee's performance on television. Other entries are inflated, i.e., billing several hours to send "confirmatory emails" and "read and review" short emails. A modest downward adjustment of 10% is warranted with respect to the alleged non-litigation work. *See Moreno*, 534 F.3d at 1112 ("[T]he district court can impose a small reduction, no greater than 10 percent-a 'haircut'-based on its exercise of discretion and without a more specific explanation.").

Defendant next contends that 169.1 hours should be excluded on the ground it constitutes "secretarial and clerical work." Plaintiff rejoins that these activities are recoverable as "attorney work product." For the most part, the time entries correspond to work on the "chronology grid" and "CaseMap" software.

Although somewhat clerical in nature, Courts have held that time spent organizing and formatting "CaseMap" software is properly recoverable. *See Semmaterials, L.P. v. Alliance Asphalt, Inc.*, No. CV-05-320-S-LMB2007, WL 676675, at 3 n.1 (D. Idaho Mar. 1,

2007)("Time spent updating Casemap and adding persons, witnesses, and organizations to spreadsheets have not been excluded because, although somewhat clerical in nature, these tasks add to a database that organizes information to save attorneys' time and to help attorneys perform legal services in a more efficient manner."). On the current record, however, there is considerable overlap between CaseMap and Plaintiff's "chronology grid." Plaintiff's cursory explanation of a "chronology grid" bears a striking resemblance to the function of the CaseMap software.[52] To account for this overlap and several obvious secretarial entries, among other reasons, the time spent on these tasks is reduced from 169.1 hours to 100 hours. Secretarial time is not compensable. It is part of an attorney's overhead. *See Yeager v. Bowlin*, No. 2:08-102-WBS-JFM, 2010 WL 2303273, at 8 (E.D. Cal. June 7, 2010)(secretarial tasks are generally not recoverable as attorney's fees).

Defendant's final argument is that Plaintiff's counsel spent 14.5 hours researching appellate procedure, however, "no appeal could have been taken and [an] extraordinary writ was never available." (Doc. 450 at 9:24-9:25.) Plaintiff rejoins:

> A trial attorney is required to look ahead to appeal as he litigates a case. The process includes preserving the record, making necessary objections, and exhausting relief at the trial court level. That is what Plaintiff did here. Also, there were numerous discovery decisions issued by Magistrate Teresa Goldner for which Plaintiff had considered seeking writ relief.

---

[5]

http://www.lexisnexis.com/trial/uslm137987.asp?ppcid=137897_p1372 79483&WT.srch=1&optify_r=ppc&optify_rd=casemap+software.   (Last visited Dec. 18, 2010).

1   (Doc. 451 at 12:2-12:5.)

2       Plaintiff is awarded eight hours for these tasks.  Plaintiff
3   is entitled to conduct reasonable research concerning appellate law,
4   however, the billed time and his "new" explanation for this research
5   conflict.   Most of the alleged time spent researching appellate
6   procedure occurred in April 2009, after the dispositive motion
7   rulings in this case.  Plaintiff's counsel incurred the rest of the
8   time in 2010, an entire year after trial.   It is unclear how
9   Magistrate Judge Goldner's "numerous" rulings are relevant to these
10  entries.  Magistrate Judge Goldner resigned from the bench on April
11  6, 2009 and did not rule on any dispositive motions.   No other
12  explanation of the purpose of this research is provided.

13

14                    g.  *Spoliation*

15      Defendant argues that the Court should reduce the 25 hours
16  Plaintiff spent researching "spoliation" issues.   According to
17  Defendant, Plaintiff attempted to build a spoliation claim based on
18  the conduct of Barbara Patrick, a member of the Kern County Board
19  of Supervisors.   Ms. Patrick left her position on the Board on
20  January 8, 2007, two days after Plaintiff filed this action.  It is
21  undisputed that she shredded all Kern-related documentation when she
22  left her Board position.

23      Plaintiff does not specifically dispute Defendant's factual
24  summary, however, he argues that the 25 hour calculation is "wrong."
25  Rather, Plaintiff asserts that the correct hourly total is 11.5
26  hours.   This is a reasonable figure.  Plaintiff's figure of 11.5
27  hours for purposes of calculating time spent researching spoliation

28

                    75

1    is adopted.

2

3                    h.   *Whistleblowing*

4        Defendant argues that all time spent on the whistleblowing

5    claims should be excluded:

6        Th[e] claims were legally deficient.   Competent,
         experienced counsel should have known it.   Plaintiff's
7        claim was under a new version of California Health &
         Safety Code § 1278.5, enacted after the underlying
8        events took place.   The version in effect at the time
         the events occurred did not cover an entity that owns or
9        operates a health facility (such as the County), did not
         extend protection to members of the medical staff, and
10       did not cover "reports."   It is the responsibility of
         competent counsel to know the law before commencing
11       litigation.

12   (Doc. 450 at 17:14-17:23.)

13       Defendant advances two additional arguments to support a

14   reduction.   One, Plaintiff could not establish a prima facie case

15   under California Labor Code § 1102.5 because the "time span between

16   the protected activity and the adverse employment actions was too

17   great.   Two, Plaintiff wasted countless hours requesting over 10,000

18   documents to explore the unmeritorious whistleblower claims.   He

19   requests a reduction of over 75 hours.

20       Plaintiff responds that he is entitled to recover all of the

21   time spent researching, preparing and arguing his whistleblower

22   claims.   He does not identify the number of hours spent litigating

23   these claims.   According to Plaintiff, because the Court did not

24   make a specific finding that the claims were "frivolous," he is

25   entitled to all of his fees:

26       Plaintiff's position was not as insinuated by Defendant.
         As the Court noted: "Plaintiff argues that,
27

28                                  76

1
2
3
4
5
6

> **notwithstanding all the textual changes, the amended version of California Health & Safety Code § 1278.5 merely clarified the original meaning of the statute and, as such, it can be applied in this case.  Citing Mendiondo, Plaintiff suggests that the Ninth Circuit has already determined that the amended version of the statute applies to whistleblowing and retaliation that occurred prior to its enactment into law."  There was never any finding that Plaintiff's contention was frivolous.**

7  **(Doc. 450 at 22:13-22:19)(citation omitted).**

8  **Plaintiff advances a similar argument regarding § 1102.5, that**
9  **the claim was not declared "frivolous" by the Court.  He also**
10  **asserts that the discovery was necessary and, in any event,**
11  **Defendant did not "indicate how it reached the arbitrary number of**
12  **75 hours [the reduction]."  Plaintiff is correct on this point.**
13  **Defendant proposes a reduction, but does not provide a task**
14  **calculation or an analytical starting point.**

15  **Plaintiff is guilty of the same offense, which controls the**
16  **analysis.  *See Falcon Waterfree Tech., LLC v. Janssen*, No.**
17  **1:05-cv-551, 2008 WL 4534119, at 4 (W.D. Mich. Oct. 6, 2008)("Where,**
18  **as here, the fee petition makes it impossible to clearly**
19  **differentiate between compensable and non-compensable attorney time,**
20  **the onus of that lack of clarity falls on the moving party.").**
21  **Plaintiff again fails to understand the relevant legal standard to**
22  **support a fee motion.  Here, Defendant's figure appears arbitrary**
23  **because Plaintiff's counsel did not provide adequate billing**
24  **documentation or task totals of the hours spent on each task in the**
25  **first instance.  Even when confronted with Defendant's figure,**
26  **Plaintiff does not provide a "rebuttal" number of hours - his fourth**

27
28

attempt to do so.[53]

An accurate lodestar figure for "whistleblower" tasks cannot be determined given the current state of the briefing. The whistleblower claims and a number of other claims advanced by Plaintiff shared common issues of fact, however, it was Plaintiff's burden to: (1) produce accurate/adequate billing records to support its fee motion, i.e., remove any ambiguity that impedes the calculation of an accurate lodestar; and (2) to "establish that the fees sought are 'associated' with a successful claim." *Signature Flight Support Corp. v. Landow Aviation Ltd. Partnership,* --- F. Supp. 2d ----, 2010 WL 3064021, at 12 (E.D. Va. July 30, 2010). Plaintiff did neither in this case.[54]

For these reasons, among others, it is impossible to deduce a lodestar figure for these tasks with any accuracy.[55]

### i.   *Motions to Compel*

According to Defendant, Plaintiff spent an "incredible" 319 hours preparing ten motions to compel or for protective orders. Defendant claims that the Court should reduce this amount because: three of the motions were withdrawn; several of the motions concerned Plaintiff's "frivolous" whistleblowing claims; and

---

[53] (Docs. 425, 436, 448, 451)

[54] As discussed in detail in the April 3 and April 8, 2009 Memorandum Decisions, the claims did not survive the dispositive motion stage. (Docs. 310 & 311.)

[55] A number of the "whistleblower" entries are too vague to permit the Court to determine whether such fees are justified. *See Ravet v. Stern*, 2010 WL 3076290, at 6.

Plaintiff chose not to reconvene the deposition of Patricia Perez.[56]

Plaintiff contends that all of the hours are reasonable. He represents that two of the motions were withdrawn, not three, and "none of the motions were focused on whistleblowing claims, as Defendant contends, or any other claim, for that matter [...] they focused on adverse employment actions and/or rebuttal of Defendant's Fifth Affirmative Defense." (Doc. 451 at 25:17-25:19.)

For the most part, these topics have been addressed. Most of the time spent preparing the motions to compel were required by the deterioration of Mr. Lee's and Mr. Wasser's professional relationship. Plaintiff's counsel, however, was unduly contentious and combative during discovery, which resulted in unnecessary discovery motions and court involvement. To account for this conduct, the withdrawn motions, the lack of documentation (and vagueness) to support the whistleblowing claims and the excessive number of hours spent drafting the motions to compel, among other reasons, Plaintiff is awarded 160 hours, the equivalent of four work weeks, for these tasks.

> j.   *Background      Investigations       and*
> *Administrative    Filings,   Undisclosed*
> *Experts*

Defendant next asserts that none of the time spent on

---

[56] With respect to Ms. Perez's deposition, Plaintiff's motion was granted. However, Plaintiff's counsel chose not to further depose Ms. Perez.

administrative filings, undisclosed experts and background filings is recoverable.  According to Defendant, Plaintiff spent 34 hours on administrative filings, 104 hours on undisclosed experts and 121 hours on background investigations.

With respect to undisclosed experts, Plaintiff represents that his counsel spent 18.6 hours.  Plaintiff's figure is reasonable and is accepted to calculate an accurate lodestar.

With respect to the other two categories, Plaintiff repeats his boilerplate argument that there is no "particularized challenge" to his evidence, thus Defendant's calculation fails.  This argument assumes that the documentation used to support the motion for attorney's fees is accurate, which is not the case.  Instead, Plaintiff's failure to provide adequate documentation and explanation necessitated Defendant's calculations/methodology.  The failure to document fees continues in the present motion as Plaintiff does not provide a corrected figure despite Defendant's specific challenge.

However, it is undisputed that Plaintiff was required to satisfy certain administrative prerequisites to commence litigation against the County.  All of these hours cannot be excluded.  With respect to the undisclosed experts, several of the individuals were on Plaintiff's expert list, (see, e.g., Doc. 320).  Although Plaintiff's documentation is inadequate, Defendant's inability to recollect these individuals does not control the analysis.  To account for these deficiencies, among others, 18 hours are awarded for administrative filings and 60 hours for background investigations.  No additional time is warranted due to the failure

1  to provide specific task descriptions, time increments or background
2  documentation.

3

4                    **k.**   *Motions for Summary Judgment*

5        The dispute over the motions for summary judgment encompasses
6  three discrete tasks: (1) reviewing Defendant's motion for summary
7  judgment; (2) preparing Plaintiff's motion for summary judgment; and
8  (3) attendance/preparation for oral argument.

9        Defendant claims that Mr. Lee and Ms. Herrington spent
10 approximately 863 hours on these tasks.   Plaintiff disagrees,
11 stating that counsel only spent 712.4 hours, 545.5 hours (Mr. Lee)
12 and 166.9 hours (Ms. Herrington).  Plaintiff's total is accepted as
13 a starting point for the lodestar analysis.

14       Plaintiff argues that the time billed on each of these tasks
15 was reasonable, in many cases directing the Court to the actual
16 motion documents.   According to Plaintiff, "the complexity was
17 reflected in Plaintiff's MSJ/MSA which was over 1,000 pages,
18 Defendant's MSJ was nearly 1,200 pages, and Plaintiff's opposition
19 to Defendant's MSJ which was over 1,000 pages."  (Id. at 36:24-
20 37:1.)  Plaintiff also claims that this case "was extremely complex,
21 involving 13 counts, 5 years of events, tens of thousands, of
22 documents produced in discovery, more than 50 depositions, and more
23 than 20 witnesses called at trial that last nearly 4 weeks."  (Doc.
24 451 at 37:24-36:24.)

25       The true complexity of this case has been appraised throughout
26 this Memorandum Decision.   While the case required counsel to
27 martial facts and establish an employment time-line, the legal

28

theories and arguments were neither novel nor innovative. Plaintiff also incorrectly correlates motion length with legal complexity. The majority of the dispositive motion briefing consisted of deposition testimony and discovery responses, which were attached as exhibits to Mr. Lee's and Mr. Wasser's declarations. The actual "legal" briefing was less than 8% of the total pages. While necessary to review this material, it takes less time to process and configure factual information, mostly deposition testimony, into a responsive briefing and/or trial strategy. In addition, as discussed in detail in the Memorandum Decisions and Orders in this case, Plaintiff's counsel's inexperience with the federal rules, trial practice and procedure, and the relevant legal authority inflated the total hours expended. (See, e.g., Doc. 321.)

After careful review of the summary judgment and post-trial briefing, the hours requested by Plaintiff's counsel are unreasonable. The motions were important for resolving the central issues in this case and the attorneys who worked on them should be compensated accordingly, however, billing the equivalent of eighteen work weeks - more than four working months - is excessive.

To be clear, each party's motion was granted in part and denied in part. Plaintiff's motion, for the most part, was not a success.[57] Further, the portion granted in his favor, the County's

---

[57] The Court's April 28, 2009 Order provides, in relevant part:

Plaintiff moved for summary judgment on the whole of his action and summary adjudication on each one of his claims, asserting that liability is established leaving only damages for trial. Plaintiff also moved for summary adjudication on certain affirmative defenses.

ability to assert a number of affirmative defenses, was not a significant portion of the motion.[58]   Plaintiff, however, successfully defeated the FMLA and FEHA portions of Defendant's motion.  The dispositive motion-related tasks should have taken no more than 300 hours.[59]  *See Ryan M. v. Board of Educ. of City of Chicago, Dist. 299*, --- F. Supp. 2d ----, 2010 WL 3184209, at 9 (N.D. Ill. Aug. 9, 2010)("Using its discretion, the Court may reduce an attorneys' fee award when the hours billed are excessive in light of the attorneys' experience and the work produced.")(citations omitted).

     Mr. Lee claims that he spent 31.7 hours preparing for and attending the oral argument on these motions and 20.5 hours reviewing the April 8, 2009 Memorandum Decision, of which 35 hours are reasonable.   Ms. Herrington asserts she spent 1.1 hours attending the hearing.  All of Ms. Herrington's time is reasonable.

     The final dispute concerning the summary judgment motions is Defendant's complaint about Mr. Lee's alleged "insistence to treat

---

The court painstakingly went through each of Plaintiff's claims and determined that Plaintiff was not entitled to judgment as a matter of law on his claims. Some of Plaintiff's claims did not survive Defendants' cross-motion.

(Doc. 321 at 5:8-5:15.)

[58]   The brief discussion re: Plaintiff's motion to exclude Defendant's affirmative defenses can be found in Doc. 311, pgs. 133-138.

[59] The hours awarded for dispositive motion-related tasks are broken down as follows (applying Plaintiff's counsel's work ratio): Mr. Lee is awarded 229.5 and Ms. Herrington is awarded 70.5.

language in the Court's summary judgment decisions as 'undisputed facts.'" (Doc. 450 at 15:21-15:22.)   According to Defendant, Mr. Lee unreasonably "transformed" the Court's Memorandum Decision into a statement of undisputed facts, which made it impossible to draft the joint pretrial statement.   Defendant claims that the 89 hours expended by Mr. Lee in connection with the pretrial statement should be excluded.

For the reasons discussed in the April 29, 2009 Order, Plaintiff is awarded 15 hours in connection with the preparation of the pretrial statement:[60]

> The Supreme Court has stated that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). This rule applies whether summary judgment on the whole of the action or partial summary judgment on a claim therein is at issue.   See, e.g., Washington v. Garrett, 10 F.3d 1421, 1424, 1428 (9th Cir. 1993). In ruling on such motions, "[t]he evidence of the non-movant is to be believed" by the court, "and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 254 (emphasis added.) Accordingly, in analyzing such motions, a court does not decide or determine facts for purposes of trial. The Ninth Circuit recognizes "[t]here is no such thing as findings of fact, on a summary judgment motion." Minidoka Irrigation Dist. v. Dep't of Interior, 406 F.3d 567, 575 (9th Cir. 2005) (internal quotation marks omitted). Although, in the course of ruling on such motions, courts will discuss facts or matters that are "undisputed," indisputable, not seriously disputed, appear "undisputed" or established, or use words of like import when discussing the record evidence and briefing, this does mean that a court has thereby usurped the function of the trier of fact and done something more than provide the context for the motion or articulate and explain the basis for the decision or a step in the analytical process [...]

---

[60]   This point is also discussed in the Court's April 22, 2009 Order, (Doc. 317).

1

2

> Accordingly, Plaintiff's attempt to take passages from the court's order on the cross-motions and assert that they represent undisputed facts that have already been established for purposes of trial is misguided. No factual findings for purposes of trial were made. Of more concern is Plaintiff's intransigence in refusing to know and follow the law.

3

4

5

> More serious is Plaintiff's intentional misrepresentation that the court did not rule on the "cross-motions for summary adjudication." Plaintiff moved for summary judgment on the whole of his action and summary adjudication on each one of his claims, asserting that liability is established leaving only damages for trial. Plaintiff also moved for summary adjudication on certain affirmative defenses. The court painstakingly went through each of Plaintiff's claims and determined that Plaintiff was not entitled to judgment as a matter of law on his claims. Some of Plaintiff's claims did not survive Defendants' cross-motion. What Plaintiff appears to be arguing, although he does not specifically say it, is that the court should now establish facts under Rule 56(d)(1) [...]

6

7

8

9

10

11

12

13

14

> Given the unnecessary complexity of this case and the impending trial date (which has already been rescheduled three times before), it is not "practicable" to comb the massive record to prepare an order under Rule 56(d)(1). In light of the inflated motion practice in this case and the apparent contentiousness between the parties, it is decidedly contrary to the interests of justice that yet another round of debate and further delay in these proceedings occurs. The case will proceed to jury trial on the present schedule. The parties are now ORDERED to comply with the court's instruction to move all the facts they cannot agree on to disputed. The parties have until 10:00 a.m. on April 30, 2009, to do so.

15

16

17

18

19

20

21

> The absence of knowledge of the law, inexperience, and refusal to follow the directions of the court vexatiously multiply the proceedings under 28 U.S.C. § 1927. In the event compliance with this order is not effectuated, appropriate sanctions will be considered.

22

23

24

(Doc. 321 at 3:14-6:13.)

25

Plaintiff is awarded 21.2 hours total for all pretrial

26

statement activities, including Mr. Lee's attendance at the pretrial

27

conference.

28

1                          1.    *Motions in Limine, Jury Instructions and*

2                                *Verdict Form*

3

4          Defendant argues that the time spent preparing the jury

5   instruction, motions *in limine* and the verdict form should be

6   reduced.  With respect to the preparation of the jury instructions,

7   Defendant explains:

8              Mr. Lee and Ms. Herrington refused to work with the
               Court in the preparation of jury instructions.  After
9              the County filed its proposed jury instructions, Mr. Lee
               filed 114 pages of objections.  Since the County's
10             instructions were simply proposed jury instructions, Mr.
               Lee's filings were unnecessary, Mr. Lee and Ms.
11             Herrington, together, spent 67 hours on the jury
               instructions - far more time than was justified.
12

13  (Doc. 450 at 16:25-17:1.)

14         Defendant additionally states that the motions *in limine* were

15  "straightforward and simple" and the time entries are "inflated."

16  Lastly, Defendant argues no time should be awarded concerning the

17  Plaintiff's proposed verdict form because "the Court prepared the

18  verdict form."

19         Plaintiff only responds to the motions *in limine* dispute.

20  Plaintiff argues that his *in limine* fees are reasonable because "the

21  Court granted all 17 of Dr. Jadwin's motions in limine."  (Doc. 425

22  at 7:14-7:15.)   In addition, according to Plaintiff, the 108 hours

23  (89 hours by Mr. Lee/Ms. Herrington and 18 hours by Ms. Minger) are

24  reasonable because the motions "addressed several fact intensive and

25  controversial issues, such as admissibility of the radiologist tie-

26  pulling incident as character evidence and exclusion of speculative

27  expert opinion."  (Doc. 451 at 38:26-38:28.)

28
                                   86

With respect to this dispute, Plaintiff holds the weaker hand. First, as explained during the July 28, 2010 hearing, the Order granting Plaintiff's motions *in limine* was docketed in error.  It was vacated during the July 28, 2010 hearing. (See Doc. 440, Minute Order, "Order Granting Plaintiff's Motions in Limine 1-17 was STRICKEN for reasons as stated on the record.")  It is undisputed that Plaintiff was not as successful as he claims to be.  Second, on the most difficult and "fact-intensive" motions, Plaintiff did not prevail.   This includes the "tie-pulling incident" and the testimony of Defendant's expert, Thomas McAfee, M.D., motions 13 and 16.  The majority of Plaintiff's motions *in limine* were boilerplate motions, i.e., to exclude non-party witnesses, to limit expert testimony to stated opinions, to exclude references to Plaintiff's claim for attorney's fees and to exclude evidence in support of unpleaded defenses.  The drafting of these motions required very little time; they were undisputed, not "fact intensive" or legally "complex."

For these reasons, and to address excessive and duplicative billing, Mr. Lee and Ms. Herrington's requested time is reduced from 89 hours to 50 hours.[61]  Ms. Minger's time for drafting two motions in limine is reduced from 18 hours to 10 hours.[62]

---

[61] The hours awarded for researching/drafting the motions in limine is broken down as follows (applying Plaintiff's counsel's work ratio):  Ms. Herrington is awarded 32.5 hours and Mr. Lee 17.5 hours.

[62] Plaintiff again cites *Emery v. Hunt*, 272 F.3d 1042, for the proposition that "prevailing plaintiffs [are] entitled to fees on unsuccessful motions."  (Id. at 36:2.)

1   **With respect to the fees requested for preparing the jury**
2   **instructions and verdict form, neither of which Plaintiff addresses,**
3   **Plaintiff's counsel are awarded 40 hours (preparing draft jury**
4   **instructions) and 10 hours (verdict form).  As Plaintiff did not**
5   **address these tasks, no accurate allocation can be made between**
6   **counsel.  As such, the 40 hours and 10 hours are added to Mr. Lee's**
7   **time, the counsel with the lower hourly rate.**

8
9                            **m.   *Miscellaneous Tasks***

10  **Defendant argues that the time spent on three "miscellaneous"**
11  **tasks should be excluded.  One, the time spent drafting a "reply and**
12  **sur-reply" to its opposition to the motion for liquidated damages**
13  **and prejudgment interest.  Defendant claims that these responses**
14  **were not "authorized."  Two, the ten hours spent preparing an 88-**
15  **page opposition to Defendant's ex parte motion, which was granted**
16  **on March 7, 2008.  (See Doc. 122.)  Three, Mr. Lee's preparing and**
17  **submitting a Proposed Order on Defendant's Motions in limine.**

18  **Defendant's first objection is without merit.  The Court**
19  **addressed the topic in the March 31, 2010 Memorandum Decision, (Doc.**
20  **408).  The time is not excluded in its entirety.  However, it was**
21  **unreasonable to bill almost 22 hours to prepare unauthorized**
22  **response briefs,[63] which multiplied the proceedings.  As discussed**
23  **in that Memorandum Decision, the reply was not entirely helpful and**
24  **contained very little legal analysis.  Mr. Lee is permitted ten**
25  **hours for this task.  In addition, Mr. Lee is permitted twenty hours**

26  _____

27      [63]   To the extent it can be ascertained, Mr. Lee billed 21.7
    hours preparing the reply brief.  (Doc. 451-1 at pgs. 350-352.)
28
                                **88**

total for researching, drafting, and editing the "motion for additional findings of fact and conclusions of law," which included requests for liquidated damages and prejudgment interest.  These motions were denied on March 31, 2010.

The second objection focuses on Plaintiff's opposition to Defendant's "Ex Parte Motion for an Order Shortening Time Re Motion for Permission to Serve Expert Reports After May 5, 2008." Defendant claims that the ten hours spent drafting an 88-page opposition should be excluded.  According to Defendant, its motion was "immediately granted."

Defendant is half right.  Although the motion was successful, there is nothing in the record to support a complete reduction of fees.  Plaintiff's opposition was lengthy and largely unnecessary, but it was not capricious or frivolous.  Mr. Lee is permitted five hours for this task.

The general confusion over the motions in limine was discussed in § III(B)(3)(l), *supra*.  As to the dispute, the Court instructed each party to submit a proposed order on their own motions in limine following the May 8, 2009 oral argument.  The Local Rules provided Plaintiff an opportunity to counter Defendant's Proposed Order, however, the two Proposed Orders were identical, except for language concerning motion in limine No. 10.  Plaintiff's version incorrectly characterized the ruling and was inaccurate.  (Compare Doc. 351, MIL No. 10, pg. 3 with Doc. 347, MIL No. 10, pg. 2.)  Defendant's Proposed Order was adopted in its entirety.  The claimed 1.1 hours spent preparing Plaintiff's Proposed Order (on Defendant's motions in limine) are excluded.

### n. *Trial Time*

Defendant also objects to the amount of time spent by Plaintiff's counsel preparing for and attending trial. Defendant requests a reduction of approximately 20%.[64]

Ms. Herrington claims she spent 60.5 hours on trial-related tasks. Mr. Lee, however, does not provide a total for trial-related tasks.

A painstaking independent review of Mr. Lee's declarations, (Docs. 425-1, 448-1 and 451-1), reveals that Mr. Lee spent 321.8 hours on all trial-related tasks, including reviewing depositions transcripts, corresponding with jury consultants, the client and "trial team," selecting impeachment evidence, organizing exhibits, preparing his opening/closing statements and arguments, outlining/drafting witness examinations, attending trial and reviewing the filings in this case (jury instructions, verdict form, jury verdict). All correspondence and time spent with television/print media reporters is included in this global amount.

Defendant's proposed reduction of approximately 20% is high. Rather, a 15% downward adjustment of trial time and fees is warranted. Based on the Court's familiarity with this action and trial experience in over 500 jury trials to verdict, the duplication of effort, the sheer number of hours spent corresponding with co-counsel and on clerical/admin tasks and after reviewing all of the time entries in detail, among other reasons, a reduction of fifteen percent is appropriate.

---

[64] Defendant identifies a number of proposed trial reductions in Doc. 450, Exh. F.

1   **Ms. Herrington is awarded 51.4 hours for trial-related tasks.**
2   **Mr. Lee is awarded 273.5 hours.**

3

4                    **o.   *Bill of Costs***

5   **Defendant objects to the 115 hours Plaintiff's counsel spent**
6   **preparing the Bill of Costs, filed June 29, 2009.  Defendant also**
7   **objects to Plaintiff's filing of a reply, arguing that a reply brief**
8   **is not allowed under the Local Rules.**

9   **Plaintiff responds that the time spent composing the Bill of**
10  **Costs is reasonable based on the "complexity" of the case.  As to**
11  **the filing of a reply, Plaintiff states: "Defendant never filed an**
12  **objection [] [n]or did Defendant raise this issue once at the post**
13  **trial motions hearing [on July 28, 2010] [...] Defendant's objection**
14  **is waived."  (Doc. 451 at 21:6-21:9.)**

15  **As the "Bill of Costs" is addressed by separate Memorandum**
16  **Decision, it is unnecessary to address the reasonableness of those**
17  **charges here.  Any fees reasonably incurred in preparing a cost bill**
18  **are addressed - and awarded - separately.**

19

20                    **p.   *Graphical Representation***

21

22                         **1.   Plaintiff's Lead Counsel, Mr. Eugene**
23                              **Lee**

24

| Task | Hours Requested | D's Proposed Reduction | Hours Awarded |
|------|-----------------|------------------------|---------------|
|      |                 |                        |               |

**91**

| All Complaint-related tasks | Not separately delineated | "Substantial" | 80 |
|---|---|---|---|
| Travel | Not separately delineated | No time should be awarded | 13.8 & Task Totals |
| Fifth Affirmative Defense | 68.6 (D's approx was 91 hours for all counsel) | No time should be awarded | 25 |
| Reconsideration | 59 (D's approx) | No time should be awarded | 29.5 |
| Depositions | 327.2 (453.8 for all counsel) | 329 for all counsel (reduced from 657 hrs) | 229 (317.7 for all counsel) |
| Non-Litigation | 57.2 (D's approx) | "Manifestly Ineligible" | 51.5 |
| Clerical Work | 169.1 (D's approx) | "Manifestly Ineligible" | 100 |
| Appellate Research | 14.5 (D's approx) | "Manifestly Ineligible" | 8 |
| Spoliation | 11.5 (D's approx) | "Substantial" | 11.5 |
| Whistleblowing | N/A | No time should be awarded | 0 |
| Motions to Compel | 319 (D's approx) | No time should be awarded | 160 |
| Undisclosed Experts | 18.6 (P's approx) | No time should be awarded | 18.6 |
| Administrative Filings | 34 (D's approx – P agrees) | No time should be awarded | 18 |
| Background Investigations | 121 (D's approx – P agrees) | No time should be awarded | 60 |
| Preparing/Opposing Dispositive Motions | 545.5 (712.4 hours for all counsel) | "Substantial" | 229.5 |
| Preparing for & Attending Hearing | 52.2 | "Substantial" | 35 |

| | | | |
|---|---|---|---|
| re: Dispositive Motions, Reviewing Court Order | | | |
| Pretrial | 89 (D's approx – P agrees) | No time should be awarded | 21.2 |
| Motions in limine | 89 (Mr. Lee and Ms. Herrington, 108 hours total) | 50 | 17.5 |
| Jury Instructions | 67 | "Substantial" | 40 |
| Verdict Form | 17 | "Substantial" | 10 |
| All trial-related time | Not Provided | 20% reduction | 273.5 |
| Liquidates Damages "Sur-Reply" | 22 (D's approx – P agrees) | No time should be awarded | 10 |
| Motion for Additional Findings of Fact and Conclusions of Law | ---- | ---- | 20 |
| Opposition to Ex Parte Application | 10 (D's approx) | No time should be awarded | 5 |
| Proposed Order re: Defendant's Motions in Limine | 1.1 (P's approx) | No time should be awarded | 0 |
| Bill of Costs | N/A | N/A | N/A |
| Post-Trial Motions and "Fees-on-Fees" (See Below) | N/A | N/A | 25 |
| Preparation of Supplemental Fee Motions | N/A | N/A | 0 |
| | | | |
| Total: | ---- | ---- | 1491.6 |

93

2.   Plaintiff's   Co-Counsel,   Ms. Herrington

| Task | Requested | D's Proposed Reduction | Hours Awarded |
|---|---|---|---|
| All Complaint-related tasks | 59.8 | "Substantial" | 40 |
| Motion to Strike Fifth Affirmative Defense (first draft) | 22.4 | No time should be awarded | 15 |
| Depositions | 126.6 | 329 for all counsel (reduced from 657 hrs) | 88.7 |
| Retaining Experts | 7.3 | n/a | 7.3 |
| Preparing/Opposing Dispositive Motions | 166.9 | "Substantial" | 70.5 |
| Motions in Limine | 57.7 | 50 for all counsel | 32.5 |
| Jury Instructions | 34.8 | "Substantial" | See Above |
| Verdict Form | 17.7 | "Substantial" | See Above |
| Court Attendance (MSJ and Trial) | 61.6 | 20% Reduction | 52.5 |
| Correspondence | 230.8 (all correspondence and client updates – "given to Ms. Herrington") | "Substantial" | See Above. Included in subtotals, e.g., "non-litigation" and "preparing/opposing dispositive motions" |
| Fee Petition | 56.3 | N/A | 20 |
| Travel | 39 | None | 39 |

94

| | | | |
|---|---|---|---|
| Total: | 880.9 | ----- | 365.5 |

### 3.   Plaintiff's Contract Counsel, Ms. Minger

| | Requested | D's Proposed Reduction | Hours Awarded |
|---|---|---|---|
| Task | | | |
| Motions in Limine | 18 | "Substantial" | 10 |
| | | | |
| Total: | 18 | ---- | 10 |

### e.   *Lodestar - Rates*

#### 1.   *Introduction*

Plaintiff's counsels' claimed theoretical rates are as follows: Eugene Lee, lead counsel, $400 per hour; Joan Herrington, co-counsel, $450 per hour; Marilyn Minger, contract counsel, $385 per hour; and David Hicks, fee counsel, $660/hr.   All of the fees requested are based on out-of-district hourly rates, namely the Los Angeles and Bay Area markets, not the Fresno Division of the Eastern District of California.

Plaintiff filed his motion for attorney's fees on June 1, 2010. In support Plaintiff submitted: (1) a Memorandum of Points and Authorities;  (2)  the  declaration  of  Mr.  Eugene  Lee;  (3)  the

declaration of Joan Herrington; (4) the declaration of Marilyn Minger; (4) the declaration of David Hicks; (5) the declaration of Michelle Reinglass; (6) the declaration of Paul Greenberg; (7) the declaration of Chris Whelan; (8) the declaration of Jean Hyams; (9) the declaration of Lee Feldman; and (10) the declaration of Dean Gordon.

The County opposed the motion on July 8, 2010. Oral argument was held on July 28, 2010, at which time supplemental briefing was requested to give Plaintiff an opportunity to properly and adequately support his fee motion. The parties were also requested to address several post-trial issues, including whether federal or state law controlled the hourly rate analysis. The parties filed supplemental briefing on August 16, 2010, Doc. 448, and September 3, 2010, Doc. 450. On September 16, 2010, Plaintiff filed a 410-page reply to Defendant's supplemental opposition.

## 2.  *Specific Legal Standards*

"To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 896 n. 11; *Dang v. Cross*, 422 F.3d 800, 814 (9th Cir. 2005). The Ninth Circuit requires:

> Once the number of hours is set, 'the district court must determine a reasonable hourly rate considering the experience, skill, and reputation of the attorney

1
2
3
4
5
6
7
8

> requesting fees.' **Chalmers v. City of Los Angeles, 796
> F.2d 1205, 1210 (9th Cir. 1986). This determination 'is
> not made by reference to rates actually charged by the
> prevailing party.' Id. The court should use the
> prevailing market rate in the community for similar
> services of lawyers 'of reasonably comparable skill,
> experience, and reputation.' Id. at 1210-11. Either
> current or historical prevailing rates may be used.
> Missouri v. Jenkins, 491 U.S. 271 (1984). The use of
> current rates may be necessary to adjust for inflation if
> the fee amount would otherwise be unreasonable; the
> district court must look to the 'totality of the
> circumstances and the relevant factors, including delay
> in payment.' Jordan v. Multnomah County, 815 F.2d 1258,
> 1262 n. 7 (9th Cir. 1987).**

9
10
11

*D'Emanuelle v. Montgomery Ward & Co., Inc.*, 904 F.2d 1379, 1384 (9th Cir. 1990) *overruled on other grounds by Burlington v. Dague*, 505 U.S. 557 (1992).

12
13
14
15
16
17
18
19
20
21
22
23
24

The "relevant legal community" in the lodestar calculation is generally the forum in which the district court sits. *Mendenhall*, 213 F.3d at 471; *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997); *Deukmejian*, 987 F.2d at 1405. Another forum may be the proper relevant community, however, "if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997) (citation omitted). The court may rely on rates outside the local forum if the plaintiff establishes either unwillingness or inability; "[t]here is no requirement that plaintiffs prove both." *Id*. at 502.

25
26
27
28

### 3. *Merits*

On July 28, 2010, the Court expressed its tentative view that

the Eastern District of California, Fresno Division, was the appropriate forum to establish the lodestar hourly rate in this case:

> Now, inferentially, I've already ruled on what is described as continuing misconduct and unprofessional behavior. I have noted that the case was contentious, the case was hotly disputed on both sides, and that there was a lot of work done on this case that, in a perfect world, wouldn't have been necessary.
>
> To make a specific charge of either vexatiousness or fee multiplication, there has to be a specific example of the date, a time and a description of the conduct and the hours sought to be reduced. That's what's now required in the Ninth Circuit.
>
> And I will tell you that in the City of Sacramento case [Moreno], Judge Levy basically said as far as he was concerned, the prevailing rate was $250 an hour per the Civil Rights Bar and he wasn't going to go above it. And although $300 had been requested, he reduced it across the board to $250 an hour. And that was found to be an abuse of discretion because he didn't give any other reasons or cite any studies for reducing the hourly rate.
>
> The applicable hourly rate in this case is the Eastern District of California, Fresno Division. The Court does pay close attention to the plaintiff's assertions that no lawyers would accept this case. Except at their rates. But that doesn't answer the entirety of the question. Rather, the question is at what prevailing rate would competent attorney accept the case. And besides the declarations of counsel and one or two others about their unwillingness to accept cases against the County of Kern, the Court notes that the issue of local bias is almost totally dissipated by the fact that the case was tried in Fresno, over 100 miles distant from Kern County, or Bakersfield.
>
> That the jury pool even further diluted the potential for local bias, because, as the parties know, the venire was drawn from all over the Fresno division, which extends as far north as the Northern Stanislaus County line, Tuolumne and Calaveras Counties, to Inyo County on the east, the Nevada border, Los Angeles County on the south. And so there was a wide geographic diversity. And nobody on our jury panel who sat had ever heard of the case or any of the parties.

In civil rights cases and employment cases in this Court, the Court has moved up from $250 an hour and has awarded, in some cases, for experienced, highly competent counsel -- and by experienced, I'm talking about more than 20 jury trials to verdict and at least ten years experience as a lawyer.  The prevailing rate has been $300 an hour.  I know that in Judge Ishii's court, in one or two cases, up to $350 an hour has been awarded, again, for attorneys with in excess of 20 years experience and more jury trials to verdict in the relevant field.

(RT, July 28, 2010 at 119:1-120:24.)

In his supplemental brief, Plaintiff argues that the tentative ruling is incorrect for a number of reasons, all of which lack merit and further demonstrate inexperience in trial work.  Plaintiff first argues that "the Court should use the rates awarded to the plaintiff's employment law bar in Sacramento," i.e., employ Sacramento Division hourly rates.  (Doc. 448 at 6:3.)  It is suggested that because Defendant retained Sacramento counsel, Plaintiff is therefore entitled to Sacramento hourly rates.  (See id. at 6:5-6:6 ("Defendant Kern County, itself, found it necessary to retain counsel from Sacramento.").)  This argument has no merit. The only case cited in support is *Moreno v. City of Sacramento*, 534 F.3d 1106, which is factually distinguishable and not helpful to Plaintiff's arguments on this issue.  Plaintiff has been unable to present any applicable or persuasive authority for the proposition that opposing counsel's billing region/forum furnishes the hourly billing rate for *all counsel* in a dispute overly the applicable hourly rate.

Plaintiff next argues that the tentative ruling is infirm because California law, not Federal law, controls the hourly rate

99

analysis in this case.[65]   Plaintiff claims that under California law, the "prevailing plaintiff need only show that hiring local counsel was 'impracticable' in order to justify an award of out-of-town hourly rates."   (Doc. 448 at 3:26-3:27.)   According to Plaintiff, his alleged "massive search" for local counsel in September 2006 satisfies California's "impracticable" standard.   He cites, but does not address or analyze, the federal standard in his briefing.

Plaintiff relies on, but does not fully analyze, a number of Ninth Circuit cases to support his argument that California law controls the hourly rate analysis.   Plaintiff correctly observes that *Mangold v. California Public Utilities Commission*, 67 F.3d 1470, 1477 (9th Cir. 1995) held that "[w]here a plaintiff moves for attorney fees on the basis of success on a state law claim, a federal court is to follow state law regarding both a party's right to fees and in the method of calculating fees."   (Doc. 448 at 1:12-

---

[65]   The parties sharply disagree over whether state or federal law controls the hourly rate analysis.   Plaintiff contends that the Court must apply California law, where the "prevailing plaintiff need only show that hiring local counsel was 'impracticable' in order to justify an award of out-of-town hourly rates."   (Doc. 448 at 3:26-3:27.) Plaintiff argues that "it would be an abuse of discretion to apply federal rather than state law regarding attorney fees."   (Id. at 1:5-1:6.)   The County disagrees. According to the County, Ninth Circuit law establishes that in "mixed cases" involving federal and state claims, "federal law applies to the award of attorney's fees on the federal claims and state law applies to the award of attorney's fees on the pendent [supplemental] state law claims."   (Doc. 450 at 3:18-3:19.)   The County also argues that the lack of detail in the billing documentation renders it impossible to differentiate between the work performed on the different claims, i.e., the FMLA and FEHA/CFRA claims.

1:13.)   Plaintiff, however, overlooks that, in Mangold, the Ninth Circuit did not analyze hourly rates *generally* or whether state law governs that analysis in circumstances applicable here and in a dual jurisdiction case.   The Ninth Circuit's analysis in Mangold was limited to whether Plaintiff was entitled to a multiplier under California law.[66]

---

[66] Mangold addressed whether state or federal law controls the method of calculating an attorney's fee awarded under state law, when contingency-fee multipliers are unavailable under federal fee-shifting statutes but state law permits such enhancements under state fee-shifting statutes. 67 F.3d 1470 (9th Cir. 1995). There, the plaintiffs had succeeded on both federal and state claims. *Crommie v. State of Cal., Public Utilities Com'n*, 840 F.Supp. 719, 725-726 (N.D. Cal. 1994). Applying state law, the district court enhanced the fee award by a multiplier of 2.0 based on the contingency basis of the case, the exceptional result in light of defense counsel's "excessively vexatious and often unreasonable opposition to plaintiff's counsel," and difficulties in preparation. *Id.* at 726. After reviewing the applicable law, the Ninth Circuit found that the district court did not err in applying the multiplier allowed under state law. *Mangold*, 67 F.3d at 1478-1479. Because Plaintiff in this case also prevailed on his state law claim (the FEHA), and state law provides for a broad application of a multiplier, it is proper to apply the state law standard for a fee multiplier. However, for the reasons explained, a deeper analysis of the "hourly rate" issue was required, but not provided. Plaintiff does not mention or analyze the impact of the jury's failure to allocate the amount of damages attributable to the federal (FMLA) or state (FEHA or CFRA) violations. Here, it is possible that the entire jury award is based on federal law, not state law. If that is the case, California law would not govern the hourly rate analysis. Second, in Mangold, the Ninth Circuit delineated *why* adopting federal law on the multiplier issue encouraged forum shopping and inequitable administration of the law. *See Mangold*, 67 F.3d at 1473 ("if a multiplier is procedural, a significant difference in fees would be available in state court but not in federal court - an 'inequitable administration of the law.'"). Plaintiff's string citation concerning this issue does not improve his argument, it only amplifies the lack of legal analysis. To the extent understood, Plaintiff argues that California law governs the hourly rate analysis because, like

1    Assuming, *arguendo*, that *Mangold* applies, Plaintiff's evidence

2    does not establish justification for "out-of-town" rates.

3    Plaintiff's lead counsel, Mr. Eugene Lee, states in his declaration

4    that he "had no success" in his attempts to locate local counsel.

5    (Doc. 425-1 at ¶ 29.)   Mr. Lee represents that he "emailed various

6    members of the California Employment Lawyers Association ("CELA"),

7    including lawyers from Fresno, Bakersfield, Modesto, and

8    Sacramento."   (Id.)   He lists several law firms, but does not

9    include the names of specific partners, of counsel, associates or

10   staff he personally contacted, or whether the email was received or

11   routed into a trash or spam folder.   No details are provided as to

12   any direct communicaton other than an electronic communication was

13   allegedly sent by Mr. Lee's law office.[67]   None of the alleged

14   ─────────────────

15   multipliers, the "twin aims" of *Erie R. Co. v. Tompkins*, 304 U.S.

16   64 (1938) are satisfied:  discouragement of forum shopping and
     avoidance of inequitable administration of the law.   Plaintiff's

17   analysis ends there.   He does not explain *why* an adoption of
     California law in the hourly rate context satisfies *Erie*,

18   especially given the unique circumstances of this case.

19   [67]   The non-specific and unsupported "reasons" cited in
     paragraph thirty of Mr. Lee's declaration are similarly deficient.

20   Mr. Lee states that "lawyers cited the difficulty of litigating
     against Kern County, the undesirability of the jury pool in the

21   Eastern District, the unanimous jury requirement in federal court,
     the sheer size and complexity of the case, etc."   However, Mr. Lee

22   does not attribute these non-specific criticisms to a law firm,
     lawyer or individual.   None of these alleged criticisms were

23   included in declarations to Mr. Lee's papers, which included
     declarations of Plaintiffs' experts.   The Court also addressed the

24   slight impact of these cited "criticisms" during oral argument on
     July 29, 2010.

25   Mr. Lee states that he contacted a "Mr. Andrew Jones" by

26   telephone.   (Doc. 425-1 at ¶ 29.)   Mr. Jones allegedly declined to

27   act as local counsel.   (Id.)   Mr. Lee provides no further
     explanation or discussion.   (Id.)   Mr. Jones did not provide a

28

electronic communications are attached as exhibits to Mr. Lee's declaration.[68] (*Compare* Doc. 121 at pgs. 12, 28-29, 35-39, 41-45, 47-52, 54-55 and 57-59) (email communications between Mr. Lee and opposing counsel attached to Plaintiff's motion). Nor do Mr. Lee's time records, which span several hundred pages and three rounds of briefing, contain a single entry concerning his "massive search" for local counsel.

The inadequacy of the "massive search" is further demonstrated by Mr. Lee's July 11, 2007 declaration, filed in conjunction with Plaintiff's unsuccessful motion to strike Defendant's fifth affirmative defense. In his declaration, which delineates his search to retain local counsel, Mr. Lee states that his search consisted of a mass email to CELA members, nothing more:

> On September 18, 2006, I sent an email to over 600 members of the California Employment Lawyers Association seeking co-counsel. No attorneys from Fresno responded.

(Doc. 33 at ¶ 20.)

Such a limited and one-sided query does not satisfy the relevant "out-of-town" legal standards, federal or state. It is entirely possible, even probable, that Mr. Lee's bulk email was batched into a trash/junk folder or mistaken for spam and deleted

declaration in this case.

[68] Plaintiff frequently emailed the Court and attached emails to his briefing. For example, the May 28, 2009 Order provides, in relevant part: "The court received an e-mail correspondence (dated April 23, 2009) from Mark Wasser, counsel for Defendant County of Kern, and an e-mail correspondence (dated April 23, 2009) from Eugene Lee, counsel for Plaintiff David Jadwin, D.O. On both of these e-mails, the opposing counsel was copied." (Doc. 321 at 1:12-1:16.)

1    by the recipient.  Either explains the lack of response.  However,

2    this issue cannot be fully addressed as Mr. Lee did not follow-up

3    with the intended recipients by any direct contact to any specific

4    attorneys.

5         That is not the end of the analysis.  A close review of the

6    evidentiary support also reveals several inaccuracies and/or

7    unconfirmed assertions that undermine the evidentiary merit of the

8    fee motion.  Plaintiff argues that it is not "surprising" that his

9    query for local counsel was unsuccessful because "only a small

10   handful of members of the California Employment Lawyers Association

11   practice in the Eastern District of California."  (Doc. 448 at

12   5:17-5:19.)  First, Plaintiff's representation that there are "very

13   few employment counsel" in the Eastern District of California is

14   contrary to the Court's experience with the number of lawyers

15   practicing employment law in the EDCA.  This is especially true in

16   cases involving traditional employment law theories of recovery and

17   conventional evidentiary issues, as were presented here.  This case

18   was contentious and factually detailed, but it was not legally

19   complex.  Second, the CELA database is not the ultimate authority

20   or complete universe of employment counsel in the Eastern District

21   of California.  A substantial number of available employment counsel

22   choose not to participate in CELA/NELA for any number of reasons,

23   including lack of synergy, high cost or attendance requirements.

24   Third, Plaintiff *had* local counsel in Bakersfield, however, that

25   counsel was removed/relieved after Mr. Lee became involved in the

26   case.  Plaintiff makes no mention of the original local counsel and

27   it is unclear how it impacted the "massive search" for local

28

                                  **104**

counsel, especially in Kern County.  In Fresno County alone, there are over 2,000 licensed and practicing lawyers.

A substantial portion of Plaintiff's "lack of local counsel" argument is based on a review of CELA's database in 2010, not in 2006.  (Doc. 448-4, Decl. of C. Krasomil, ¶¶ 4-6.)  It is unclear how a review of CELA members in Sacramento County in 2010 is relevant to Plaintiff's "massive search" for local counsel in September 2006 in the Fresno Division.

*Kochenderfer v. Reliance Standard Life Ins. Co.*, No. 06-CV-620-JLS-NLS, 2010 WL 1912867 (S.D. Cal. Apr. 21, 2010) addressed a prevailing plaintiff's motion for attorney's fees. There, the Court found that the plaintiff's documentary evidence - including sworn declarations from numerous attorneys - was insufficient to support the requested hourly rates:

> Although Plaintiff submits numerous attorney declarations, those declarations fail to carry Plaintiff's burden. First, having reviewed all of the declarations, the Court finds that they do not establish that a paying client would pay Ms. Horner or Mr. Monson their requested rate for legal work of similar complexity.  Neither Ms. Horner's declaration nor Mr. Monson's declaration states that a paying client has ever paid them their requested rate for this type of work.  As to the other declarations, they either do not offer evidence of what a paying client would actually pay or they do not indicate that a paying client had paid this rate for comparable work or they do not indicate that these rates are reasonable within the Southern District of California.
>
> Second, the value of these declarations is questionable because they are both self-serving and self-perpetuating.  Each of these attorneys works on ERISA matters and claiming that the rates charged by Plaintiff's counsel, no matter how high, is in their own interest.  A high award in this case would support the declarants' own high hourly rate requests in the future. Ultimately, the rates Plaintiff's attorneys request appear to have little basis in what an arms-length

1

**agreement with a paying client would produce.**

2

*Id.* **at 3-4 (citations omitted).**

3

**Although** *Kochenderfer* **is not factually identical to this case,**

4

**there are similarities.  It analyzed the evidentiary showing needed**

5

**to support a prevailing party's request for legal fees, including**

6

**the claimed hourly rates.   For the reasons discussed in**

7

*Kochenderfer***, Plaintiff's documentary evidence is insufficient to**

8

**support the requested hourly rates in this case.[69]**

9

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

[69] Because the hourly rate issue is resolved on different grounds, it is unnecessary to fully analyze whether the declarations attached to Plaintiff's motion are sufficient to support the hourly rates in this case.  However, assuming, *arguendo*, that the motion is properly supported, the declarations are inadequate to support a $400 hourly rate for Mr. Lee.  Mr. Lee supports his hourly rate request with the declarations of Michelle Reinglass, Paul Greenberg, and Lee Feldman.  These boilerplate declarations indicate that they are familiar with Mr. Lee through his work with two employment law associations - NELA and CELA.  Two of these individuals are familiar with Mr. Lee's legal performance in 2010, several years *after* the lion's share of litigation occurred in this case (filed case in 2007, discovery in 2007 and 2008, Rule 56 motions in 2008, trial in 2009).  For example, Mr. Greenberg states that he and Mr. Lee worked together in a number of "harassment and disability" cases.  He also opines that this case involved "substantial complexities and the need for exhaustive discovery." (Doc. 425-6 at ¶ 13.)  However, Mr. Greenberg's core opinion is based on the following:  Mr. Lee satisfactorily drafted motions/jury instructions and attended depositions (conducting one).   No time-frame is provided for these tasks, which are commonly performed by associates at much lower hourly rates.  Mr. Greenberg's second opinion is based on "numerous" conversations with Mr. Lee in 2009 and 2010, nothing more.  This is not a proper basis to opine on overall case complexity and the alleged need for "exhaustive discovery."  As discussed in detail throughout this Memorandum Decision, this case was grossly overlitigated due to unnecessarily contentious attorney conduct with huge expenditures of unnecessary time resulting from Mr. Lee and Mr. Wasser's inability to extend rudimentary professional courtesy to each other and to employ reasonable efforts to cooperate in preparing the case

28

**106**

1    **The Eastern District of California, Fresno Division, is the**
2    **appropriate forum to establish the lodestar hourly rate in this**
3    **case.  Plaintiff, who carries the burden on a fee motion, has not**
4    **fully analyzed why Sacramento hourly rates are appropriate or why**
5    **California law exclusively controls the hourly rate analysis in this**
6    **case, especially in light of the general verdict form.  In addition,**
7    **Plaintiff has not provided adequate evidentiary support to**
8    **demonstrate that the use of an attorney from outside the relevant**
9    **community was necessary for purposes of charging another community's**
10   **higher hourly rates.  *See, e.g., Welch v. Metropolitan Life Ins.***
11   ***Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007)(the party seeking fees**
12   **"bears the burden of documenting the hours expended in the**
13   **litigation and must submit evidence supporting those hours *and the***
14   ***rates claimed*.")(emphasis added)(citation omitted).  For all of**
15   **these reasons, as well as those discussed in open court on July 28,**
16   **2010, the Fresno Division is the appropriate forum to determine**
17   **hourly rates.**

18

19                          1.    **Attorneys**

20                               a.    ***Eugene Lee***

21

22   for trial.  Any added complexity was based on counsel's
23   inexperience and unfamiliarity with the Federal Rules and governing
     legal standards.  Taking Mr. Greenberg's hourly scale as
24   representative of the Los Angeles market - where "rates tend to be
     particularly high" - there is no evidence to support his opinion
25   that Mr. Lee, who had no trial experience and associated Ms.
     Herrington, is entitled to $400/hr (or even the $475.00/hour also
26   mentioned by Mr. Greenberg).  Assuming Plaintiff's position is
     legally and factually supported, which it is not, Mr. Lee's "out-
27   of-town" hourly rate would be substantially reduced.

28
                                    **107**

1    Plaintiff requests an hourly rate of $400/hr for the services

2  of attorney Eugene Lee.  Mr. Lee graduated from law school in 1995

3  and was admitted to the New York State Bar in 1996.  (Doc. 425-1 at

4  ¶ 3.)  Mr. Lee took a two-year hiatus from the practice of law in

5  1997.  In 1999, Mr. Lee worked as counsel to a technology startup

6  in Northern California.  (Id.)  In 2002, he took an associate

7  position with a law firm in South Korea, where he worked until 2004.

8  (Id.)  In 2005, Mr. Lee was admitted to the California State Bar.

9  He has been the principal attorney in his own practice, the Law

10  Office of Eugene Lee, since he was admitted to practice law in

11  California.  (Id.)

12    Mr. Lee self-describes that he is an attorney with thirteen

13  years of experience and has "an excellent reputation in the

14  California employment law community and demonstrated skill and

15  success."  (Id. at ¶ 40.)  He reiterates that he went to

16  undergraduate school at Harvard University and that he successfully

17  litigated a "a waiter's employment lawsuit in Los Angeles Superior

18  Court for $350,000, even though the waiter had economic damages of

19  only $50,000 and no significant emotional distress damages."  (Id.

20  at ¶¶ 41-42.)  Mr. Lee declares that his hourly rate is $400 and "in

21  fact [I have] been paid this rate by my clients since 2006 [...] Dr.

22  Jadwin has paid me $400 per hour in the past for my legal services."

23  (Id. at ¶ 44.)

24    Mr. Lee also represents that this "litigation proved to be

25  extraordinarily complex, difficult and onerous for me."  (Id at ¶

26  7.)  It is undisputed that according to Mr. Lee this was his first

27  trial in any court.  (See RT, June 2, 2009 at 35:10-35:12)("I must

28

emphasize this is really my first trial and a lot of stuff is going on.").

In this Circuit, the reasonable hourly rate "is not made by reference to rates actually charged by the prevailing party," an attorney's undergraduate institution, or by the number of years spent as a practicing lawyer. *See, e.g., Welch v. Metro. Life Ins. Co.,* 480 F.3d 942, 946 (9th Cir. 2007); *see also Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986). Rather, a reasonable hourly rate is determined by "experience, skill, and reputation." *Welch*, 480 F.3d at 946.

In a recent fee motion before the Court, *Schultz v. Ichimoto*, No. 1:08-CV-526-OWW-SMS, 2010 WL 3504781 (E.D. Cal. Sep. 7, 2010), it was determined that two very experienced employment litigation counsel - with more than twenty years of litigation experience each - were entitled to hourly rates of $305.00 and $255.00, respectively. To reach the hourly rates in *Schultz*, the Court catalogued the recent attorney's fee decisions in the Eastern District of California, Fresno Division, including *Ruff v. County of Kings*, 700 F. Supp. 2d 1225 (E.D. Cal. 2010), *Beauford v. E.W.H. Group Inc.*, 2009 WL 3162249 (E.D. Cal. Sept. 29, 2009) and *Wells Fargo Bank, Nat. Ass'n v. PACCAR Financial Corp.*, 2009 WL 211386 (E.D. Cal. Jan. 28, 2009). In those cases, it was determined that hourly rates of $350 (*Beauford*), $ 315 (*PACCAR*) and $300 (*Ruff*) were reasonable for "experienced and competent counsel."

The most reliable factor in determining a reasonable hourly rate is the ability and skill demonstrated by counsel. Mr. Lee was able to secure a jury verdict in his client's favor, but recovery

was limited to approximately 12% of the *economic damages he* requested from the jury.  Mr. Lee also asserted a number of unsuccessful claims in multiple amended complaints, which were eliminated by dispositive motion or rejected by the jury/Court; named numerous defendants who were later voluntarily eliminated from amended pleadings without explanation; displayed a tendency to take contrary legal positions (often in the same brief); and filed numerous unnecessary motions/supporting material.  In all stages of this case, Mr. Lee exhibited inexperience with the Federal Rules of Civil Procedure, the Rules of Evidence, the federal and state legal frameworks and, notably, found it difficult to comply with the Court's rulings.[70]

Mr. Lee was exceedingly contentious, unduly adversarial and expended inordinate time in personal conflicts and arguments with opposing counsel, many of which resulted in needless discovery and logistic motions which burdened scarce judicial resources.  Some of Mr. Lee's conduct or confusion could be attributed to a skilled legal technician's attempts to preserve his case and foil opposing counsel.  But that is not the case here.  The unnecessary court proceedings and confusion were, for the most part, due to inexperience.[71]  Mr. Lee caused countless problems for the Court's

---

[70] Several, but not all, of these instances are discussed in this Memorandum Decision.

[71] For example, the repeated failure to follow the Federal Rules of Evidence during trial reveals that Plaintiff's attorney was inexperienced and lacked a practical knowledge of the Federal Rules of Evidence.  Many times Mr. Lee reacted in an incredulous or hostile manner to the Court's rulings on objections and motions during trial.  Plaintiff's attorney also had a practice of not

staff, was rude on occasion, without explanation or apology. Nonetheless, Mr. Lee was afforded full opportunity to try his client's case in what was a fair trial.

In light of the recent attorney's fee rulings in the Eastern District of California, Fresno Division,[72] the Court's comprehensive familiarity with this action, its experience, prevailing attorney rates in the employment law field, and after reviewing supporting declarations in detail, a rate of $275 per hour for Mr. Lee constitutes a reasonable rate for this case and is based on similar work performed by attorneys of comparable experience and skill to Mr. Lee in the Fresno Division of the Eastern District of California.

A further consideration is Mr. Lee's unprofessional conduct throughout this case. He was unjustifiably rude, argumentative, and unreasonable in his dealings with opposing counsel, some of which entered into papers filed with the court and his interactions with court staff and the magistrate judge. Mr. Lee was treated with patience and courtesy. The Court has not based its fee award on this ground, although for the purpose of providing guidance and a example to counsel, it would be reasonable to do so.

---

raisesing all ground or basis for his legal positions in oral argument and then raising them in motions for reconsideration.

[72] Mr. Lee is not as experienced as any of the counsel in *Beauford*, *PACCAR*, *Schultz* or *Ruff*. He is not as skilled as any of the counsel in *Schultz* or *Ruff*, two cases recently litigated in this Court. The Court evaluates counsel's performance and ability based on over nineteen years on the bench and over five hundred jury trials to verdict.

1

### b.   *Joan Herrington*

2      Plaintiff requests an hourly rate of $450/hr for the services

3  of attorney Joan Herrington, co-lead counsel.  Ms. Herrington is a

4  1995 law graduate of Golden Gate University and has practiced

5  employment law since she was admitted to practice in California that

6  same year.   (Doc. 425-2 at ¶¶ 3-6.)  Ms. Herrington has worked as

7  a workers' compensation associate and as principal in her own

8  employment law firm.  (Id. at ¶¶ 5-6.)  According to Ms. Herrington,

9  she "ha[s] been forced to proceed to trial in only eight cases [and]

10  participated in four appeals as attorney of record, and one as a

11  contract attorney."  (Id. at ¶ 6.)

12      To support her motion, Ms. Herrington submits her own

13  declaration as well as those of Christopher Whelan, Jean Hyams and

14  Lee Feldman, all California employment law attorneys.   These

15  declarations set forth the following: (1) Ms. Herrington spent 839.9

16  hours on this case at a rate of $450/hr, including 413.6 hours

17  drafting and reviewing pleadings, 126.6 hours attending depositions,

18  and 61.6 hours attending court proceedings; (2)  Ms. Herrington

19  incurred 39 hours of travel time at $200 per hour; and (3) Ms.

20  Herrington is an experienced employment law attorney and is entitled

21  to her hourly rate of $450/hr, which is the "market rate" for

22  similar attorneys in Sacramento and/or the Bay Area.

23      In support of her fee motion, Ms. Herrington provides the

24  declaration of Christopher Whelan. Mr. Whelan, a trial attorney and

25  Ms. Herrington's CELA colleague, provides a summary of his trial

26  history, including a number of sizeable verdicts obtained in Yolo

27  and Sacramento County Superior Courts.  Mr. Whelan provides a range

28

**112**

1   for experienced counsel in the Eastern District, Sacramento
2   Division, however, he does not provide a lodestar rate/range for
3   attorneys with Ms. Herrington's experience in the Fresno Division.
4   (See Doc. 425-7 at ¶ 9 ("$450.00 to $595.00 per hour for employment
5   law trial counsel in Central and Northern California, including the
6   Sacramento area.") In addition, based on his declaration, Mr.
7   Whelan's experience is limited to the state court system in Northern
8   California, Alameda, Yolo, and Sacramento Counties. (Id at ¶¶'s 5-
9   8.) His declaration does not indicate litigation experience in any
10  federal forum or in Calaveras, Fresno, Inyo, Kern, Kings, Madera,
11  Mariposa, Merced, Stanislaus, Tulare or Tuolumne counties, the
12  Fresno Division.

13      As discussed above, several district courts in the Eastern
14  District of California, Fresno Division, have determined that
15  hourly rates of $350 (*Beauford*), $ 315 (*PACCAR*), $305 (*Schultz*) and
16  $300 (*Ruff*) were reasonable for "experienced and competent trial
17  counsel."[73] In light of these decisions and the evidence submitted
18  by Plaintiff, a reasonable hourly rate for the services of attorney
19  Joan Herrington is $350/hr, more than the (very) experienced and
20  skilled trial counsel in *Schultz* and *Ruff*. Ms. Herrington was
21  competent but prepared no independent work product and appeared
22  before the Court only in a limited role. The $350/hr figure is near
23  the top of the range of hourly rates charged by the other attorneys
24  and consistent with the hourly rates other courts in the Fresno

25

26      [73] These decisions include *Schultz v. Ichimoto*, 2010 WL
    3504781, *Ruff v. County of Kings*, 700 F. Supp. 2d 1225, *Beauford v.*
27  *E.W.H. Group Inc.*, 2009 WL 3162249 and *Wells Fargo Bank, Nat. Ass'n*
    *v. PACCAR Financial Corp.*, 2009 WL 211386.
28

Division have approved for similar services performed by Ms. Herrington in this case.

Ms. Herrington's travel rate of $200 is not reduced.

### c.   *Marilyn Minger*

Plaintiff requests an hourly rate of $385/hr for the services of contract counsel Marilyn Minger.  Plaintiff contracted with Ms. Minger to draft two motions in limine, to exclude the testimony of two defense experts:  Thomas McAfee, M.D. and Rick Sarkisian, Ph.D. Ms. Minger spent 20.4 hours drafting the motions for a total of $7,854.00. (Doc. 425-3 at ¶ 7.)  Ms. Minger contends that "[b]oth motions were granted by court order dated July 29, 2009," however, that inadvertently electronically signed Order was vacated during the July 28, 2010 hearing.  (Doc. 440, Minute Order, ("Order Granting Plaintiff's Motions in Limine 1-17 was STRICKEN for reasons as stated on the record.").)  The Order granting the motions in limine was docketed in error, seven weeks *after* the jury returned their verdicts and is VACATED.

Ms. Minger is a 1991 law graduate of University of California at Davis and has practiced in the area of litigation since 1991, when she was admitted to practice in California.  (Doc. 425-3 at ¶ 3.)  Ms. Minger has "conducted" a single bench trial in both federal and state court, as well as a jury trial in state court.  (Id. at ¶ 5.)  She has "second chaired" two trials.  (Id.)  It is unknown when Ms. Minger participated in these trials.

In light of *Schultz v. Ichimoto*, 2010 WL 3504781 and *Ruff v. County of Kings*, 700 F. Supp. 2d 1225, among other Fresno Division

cases, as well as the evidence submitted by Plaintiff, a reasonable hourly rate for the services of contract attorney Ms. Minger, performing research attorney services, is $295/hour.  This figure is within the range of hourly rates charged by the other attorneys as stated by Ms. Minger and consistent with the hourly rates other courts have approved for the services of attorney Ms. Minger.  Ms. Minger's involvement was limited to drafting two motions in limine, which she did under contract.  She has limited trial experience and does not indicate whether she has drafted motions in limine in the past or, alternatively, whether she has substantial motion experience.  The July 29, 2009 Order granting the motions in limine was erroneously entered seven weeks *after* the jury returned their verdicts.  It had no effect on the trial.

### d.  *David Hicks*

Plaintiff requests an hourly rate of $660/hr for the services of fee counsel David Hicks.  Plaintiff retained Mr. Hicks to opine on the range of hourly rates in the various California forums, federal and state.  Mr. Hicks spent 6.5 hours on this case, however, he reduced this amount to five hours based on billing judgment. (Doc. 425-4 at ¶ 20.)

Mr. Hicks is a 1972 law graduate of University of California at Davis and has practiced in the area of employment litigation for more than thirty years.  (Id. at ¶ 3.)  Mr. Hicks is an experienced expert witness.  (Id. at ¶ 4.)  Mr. Hicks' declaration provides rate and survey information for the following venues/law firms: San Francisco Superior Court, Los Angeles County Superior Court, U.S.

District Court, Northern District of California, U.S. District Court, Eastern District of California, Sacramento Division, U.S. District Court, Central District of California, Bingham McCutcheon, Chavez & Gertler, Cohelan, Khoury, & Singer, Goldstein, Demchak, Baller, Borgen & Dardarian, Morrison Foerster, Quinn Emanuel LLP, Rosen, Bien & Galvan, Schneider Wallace Cottrell Konecky & Brayton, and Sturdevant Law Firm.  (Id. at ¶ 18.)  The ranges in Mr. Hicks' declaration are delineated by his experience only; he provides no knowledge of hourly ranges/rates in the Fresno Division.  No Fresno Division law firms or employment lawyers were surveyed.

In light of the authorities discussed above and the evidence provided by Plaintiff, a reasonable hourly rate for the services of attorney David Hicks is $380/hour.  This figure is within the range of hourly rates charged by the other attorneys and consistent with the hourly rates other courts have approved for the services of fee counsel with similar experience to Mr. Hicks.  The closest comparable to Mr. Hicks is the lead counsel for the prevailing party in *Schultz v. Ichimoto*, 2010 WL 3504781.  Counsel in that case was 31-year lawyer, a preferred shareholder at a large Fresno law firm, and specialized in complex civil litigation and environmental law. *Id.* at 6-7.  That individual was awarded a reasonable hourly rate of $305, substantially less than the rate Mr. Hicks is awarded in this case.

                    e.    *Summary of Rates*

A graphical representation of the reasonable hourly rates for the legal services provided by Plaintiff's counsel in this case:

**116**

| | Type | Years Practicing (as of 2009) | Trial Experience | Rate Sought | Rate Awarded |
|---|---|---|---|---|---|
| Eugene Lee | Lead | 11 | None | $400 | $275 |
| Joan Herrington | Co/Trial Counsel | 14 | Minimal – 8 trials | $450 | $350 |
| Marilyn Minger | Contract | 18 | Minor – 2 trials | $385 | $295 |
| David Hicks | Fee | 30+ | N/A | $660 | $380 |

### e.    Multiplier

Plaintiff seeks a multiplier of 2.0 times the lodestar. Plaintiff contends that a multiplier is necessary to the determination of a reasonable fee because the case involved "arcane and intellectually challenging" claims, was undesirable and precluded other employment.  Plaintiff also asserts that counsel displayed great skill and "attained an outstanding result in this action."

Defendant vehemently disagrees with Plaintiff on each ground.[74]

---

[74] According to Defendant, the Court should further reduce the lodestar figure based on the limited success at trial and Mr. Lee's "excessive" communications with Plaintiff:

> Attorney/client communication is obviously important. Mr Lee needed to keep Plaintiff informed of developments in the case, However, as with everything else, Mr. Lee went overboard.  His time records disclose above 400 conferences regarding the status of the case.  The time spent on conferences between Mr. Lee and Plaintiff needs to be substantially reduced.

(Doc. 450 at 19:25-19:28.)

117

**In particular, Defendant argues that Plaintiff is not entitled to a multiplier because counsel did not demonstrate exceptional skill, the case was not exceedingly complex and "Plaintiff's counsel's behavior throughout the case was far beneath what is expected of an experienced lawyer."**

**After making the lodestar computation, Courts sometimes assess whether it is necessary to adjust the presumptively reasonable lodestar figure on the basis of several factors, including:[75] (1)**

Defendant correctly observes that 230.8 hours of claimed correspondence time is "unusually high." *See Miller v. Alamo*, 983 F.2d 856, 859 (8th Cir. 1993)(finding that 95 hours spent on "attorney conferences, telephone calls, and reviewing correspondence from the government and this court" was "an unusually high number of hours."). The time billed for drafting correspondence to Plaintiff/co-counsel and answering Plaintiff's phone calls, among others, is not reasonable in this case. Moreover, because of the inadequate documentation, Plaintiff's counsel has not explained why such extensive correspondence and status updates were required in the first instance (or why a second, or in some cases third, client contact or update was required). To the extent possible, the time spent corresponding between counsel and client was accounted for in the original lodestar amounts, namely in the "manifestly ineligible" and "dispositive motion" sections of this Memorandum Decision. Contrary to Defendant's arguments, however, there is no reason to further reduce the lodestar amount beyond the original reductions. Any excessive correspondence and communication between Mr. Lee and his client has been accounted for. Any further reduction is duplicative and unnecessary. Defendant's other concerns are adequately addressed in the multiplier analysis.

[75] The parties sharply disagree over whether Federal or California law controls the multiplier analysis. (Doc. 425 at 14:15-15:15; Doc. 432 at 14:28-16:4.) Plaintiff argues that California law governs the multiplier analysis. Defendant contends the discussion is controlled by U.S. Supreme Court precedent, including *Perdue v. Kenny A.*, --- U.S. ----, 130 S.Ct. 1662 (2010). Although the general jury verdicts and other circumstances in this case demand a deeper analysis than provided in Plaintiff's

the results obtained by plaintiff's counsel; (2)  the skill and quality of representation;   (3) the novelty and difficulty of the questions involved; (4) the extent to which the litigation precluded other employment by the attorneys; and (5) the contingent nature of the case.  *See, e.g., Serrano v. Priest*, 20 Cal.3d 25, 49 (1977); *Lealao v. Beneficial California, Inc.*, 82 Cal. App. 4th 19, 45 (2000); *see also Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).[76]

At the outset, the requested fee multiplier is rejected for all

---

briefing, *Perdue* ultimately does not control the multiplier analysis in this case. *See Bancroft v. Trizechahn Corp.*, No. 02-CV-2373-SVW-FMO, 2006 WL 5878143, at 6 (C.D. Cal. Jan 17, 2006)("Where a plaintiff prevails under both state and federal claims, and where state law permits the award of a multiplier, a federal court may award a multiplier even if such an upward adjustment is not available for the federal claim.")(citing *Mangold*, 67 F.3d at 1478). However, as discussed during oral argument on July 28, 2010, the Supreme Court's reasoning in *Perdue* is persuasive, including the "strong presumption" that a lodestar figure provides adequate compensation, provides useful guidance in considering the reasonableness of an award of attorneys' fees.

[76] The lodestar "adjustment" analysis under federal law is slightly different from that under state law. Specifically, since first articulating twelve relevant enhancement factors in Kerr, the Ninth Circuit subsequently stated that only those Kerr factors-approximately seven-that are not subsumed within the initial lodestar determination (which initial determination coincides with the majority of the factors just listed) are relevant to analyzing the propriety of any upward or downward adjustment. *See Morales v. City of San Rafael*, 96 F.3d 359, 364 fn. 9 (9th Cir. 1996). Additionally, the viability of the "contingent fee" factor has been called into question by the Supreme Court's decision in *City of Burlington v. Dague*, 505 U.S. 557 (1992). Because the court must construe the applicability of California's fee-shifting statutes under state law, however, the foregoing listed factors nonetheless remain relevant to the enhancement determination here.

the reasons cumulatively discussed in this Memorandum Decision and during oral argument on July 28, 2010. *See Ketchum*, 104 Cal. Rptr. 2d 377 ("the trial court is not required to include a fee enhancement to the basic lodestar figure for contingent risk, exceptional skill, or other factors, although it retains discretion to do so in the appropriate case."). Plaintiff has not come close to meeting his burden to demonstrate that the issuance of a multiplier - in addition to the requested lodestar amount - represents a "reasonable" award of attorney's fees in consideration of the claims for which an award of fee's is permitted. *See Ketchum*, 24 Cal.4th at 1138 (the party seeking a fee enhancement bears the burden of proof).

Plaintiff has not established that he is entitled to a lodestar multiplier based on exceptional results.[77] Although counsel in this case secured a jury verdict in Plaintiff's favor, the recovery was limited to approximately 12% of the economic damages he requested from the jury.  (See Doc. 451 at 39:24-39:25)("Total Past and Present Value of Future Losses Net of Offsets [is] $4,241,670.") As support for the "exceptional success" factor, Plaintiff submits the declaration of attorney Paul Greenberg.  However, for the reasons discussed *supra*, and others, Mr. Greenberg's declaration is

---

[77] Relevant to the skill and results factors, Plaintiff's motion mischaracterizes the record:  "Counsel achieved this result despite the fact that highly prejudicial evidence was admitted which violated the Court's post-trial order granting all of Dr. Jadwin's motions in limine."  (Doc. 425 at 21:17-21:18.)   As explained, this evidence was admitted over Plaintiff's objection during oral argument on the motions in limine.  The erroneous order upon which Plaintiff relies, docketed seven weeks after trial, was vacated on July 28, 2010.

1    unpersuasive and fails to demonstrate that the verdict in this

2    matter was an exceptional result.   *Compare Leuzinger v. County of*

3    *Lake*, No. C-06-00398 SBA, 2009 WL 839056, at 10 (N.D. Cal. Mar 30,

4    2009)([Plaintiff] proffered declarations from two attorneys with

5    extensive employment law litigation experience, one of whom also

6    reviewed verdict databases, and each of which declares that the

7    $1.67 million verdict in this matter was an exceptional result.").

8    This factor does not support a multiplier.[78]

9        The next factor is the skill in presenting the various relevant

10   legal arguments.   In *Ketchum v. Moses*, 24 Cal.4th 1122, the

11   California Supreme Court stated that: "Courts should only award

12   multipliers for exceptional representation when the quality of

13   representation exceeds the quality of representation that would have

14   been provided by an attorney of comparable skill and experience."

15   For the reasons discussed throughout this Memorandum Decision and

16   other Orders/Memorandum Decisions on file in this case, Plaintiff's

17   counsel's representation was far from exceptional.   His inexperience

18   and unduly disputatious nature required special judicial attention

19   as evidenced by the post trial motions it engendered.   The

20   qualifications and skill level of Plaintiff's counsel were fully

21   considered in determining the original lodestar figure.   Based on

22

23       [78] In *Maher v. City of Fresno*, No. 08-CV-00050-OWW-SMS, the
     jury returned a $2,500,000 verdict for a female firefighter
24   candidate wrongfully discharged from the fire fighter academy.
     There, Plaintiff's very experienced and highly competent counsel,
25   with over 30 years of trial experience, recovered approximately
     $900,000 in attorney's fees after a settlement on appeal.
26   Plaintiff's counsel had tried many employment and civil rights
     cases to verdict, receiving a number of multimillion jury awards,
27   as high as $19 million.

28

1  conduct, **experience, and success rate on all motions and trial, Mr.**

2  **Lee is in the lowest quartile of trial attorneys appearing in this**

3  **Court.  This factor weighs heavily against awarding a multiplier.**

4      **The same reasoning applies to Plaintiff's characterization of**

5  **this case as novel and "inherently challenging."  A review of the**

6  **record indicates that the case was a garden-variety employment case**

7  **involving mental disability under state and federal Family Leave**

8  **Acts and constructive termination claims.   Before the lawsuit,**

9  **Plaintiff was paid his full contract compensation, except as**

10  **department Chair and additional professional fee income he could not**

11  **earn because was on medical leave.   The litigation and trial were**

12  **contentious and required fact gathering, but did not involve any**

13  **novel or particularly complex legal issues.   The employment and**

14  **disability issues inherent to this litigation have been litigated**

15  **many times and the law on the subject is well-established.   A**

16  **disproportionate amount of the "complexity" in this case was a**

17  **direct result of Plaintiff's counsel's difficulty grasping the**

18  **relevant legal principles (and the Court's Orders) and his total**

19  **inability to observe his professional responsibilities to aid the**

20  **court, be courteous and respectful to all, and not to unnecessarily**

21  **multiply the proceedings.  Plaintiff's lead counsel, Mr. Eugene Lee,**

22  **provides the last word:    "[This] litigation proved to be**

23  **extraordinarily complex, difficult and _onerous for me_." (Doc. 425-1**

24  **at ¶ 7)(emphasis added).   No multiplier to the lodestar amount is**

25  **justified based on the alleged uniqueness or complexity of the case.**

26      **Plaintiff also argues that he is entitled to a multiplier**

27  **because of the contingent risk of the litigation.   The Court in**

28  **122**

*Weeks v. Baker & McKenzie*, 63 Cal. App. 4th 1128 (1998), a case involving a request for attorney's fees and a multiplier based on the FEHA, reconciled the Serrano cases and discussed the "contingency" factor of the multiplier analysis:

> Looking first to the contingent nature of the award, as has already been discussed, the situation here is unlike that in the Serrano cases, where it was uncertain that the attorneys would be entitled to an award of fees even if they prevailed. Government Code section 12965, subdivision (b) created a reasonable expectation that attorney fees would not be limited by the extent of Weeks's recovery and that Weeks's attorneys would receive full compensation for their efforts. The contingent nature of the litigation, therefore, was the risk that Weeks would not prevail. Such a risk is inherent in any contingency fee case and is managed by the decision of the attorney to take the case and the steps taken in pursuing it.

*Id.* at 1175.

That language applies with equal force to the facts of this case. *Cf. Ketchum*, 24 Cal.4th at 1138 ("[t]he trial court is not required to include a fee enhancement to the basic lodestar figure for contingent risk."). Moreover, Plaintiff's lead counsel has mentioned in his declarations that Dr. Jadwin, who continued to receive his contract rate of compensation thru the end of the term of his contract, has paid Plaintiff's counsel for legal services, although the full amount paid is not described.

Plaintiff argues that a multiplier is justified because counsel had to turn down other work for handling this case. But Plaintiff's counsel have not provided any specific examples for work they turned away. Mr. Lee has identified no cases or prospective clients. In any event, the hours counsel spent on this case will be compensated.

Applying these factors, a multiplier is not appropriate under

1  the totality of the circumstances in this case.  The litigation was
2  not exceedingly novel and counsel did not demonstrate "exceptional
3  skill."  Plaintiff prevailed on nine causes of action, however, it
4  translated into a monetary award of less than 12% of the amount he
5  requested the jury award.  Even if there was some contingency risk
6  involved, it in no way merits a multiplier.

7  Plaintiff's string citation to "reasonable fee" and
8  "multiplier" cases does not assist.  For example, Plaintiff cites
9  Green v. City of Los Angeles, a Los Angeles Superior Court decision,
10 stating: "the court [in Green] awarded costs of $35,000 and
11 attorney's fees of $461,500.00, using a multiplier of 2.0."  (Doc.
12 425 at 23:9-23:10.)  This citation - and others - are unpersuasive.
13 Courts in California (federal and state) have awarded multipliers
14 greater than one for successful cases brought under federal and
15 state law, placing special emphasis on the exceptional results
16 obtained.  See, e.g., *Leuzinger v. County of Lake*, 2009 WL 839056,
17 at 10-11 (in a disability and employment discrimination case,
18 awarding a 2.0 multiplier based on exceptional results - jury award
19 of $1,679,001);  *Donovan v. Poway Unified School Dist.*, 167
20 Cal.App.4th 567, 628 (2008) (awarding a 1.25 multiplier in light of
21 the case's difficulty and risk, but declining to grant the 1.7
22 multiplier plaintiffs had requested).  However, when a case did not
23 present novel or complex issues or counsel's skill was
24 unexceptional, the courts have not awarded a multiplier.  See, e.g.,
25 *James v. Cardinal Health 200 Inc.*, No. ED-CV-09-00695-JRG-SHx, 2010
26 WL 4796931, at 4 (Nov. 22, 2010)("The plaintiff has not established
27 that she is entitled to a lodestar multiplier [] [a] review of the

28

1  record indicates that the case did not involve any novel or

2  particularly complex issues."); *see also Perez v. Safety-Kleen*

3  *Systems, Inc.*, No. C-05-5338 PJH, 2010 WL 934100, at 9 (N.D. Cal.

4  Mar. 15, 2010)("court cannot conclude that the quality of counsel's

5  representation exceeds the quality of representation that would have

6  been provided by an attorney of comparable skill and experience,

7  such that a multiplier should be awarded"); *Schultz*, 2010 WL

8  3504781, at 11 (declining to award a multiplier because "this

9  litigation was not unusually complex or risky, nor were there

10  'exceptional circumstances.'"); *Bancroft v. Trizechahn Corp.*, No.

11  02-CV-2373-SVW-FMO, 2006 WL 5878143, at 6 (C.D. Cal. Jan 17,

12  2006)(declining a multiplier because "Plaintiffs' counsel have not

13  established that there was a novel issue involved or that the case

14  was particularly difficult [] [n]or have Plaintiffs shown that

15  counsel used skill above and beyond what is normally expected of

16  attorneys with their level of experience."). Here, counsel's trial

17  performance, skill, and decorum was deficient compared to that of

18  attorneys regularly trying cases in this court. This was

19  acknowledged during trial by a number of apologies by Mr. Lee for

20  lack of experience and not following the rules.

21      Three trial exchanges are illustrative. The first took place

22  on June 2, 2009, during Mr. Lee's cross-examination of Mr. Robert

23  Burchuk, the County's forensic psychiatrist:

24

25  Q:   The point is: Is that you had Dr. Reading's full
        report, which disclosed all of this Fort Hood
26      information. You had that. Okay? If Dr. Jadwin
        wasn't forthcoming with it, wasn't it incumbent on
27      you to draw that information out for him? Knowing
        you had his report.

28

125

1    A:    A standard approach to psychiatric interviewing is
           to begin with open-ended questions. To invite an
2          individual to share information based on a general
           question and then to more specifically ask
3          questions based on what they disclose. And then on
           other sources of information that you may have that
4          may contradict information that they've provided
           you.
5
     Q:    And your success in eliciting that information from
6          Dr. Jadwin, can you automatically ascribe that to
           being Dr. Jadwin's fault or could it have been due
7          to your lack of skill as an examiner?

8    A:    I don't believe that to have been the case.

9    Q:    *Naturally*. And --

10         THE COURT: Now, do you realize what you just did,
           Mr. Lee?
11
           MR. LEE: I apologize, Your Honor. I'll --
12
           THE COURT: I'm going to ask you, please --
13
           MR. LEE: Yes, Your Honor. Absolutely.
14
           THE COURT: -- to follow the rules.
15
           MR. LEE: Yes, Your Honor.
16

17   (RT, June 2, 2009, 24:15-25:13)(emphasis added).

18       A short time later, after excusing the jury, Mr. Lee was

19   instructed on the rules of courtroom decorum and tenets of

20   professionalism relevant to cross-examination, in particular, that

21   examining counsel shall not repeat, echo or comment on the witness'

22   statements:

23   Court:    Now, we're outside the presence of the jury. And
               Mr. Lee, I want to remind you that as part of the
24             [written] courtroom decorum rules, and I have
               mentioned this to you before. That the examination
25             of witnesses includes number 13, "In examining a
               witness, counsel shall not repeat, comment on or
26             echo the answer given by the witness." And I -- I
               don't know if you're doing this intentionally,
27             though, because I have mentioned it to you before.

28
                              **126**

1

2

3

4

But candidly, bad actor lawyers, this is a tactic to prejudice the witness in the eyes of the jury and to, in effect, to upset the level playing field. It's misconduct. So I'm not ascribing this to you, but I don't understand why you're unable to follow my direction.

Mr. Lee:   Your Honor, I apologize. And it will stop.  It's just like with the "removal" versus "demotion." I made a very concerted effort never to say the word "demotion" again and I think I've done that. I will assure you that this conduct will also stop. It's completely inadvertent, Your Honor, and I think it only happened today and I'll stop it.

Court:   All right.  And the -- there is another tendency that you need to work on as well. And that is making a comment like the "Naturally."

Mr. Lee:   Yes.

Court:   In other words, it was expressed in a sarcastic tone.  And what that is, we are governed in our society by the rule of law.  And these jurors are here invested with the high purpose of following the law and doing justice. We don't have any chance of that happening if the attorneys who are officers of the Court, and who are bound by professional rules of conduct and ethics, if they do not demonstrate respect for the witness, respect for the process and respect for the law, then we're not going to have a legal system that anybody has any regard for.  And the fact that somebody is your adversary and we have an adversarial system, the fact that there are two sides to a lawsuit never means that you lose your professionalism, that you don't extend courtesy, and that you don't treat your adversary with the same respect that you want your client and yourself to be treated with by the Court and by other officers of the Court.

And so candidly, I don't want to have to do something about this, but I do want you to come to your senses and basically be a lawyer.  The rules are in writing.  They've been given to you.  Can you follow them?

Mr. Lee:   Your Honor, I will -- I will eliminate the behavior from this point forward. And the only thing I'll say is that, Your Honor, it's completely inadvertent. I must emphasize this is really my first trial and a lot of stuff is going

127

on. But that's not an excuse and it will stop, Your Honor. It will stop.

Court:     All right. Thank you. Again, I believe that I have been patient and that I have been indulgent. And as I said, I'm trying to protect your client's rights here as well. Because Dr. Jadwin is just as entitled to a fair trial in this case as the defendants are.

Mr. Lee:  Absolutely, Your Honor.  Thank you.

(Id. at 33:13-35:19.)

The final illustration is Mr. Lee's "big versus small" reference during closing argument, which improperly appealed to bias and emotion.  Mr. Lee's comments and the Court's *sua esponte* admonition were discussed in section III(A), *supra*, in the context of the County's motion for a new trial.[79]  Although the statements

---

[79] During his closing argument, Mr. Lee stated:

And you know, we've heard Dr. Jadwin, how he is supposedly a millionaire, this and that. You know, in the end, he's just an individual, it's just one person against an entire County and all of its resources that we faced in this case. But I will tell you, it's very important that even a powerful organization such as the County understand that in a court of law, everybody's equal.

(RT, June 4, 2009, 81:10-81:17.)

The Court, *sua sponte*, immediately instructed the jury to disregard Mr. Lee's statement:

And I must say, ladies and gentleman, that an appeal to status, big versus little, strong versus weak, is improper under the law and you should disregard any such suggestion.

(RT, June 4, 2009, 81:23-82:1.)

did not ultimately control the *Settlegood* analysis, they arrived after countless admonitions and warnings, an in-court review of the federal rules of evidence and rules of courtroom decorum, and Mr. Lee's repeated apologies and pronouncements that he would follow the applicable rules of evidence/decorum.   These clarifying examples are a narrow sampling of the admonitions/instructions concerning professionalism and courtroom decorum given to Mr. Lee during the different stages of litigation in this case.

Plaintiff's request for application of a 2.0 multiplier is DENIED.   No multiplier was earned as not one of the justifying factors is present.

### f.   *Hours   Expended   in   Drafting   Fee   Motion ("Fees-on-Fees")*

Plaintiff requests "reasonable fees" to compensate his counsel for the preparation of the motion for attorney's fees.   According to Ms. Herrington, she spent 56.3 preparing the "first" fee petition.   Mr. Hicks, Plaintiff's fee counsel, spent five hours preparing his declaration.   Mr. Lee, however, does not provide a separate task total or an explanation why one was not included.

For all the reasons discussed in this Memorandum Decision and during July 28, 2010's oral argument, Mr. Lee is awarded no "fees on fees."   He is awarded ten hours time for his travel and attendance at the July 28, 2010 hearing, nothing more.

Mr. Lee's post-trial briefing was underdeveloped and willfully, perhaps intentionally, non-responsive to the Court's

requests for supplemental billing information, which were expressly made to afford Plaintiff a full opportunity to justify and prove his attorney's fees request and to comply with Ninth Circuit law. The relevant legal standards for fee motions were not addressed or taken into consideration. This course of conduct had a considerable impact on the Court's ability to resolve the fee issues in a correct and timely manner. More critical to the analysis, Mr. Lee did not consider the impact his actions had on the County's ability to oppose the motion. His conduct placed the County at a considerable disadvantage.

Plaintiff is only entitled to recover fees that are reasonable. *See Serrano*, 32 Cal.3d at 635; *Ketchum*, 24 Cal.4th at 1137. With respect to "fees on fees," that number is ten hours. Mr. Lee, however, is awarded an additional 15 hours for the time spent preparing the other post-trial motions, for a post-trial total of 25 hours.

To account for the general lack of detail and excessive time spent preparing the original fee motion, among other concerns, Ms. Herrington is awarded 20 hours for time spent on the original attorney's fee motion, including travel and attendance at the July 28, 2010 hearing. Mr. Hicks is awarded four hours.

No additional "fee on fee" time is awarded, i.e., no time is awarded to any counsel concerning the supplemental fee motions/replies, which were necessitated by Plaintiff's counsel's failure to properly support and document the motion.

g. *Graphical Summary*

| NAME | HOURS | HOURLY RATE | LODESTAR AMT |
|------|-------|-------------|--------------|
| Lee | 1,477.8 (not including travel) | $275 | $ 406,395.00 |
| Lee (travel) | 13.8 | $200 | $ 2,760.00 |
| Herrington | 326.5 (not including travel) | $350 | $ 114,275.00 |
| Herrington (travel) | 39 | $200 | $ 7,800.00 |
| Minger | 10.0 | $295 | $ 2,950.00 |
| Hicks | 4.0 | $380 | $ 1,520.00 |
|  |  |  |  |
| TOTAL | 1,871.1 |  | $ 535,700.00 |

//

//

//

//

//

//

//

//

//

//

131

1

**IV.   CONCLUSION.**

2   **Judges are experts in the matter of attorney's fees. *See,***

3   ***e.g., Hancock Laboratories, Inc. v. Admiral Ins. Co.*, 777 F.2d 520,**

4   **525 (9th Cir. 1985).[80]  In over 43 years in jury trials and almost**

5   **20 years on the bench, in cases of monumental complexity with**

6   **exceptionally qualified and experienced counsel, Plaintiffs' fee**

7   **request is the highest ever made.  Contrary to the law's intent to**

8   **limit attorneys' fee litigation, this motion has become a case**

9   **within a case.**

10

11       **For all the reasons stated above:**

12   **1.   Defendant's Motion to Amend the Judgment has been**

13        **resolved pursuant to separate ORDER; the judgment is**

14        **amended to reflect the dismissals with prejudice of Mr.**

15        **Bryan and Dr. Harris;[81]**

16   **2.   Defendant's Motion for New Trial on all grounds is**

17        **DENIED;**

18   **3.   Plaintiff's Motion for Pre-Judgment Interest is GRANTED**

19        **in part in the amount of $15,022.27;**

20   **4.   The judgment is AMENDED to include an award of**

21        **post-judgment interest at the federal treasury rate, from**

22

23   ─────────────────

24   [80]   A trial court has broad discretion to determine the
      reasonable amount of an attorney fee award, including whether to

25   increase or decrease the lodestar figure. *Nichols v. City of Taft,*
      155 Cal.App.4th 1233, 1240 (2007).

26
     [81] On August 12, 2010, Defendant's motion to amend the judgment

27   was granted as to Defendants Peter Bryan and Irwin Harris only.
      (Doc. 445.)  Defendant's motion was, in all other respects, denied.

28

1  the date of the judgment to the date of satisfaction of
2  the judgment.

3  5.   The Bill of Costs is decided by separate memorandum
4  decision;

5  6.   Plaintiff's motion for attorneys' fees is GRANTED.

6  7.   Plaintiff is awarded $535,700.00 in attorneys' fees as
7  follows:

8  a.   Eugene Lee - $ 409,155.00

9  b.   Joan Herrington - $122,075.00.

10  c.   Marilyn Minger - $2,950.

11  d.   David Hicks - $1,520.

12

13  Plaintiff shall submit a form of order consistent with, and
14  within five (5) days following electronic service of, this
15  Memorandum Decision.

16

17  SO ORDERED.

18  Dated: January 24, 2011

19

20                                          /s/ Oliver W. Wanger
                                            Oliver W. Wanger
21                                          U.S. District Judge

22

23

24

25

26

27

28

**133**